1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17
18

| | |
|---|---|
| **ROGELIO CUEVAS ESPINOZA,** | Civil No.      10-cv-0397-WQH(BGS) |
| **Petitioner,** | |
| | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| **vs.** | |
| **MATTHEW CATE,** | |
| **Respondent.** | |

19
20
21
22
23
24
25

        Rogelio Cuevas Espinoza ("Espinoza"), a state prisoner proceeding pro se and in forma pauperis with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"), seeks relief from his March 2006 convictions in San Diego County Superior Court Case No. SCS158094 of mayhem and assault with a semi-automatic firearm.  He is serving a sentence of  29 years to life for those convictions.  The California Court of Appeal affirmed the judgment, and the California Supreme Court summarily denied his petition for review.  He unsuccessfully sought collateral relief in the state supreme court before filing his federal Petition.  (Lodgment Nos. 9, 10.)

26
27
28

        Respondent concedes that Espinoza exhausted his state-court remedies by presenting all his Petition claims to the California Supreme Court in his petition for review or his petition for writ of habeas corpus to that court, but opposes federal habeas relief on any of his six claims.  (Ans. 2, ECF

No. 16.)[1]  Respondent argues that Petition Grounds One and Two are not cognizable and must be dismissed because they fail to present a federal question, and that the other claims were reasonably rejected by the state courts on the merits, a result entitled to deference here.  (Id.)  The Court granted Espinoza several extensions of time to reply to the Answer.  On September 7, 2010, he filed a Motion For Stay And Abeyance.  (ECF No. 21.)  The Motion was denied as unnecessary.  (ECF Nos. 27, 28.)  He then filed a Traverse and an Amended Traverse.  (ECF Nos. 33, 35.)  After review of the trial transcript and other pertinent portions of the record, in consideration of controlling federal authority, it is recommended that the Petition be **DENIED**, for the reasons discussed below.

## I.      BACKGROUND

### A.      Factual Background

In its March 12, 2008 reasoned decision affirming the judgment, the California Court of Appeal summarized Espinoza's trial and the judgment.

> During a party to celebrate the baptism of his wife's nephew, Rogelio Cuevas Espinoza repeatedly fired a semi-automatic handgun.  One of the bullets hit Pedro Arturo Rivera in the eye.  A jury convicted Espinoza of mayhem involving the intentional and personal discharge of a firearm that caused great bodily injury (Pen. Code §§ 203, 12022.53, subd. (d)), and assault with a semi-automatic firearm involving the personal use of the firearm and personal infliction of great bodily injury.  (Id., §§ 245, subd. (b), 12022.5, subd. (a)(1); 12022.7, subd. (a)).  The jury deadlocked on a count of attempted murder and the court declared a mistrial on that count.  The court sentenced Espinoza to a four-year middle term for mayhem and a consecutive term of 25 years to life for personally discharging a firearm and causing great bodily injury during the mayhem.  (Id., § 12022.53, subd. (d).)  The court stayed the remaining terms for the other counts and enhancements.  (Id., § 654.)

(Lodgment No. 6, People v. Cuevas Espinoza, Case No. D049505, pp. 1-2.)

> A presumption of correctness attaches to state court determinations of factual issues. 28 U.S.C. §2254(e)(1).  Espinoza does not dispute the evidentiary summary provided by the court of appeal.

> On March 10, 2001, Rosea Barajas gave a party at a hall in National City to celebrate the baptism of her son.  Barajas's sister, who was married to Espinoza, was the child's godmother.  Espinoza attended the party but there was conflicting evidence about whether he was expected there.  [Arturo, also known as Pedro] Rivera and his brother, Adan Rivera, were told Espinoza would not attend the party.  The Rivera brothers would not have attended had they believed Espinoza was going to be present because there were ill feelings between Adan and Espinoza due to a fight between the two about a year earlier.

---

[1]  Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

Soon after the Rivera brothers arrived at the party, a fight erupted inside the hall involving them, Espinoza and others. There was conflicting evidence as to whether Adan or Espinoza started the fight. Eventually, other people intervened and broke it up. Espinoza was injured during the fight, and one witness described seeing a gash above his eye. Adan believed he had broken Espinoza's nose because he was bleeding profusely. Barajas told all of them to leave. Espinoza went out a back door of the hall while the Rivera brothers and others went out the front entrance.

Soon thereafter, Espinoza approached the Rivera brothers with a semi-automatic gun in his hand. Adan ran back toward the hall. Espinoza fired into the air. There was evidence Espinoza pointed the gun at Rivera, fired at Rivera's feet or lower body, fired at the ground, fired toward the crowd of people outside the hall and fired toward Rivera as he fled. Some people struggled with Espinoza for the gun. A woman who lived near the hall heard a man yell, "I'm going to kill you, motherfucker." She saw the man chasing Rivera and shooting at him, while Rivera crouched behind a truck.

Rivera was shot in his right eye and lost his eye as a result. There was not stippling or burning around the entrance wound, indicating the bullet was fired from a distance of more than three or four feet.

The police recovered eight cartridge casings and a bullet fragment, all of which had been fired from the same gun. Based on the distribution of the cartridge casings, the shooter had been moving while the gun was fired.

A number of people from the party went to the police station to be interviewed. Espinoza's wife told the group, "nobody rats, nothing will happen." The interviews were taped.

Espinoza fled into Mexico. In 2005, however, while the police were conducting a surveillance of a house in San Diego, they saw Espinoza driving a car with expired registration tags and stopped him. Espinoza was very nervous, and he provided the officers with a driver's license in the name of Victor Gallego and said the car belonged to a female friend. The police suspected the identification was false and conducted a records check. As soon as Espinoza heard he was going to be arrested, he knocked one of the officers to the ground and fled across a busy street. He was arrested nearby in a culvert.

(Lodgment No. 6, pp. 2-4 (footnote omitted).)

Espinoza's defense was that the shooting was an accident as he tried to frighten away his assailants, after they beat him inside the hall then mobbed him again outside while he was still disoriented from the beating and attempting to flee. His case in chief consisted entirely of his own trial testimony. As summarized by the court of appeal:

Espinoza testified Barajas invited him to the party because his wife was going to be the child's godmother. He arrived early at the party because his wife said they needed help, but before contacting his wife, he had something to eat at the hall. About 20 to 40 minutes later, he started looking for his wife. He did not find her inside the hall, and he was about to look outside when the Rivera brothers and others arrived. Espinoza indicated to Adan that he wanted to go outside. Adan, without warning, punched Espinoza. Espinoza defended himself.

3

After the fight ended, Espinoza went out the back door of the hall.  He had been badly beaten and was afraid and confused.  His uncle told him the Rivera brothers wanted to kill him, handed him a gun and showed him how to use it.  As Espinoza walked toward his car, the Rivera brothers and other people confronted him.  He fired the gun into the ground and into the air to keep them away.  He was surrounded by people who were trying to get the gun from him, and he believed they would harm him if they got the gun.  During the struggle, the group moved him into the street; he stumbled but did not fall as they went over the curb.  He fired the gun until it would fire no more.  He also testified the gun fired because people were "yanking" at his hand. Someone yelled "Policia" and everybody dispersed.  Espinoza ran to his car and drove home.  He did not turn himself in because he was afraid he would be imprisoned even though he was innocent.

(Lodgment No. 6, pp. 4-5; *see* Lodgment No. 2, RT vol. 5, pp. 675-765.)

B.    **Procedural History**

This Court summarized the post-trial proceedings in its April 18, 2012 Order granting Espinoza's motion to consider his Amended Traverse as the operative response to the Answer.

Thereafter, Espinoza appealed the convictions in the Fourth District of the California Court of Appeal. (Lodgs. 3–5.) According to Espinoza, reversal was required because the trial court: (1) erroneously admitted audio tape recordings of police interviews of witnesses as prior inconsistent statements; (2) allowed the jury to listen to these tapes during deliberation, constituting receipt of extraneous matters not in evidence, and instructed the jury on the use of the prior statements; and (3) denied his motion for a new trial on an erroneous basis. (Lodg. 3, at 18, 38, 50; Lodg. 6, at 2.) Espinoza's reply brief concluded: "The entire judgment should be reversed on multiple grounds of federal constitutional due process and jury error . . . ." (Lodg. 5, at 24.) The state appellate court unanimously affirmed the trial court's decision. (Lodg. 6, at 16.)

Subsequently, Espinoza sought review of the appellate court's decision before the California Supreme Court. (Lodg. 7.) Espinoza maintained that review was warranted because: (1) the "case presents a unique opportunity . . . to delineate the boundaries of cases in which use of batches of tapes can deny federal constitutional due process"; and (2) "[e]xtraneous evidence heard by even one juror denies a defendant his Sixth Amendment right to an unbiased jury," and therefore, "the treatment of even accidental slips in what is given the jury [i]s federal constitutional error." (*Id.* at 24, 31–32.) On June 25, 2008, the California Supreme Court denied Espinoza's state petition without comment. (Lodg. 10.) Espinoza has raised both of these grounds for relief in his federal petition.  (Pet. at 6-7; Pet. 1, ECF Doc. No. 1.)

On August 31, 2009, Espinoza filed a Petition for Writ of Habeas Corpus with the California Supreme Court ("S[t]ate Petition"). (Lodg. 9.) The state habeas petition raised claims alleging ineffective assistance of trial and appellate counsel.  The California Supreme Court denied the state petition without comment.[2]  (Lodg. 10.)

_____

[2]  Espinoza joined an October 23, 2009 Motion For Discovery And Interrogatories with his habeas petition to the California Supreme Court, Case No. S175936 (Pet. Appendix B, pp. 27-37, 39-45, ECF No. 1-1) seeking, among other things, evidence to substantiate his ineffective assistance of counsel claims. His post-trial pro se discovery motion failed twice in the superior court (*see* Pet. Exh. 3, ECF No. 1-2, pp. 2, 6), and he received no evidentiary hearing or other response to that Motion when the supreme court summarily denied his habeas petition on February 10, 2010. (Pet. 4, ECF No. 1; Pet. Appendix A, p. 24, ECF No. 1-1.) His argument that "the prosecution has refused to answer petitioner's discovery, dated June 24, 2008, which would

4

1    Espinoza also included these claims in his federal petition. (Pet. 8–9; Lodg. 9, at 3–4.)

2    (ECF No. 39, p. 2)   The Court also summarized the procedural history of Espinoza's federal case:

3         On February 18, 2010, Espinoza filed a Petition for Writ of Habeas Corpus in
     this court.  (Pet. 1; ECF Doc. No. 1)  Espinoza asserted six grounds for review:  (1)
4    whether the trial court denied Espinoza due process and a fair trial by admitting, over
     objection, audio recordings and corresponding transcripts of police interviews of
5    witnesses; (2) whether supplying the jury with the tapes during deliberation constitutes
     reversible error as receipt of extraneous matters under federal law; (3) whether
6    Espinoza's Sixth Amendment right to effective counsel and Fourteenth Amendment
     due process rights were violated when trial counsel failed to interview eyewitnesses;
7    (4) whether Espinoza's Sixth Amendment right to effective assistance of counsel and
     Fourteenth Amendment due process rights were violated when appellate counsel
8    refused to raise an ineffective assistance of counsel claim against trial counsel; (5)
     whether the prosecution's alleged failure to comply with the requirements of *Brady v.
9    Maryland* violated Espinoza's due process rights, warranting a reversal of the
     conviction; and (6) whether Espinoza was denied his Sixth Amendment right to
10   effective counsel when trial counsel failed to investigate, consult, or otherwise utilize
     a ballistics expert at trial.  (*Id.* at 6–9.)

11
         Respondent filed an answer on May 28, 2010.  (Ans., ECF Doc. No. 16.)
12   Respondent stated that Espinoza has exhausted state-court remedies and asks that
     Espinoza's petition be denied on the merits.  (*Id.* at 2.)  In addition to arguing that the
13   court should deny Espinoza's petition because the state court decisions are entitled to
     deference, Respondent submitted that ground one and ground two must be dismissed
14   because they are not cognizable federal claims.  (*Id.*)

15        On September 7, 2010, Espinoza filed a motion for stay and abeyance pursuant
     to *Rhines v. Weber*, 544 U.S. 269 (2005).  (Pet'r's Mot. Stay and Abey., ECF Doc. No.
16   21.)  Espinoza contended that grounds one and two were not cognizable federal claims
     because he did not exhaust these claims before filing his federal petition.  (*See Id.* at
17   2.)  In order to avoid running afoul of the applicable statute of limitations, Espinoza
     asked that his petition be stayed and held in abeyance while he fully and fairly presents
18   these claims to the highest state court.  (*Id.* at 4.)

19   (ECF No. 39, p. 3.)

20        By Order entered September 15, 2011, the district judge assigned to this case adopted the

21   Report and Recommendation to deny Espinoza's stay and abeyance motion, finding that Grounds One

22   and Two plead cognizable federal claims and that they were exhausted before he filed his Petition.

23   (ECF Nos. 27, 28.)  Espinoza filed a Traverse then moved on January 10, 2012 to amend it.  (ECF

24   Nos. 33, 35.)  On January 19, 2012, he filed a Request For Judicial Notice of the Amended Traverse,

25   citing an inapposite federal rule of evidence.  (ECF No. 38.)  This Court granted his request to

26   substitute the Amended Traverse pursuant to Fed. Rule Civ. Proc. 15(a)(2).  (ECF No. 39.)

27   \\

28   _____
     be used in this petition"  (Pet. ECF No. 1-11, p. 59) is a state law complaint not cognizable here.

## II.    DISCUSSION

### A.    Legal Standards For Federal Habeas Relief

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a) (West 2006). Federal habeas courts do not "reexamine state-court determinations on state-law questions" because "state-law violations provide no basis for federal habeas relief."  Estelle v. McGuire, 502 U.S. 62, 68, n.2 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law"); *see also* Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990) (federal courts "have no authority to review a state's application of its own laws"); Park v. California, 202 F.3d 1146, 1149-50 (9th Cir. 2000) (same).  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  Bradshaw v. Richey, 546 U.S. 74, 76, (2005).  Moreover, "[a]s a rule, a state prisoner's habeas claims may not be entertained by a federal court 'when (1) "a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement," and (2) "the state judgment rests on independent and adequate state procedural grounds." ' "  Maples v. Thomas, __ U.S. __, 132 S.Ct. 912, 922 (2012) (internal and parallel citations omitted), *quoting* Walker v. Martin, 562 U.S. __, 131 S.Ct. 1120, 1127 (2011); *see* Beard v. Kindler, 558 U.S. __, 130 S.Ct. 612, 617-18 (2009);  *see also* Coleman v. Thompson, 501 U.S. 722, 729-730 (1991) (on federal habeas review, the "court does not review the judgment, but [only] the lawfulness of the petitioner's custody" under federal law).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Espinoza's claims because he filed his federal habeas petition after that statute's 1996 effective date.  Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).  AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7.  Federal habeas corpus is a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 786 (2011), *quoting* Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring).  "As a condition

for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87; *see also* Renico v. Lett, 559 U.S. __, 130 S.Ct. 1855, 1866 (2010) (AEDPA proscribes "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts").

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington, 131 S.Ct. at 784.  Habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see* Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); *see also* Rodgers v. Marshall, 678 F.3d 1149, 1155 (9th Cir. 2012) ("Circuit precedent may provide 'persuasive authority' for purposes of determining whether a state court decision is an 'unreasonable application' of Supreme Court precedent", but "only Supreme Court holdings are binding on state courts, and 'only those holdings need be reasonably applied' ") (citation omitted); Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005).

A decision is "contrary to" clearly established precedents if it " 'applies a rule that contradicts the governing law set forth in our cases' " or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam), *quoting* Williams, 529 U.S. at 405-06 (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test). A decision is an "unreasonable" application if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407-08.  The decision must be "more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' " Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citations omitted); *see* Harrington, 131 S.Ct. at 786, *citing* Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  "[R]eview under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. __, 131 S.Ct. 1388, 1398 (2011).

10cv0397-WQH(BGS)

1    Relief is available under the second AEDPA exception only if the state court result "was based

2    on an unreasonable determination of the facts in light of the evidence presented in the State court

3    proceeding." 28 U.S.C. § 2254(d)(2). "Factual determinations by state courts are presumed correct

4    absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the

5    merits in a state court and based on a factual determination will not be overturned on factual grounds

6    unless objectively unreasonable in light of the evidence presented in the state-curt proceeding." Miller-

7    El v. Cockrell, 537 U.S. 322, 340 (2003). "The question under AEDPA is not whether a federal court

8    believes the state court's determination was incorrect but whether that determination was unreasonable

9    -- a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

10    Federal habeas courts apply AEDPA standards to "the last reasoned decision" by a state court

11    addressing the merits of the claim. Campbell, 408 F.3d at 1170; see also Ylst v. Nunnemaker, 501

12    U.S. 797, 803 (1991). An unexplained denial of a habeas petition by the California Supreme Court

13    is an adjudication on the merits of the federal claims presented and entitled to AEDPA deference

14    unless "there is reason to think some other explanation for the state court's decision is likely."

15    Harrington, 131 S.Ct. at 785; see Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992). As long

16    as the state court reached a "decision" from an "adjudication," a federal habeas court can determine

17    whether the state court decision "resulted from an unreasonable legal or factual conclusion."

18    Harrington, 131 S.Ct. at 784. In that circumstance, federal habeas courts must conduct an independent

19    review applying the AEDPA standards. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002)

20    ("although we independently review the record," federal habeas review "is not de novo" because "we

21    still defer to the state court's ultimate decision"); see also Himes v. Thompson, 336 F.3d 848, 853 (9th

22    Cir. 2003). The petitioner must still show "there was no reasonable basis for the state court to deny

23    relief." Id.

24    In deciding whether relief from an unconstitutional trial error is warranted, federal courts apply

25    the standard from Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) "uniformly in all federal habeas

26    corpus cases under § 2254." Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000); see Fry v. Pliler,

27    551 U.S. 112, 121-22 (2007) (holding "that in § 2254 proceedings a court must assess the prejudicial

28    impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect'

8

1    standard set forth in *Brecht, supra*, whether or not the state appellate court recognized the error and

2    reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in

3    *Chapman*, 386 U.S. 18") (parallel citations omitted).

4        **B.    Evidentiary Hearing**

5        Espinoza requests an evidentiary hearing in the caption of his Petition, incorporating by

6    reference conclusory argument from his unsuccessful request for an evidentiary hearing in the

7    California Supreme Court on collateral review.  (Pet. ECF No. 1-11, p. 69; *see* Lodgment No. 9,

8    "Conclusion".)  AEDPA "substantially restricts the district court's discretion to grant an evidentiary

9    hearing," and prescribes the manner in which federal courts must approach the factual record.  Baja

10   v. Ducharme, 187 F.3d 1075, 1077 (9th Cir. 1999); *see* 28 U.S.C. § 2254(e)(2); *see also* Insyxiengmay

11   v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005).  "[A] determination of a factual issue made by a

12   State court shall be presumed to be correct," with the "applicant [having] the burden of rebutting the

13   presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "If the

14   applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall

15   not hold an evidentiary hearing on the claim unless the applicant shows that . . . the claim relies on . . .

16   a factual predicate that could not have been previously discovered through the exercise of due

17   diligence and . . . the facts underlying the claim would be sufficient to establish by clear and

18   convincing evidence that but for constitutional error, no reasonable factfinder would have found the

19   applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2); Turner v. Calderon, 281 F.3d 851,

20   890-91 (9th Cir. 2002).

21       "Because a federal court may not independently review the merits of a state court decision

22   without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing

23   without first determining whether the state court's decision was an unreasonable determination of the

24   facts." Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005), *citing* Lockyer, 538 U.S. at 71; *see*

25   Schriro, 550 U.S. at 474 ("a federal court must take into account [the § 2254] standards in deciding

26   whether an evidentiary hearing is appropriate").  "In practical effect, . . . this means that when the

27   state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not

28   required to hold an evidentiary hearing.' " Cullen, 131 S.Ct. at 1401, 1399, *quoting* Schriro, 550 U.S.

at 474.  When an issue arises under 28 U.S.C. § 2254(d)(1), "evidence introduced in federal court has no bearing" on the review, and AEDPA limits review "to the record that was before the state court that adjudicated the claim on the merits."  Cullen, 131 S.Ct at 1398, 1400.  If a claim subject to 28 U.S.C. § 2254(d)(1) does not satisfy that provision, it is "unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on th[at] claim."  Id. at 1400, *quoting* Williams, 529 U.S. at 444.  By its terms, 28 U.S.C. § 2254(d)(2) restricts federal habeas review to the record that was before the state court, permitting relief only if the state court reached "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  "[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state court record."  Totten v. Merkle, 137 F.3d 1172, 1176 (1998).

Espinoza fails to satisfy the exacting AEDPA standards he had to meet before  an evidentiary hearing is permissible here.  As demonstrated below, none of his Petition claims satisfies the provisions of 28 U.S.C. § 2254(d)(1).  To the extent he intends to challenge the state court results as based on unreasonable determinations of the facts under 28 U.S.C. § 2254(d)(2), that provision expressly limits this Court's review to the same evidence presented to the state court.  Espinoza's request for an evidentiary hearing should be **DENIED**.

## C.    Ground One:  Evidentiary Challenges To Interview Tapes And Transcripts

### 1.    The Claim

Espinoza incorporates by reference "petition attached at pages 1through 24" as the support for this claim.  (Pet. 6, ECF No. 1; *see* ECF No. 1-11, pp. 2-25.)  Those pages appear to be from his petition to the California Supreme Court for review of the appellate court's opinion affirming his conviction which the state high court summarily denied.  That petition is provided in its entirety as Lodgment No. 7, Case No. S162902, filed April 21, 2008.

The trial court permitted edited tapes of certain witnesses' interview statements to police at the time of the incident, and transcriptions of those excerpts, to be used at Espinoza's trial about five years later as past recollections recorded, prior inconsistent statements, or non-hearsay.  In rejecting certain defense objections, the trial court stated:  "It's clear to this Court . . . that there's been witnesses that have testified either consistent or inconsistent with previous statements and/or testimony.  I think both

counsel have a right to explore why they have changed their testimony today or may be reluctant to testify." (Lodgment No. 2, RT vol. 3, pp. 330-331.) Counsel relied on portions of the audiotapes and transcripts of those excerpts in their examinations and cross-examinations of those witnesses, referring on the record to page numbers, when attempting to impeach or to refresh their recollections. (*See, e.g.*, Lodgment No. 4, RT vol. 4, p. 493, 525-527 ("THE COURT: . . . you both are working from some prerecorded statements. . . .")

Espinoza presented this claim as: "whether the trial court denied petitioner due process and a fair trial, overruling defense objections to the prosecutor playing entire tapes (with accompanying transcripts) of all the recorded police interviews of the witnesses, admitted wholesale over valid defense objections of foundation and Evidence Code section 352." (Pet. ECF No. 1-11, p. 17.) Citing California case law and section 1235 of the California Evidence Code, he alleges prejudicial error in the "wholesale playing of tapes for the jury which admittedly included matters thought [wrongly] to be past recollection recorded, or to provide background for consistent statements, and to provide substantive evidence for the truth of the statements contained in the tapes and transcripts, regardless of whether the statements were inconsistent or not." (Pet. No. 1-11, p. 22.) Espinoza acknowledged in his petition for review that ordinarily, "state evidentiary procedures and rulings do not implicate due process," but represented that his "case presents a unique opportunity for this Court [referring to the California Supreme Court] to delineate the boundaries of cases in which use of batches of tapes can deny federal constitutional due process." (Pet. ECF No. 1-11, p. 25.)

## 2.   State Court Proceedings

The court of appeal summarized the context and background of the evidentiary rulings Espinoza argues in Ground One affected the fairness of his trial, a summary he does not rebut.

> The trial occurred about five years after the shooting and by that time many of the witnesses could not remember all the details of the events or testified to versions that differed from their taped interviews with the police. At trial, the prosecutor examined the witnesses on the statements they made to the police and then sought admission of excerpts from the taped interviews of Rivera's sister Norma Soltero, his cousin Evaelena Soltero, his aunt Joaquina Soltero, Adan, and Barajas on the basis the excerpts were admissible as prior inconsistent statements under Evidence Code section 1235, as past recollection recorded under Evidence Code section 1237, or as nonhearsay statements. Although the defense had copies of the entire interviews for a significant period, it received copies of the final redacted interviews shortly before the hearing.

        The defense filed written objections to the use of the tapes.  At the hearing, defense counsel initially objected to playing the tapes rather than reading the interview questions and answers.  Defense counsel generally conceded that the taped interviews included statements admissible under Evidence Code sections 1235 and 1237, except for Barajas' taped statements, which defense counsel argued were not inconsistent with her trial testimony.  Defense counsel, however, requested the court determine admissibility on a line-by-line basis.  The court agreed, but stated it would be more efficient if defense counsel raised specific objections rather than going through line-by-line of each redacted tape on the record.  Defense counsel told the court he needed an additional 20 minutes to examine the excerpts and the court granted his request.

        Following a recess, defense counsel objected to some of the statements in the taped excerpts.  The court ruled on the individual statements, finding most of the statements were prior inconsistent statements, past recollection recorded or were not hearsay because they were not being admitted for the truth of the matter asserted.

(Lodgment No. 6, pp. 5-6 (footnote omitted); *see* Lodgment No. 2, RT vol. 5, pp. 582-603, 626-635, 641-642.)

The appellate court rejected Espinoza's procedural challenge.  The court first found "the record . . . does not support Espinoza's claim the court admitted the tapes 'wholesale' . . . . because "[t]he proffered tapes did not contain all the police interviews but were limited to selected statements." (Lodgment No. 6, p. 7.)  In addition, the trial court had "considered and ruled individually on each specific objection to statements in the record" retained in the redacted versions of the tapes.  (Id.; *see also* Lodgment No. 2, vol. 9, pp. 1143-1144.)  The trial court had explained to the jury:

    [T]he People are proposing to play some tapes.  These tapes contain statements of witnesses who have testified here before you.  They're being played for your consideration to determine whether or not these previous statements that were recorded were consistent or inconsistent with their testimony before you.  [¶]  Some of the portions have been redacted because the Court felt that they were not relevant.  And you may consider, ah, this tape, this information you're going to hear for the purposes of testing the credibility of the witnesses as well as for purposes of determining whether or not what they said on the former occasion was in fact true.

(Lodgment No. 2, RT vol. 5, pp. 644-645.)

      Each juror was provided with a transcript of each of the redacted recordings during the playback at the trial.  Those transcripts were collected after the tapes were played.  (*See* Lodgment No. 2, RT vol. 5, p. 647.)  The prosecution also called the interviewing police officers to authenticate the timing and context of the recorded statements.  Defense counsel was permitted to cross-examine the officers and the testifying witnesses themselves.  (*See. e.g.*, Id. pp. 644-655, 656-666, 671-674.)  The court of appeal found Espinoza's challenges to the tape excerpts evidence to be without merit.

1    The court of appeal also rejected Espinoza's contention that the court allowed the defense

2    insufficient time to review the interview excerpts to formulate specific objections because "the record

3    reflects that the court gave defense counsel all the time that was requested, that is, 20 minutes," and

4    "[n]othing in the record suggests the court would not have provided additional time had it been

5    requested." (Lodgment No. 6, p. 7 n.3.)  The court of appeal further found Espinoza had waived

6    claims of error in admitting certain other of the excerpts by failing to object contemporaneously.  All

7    those determinations were based on state law applied to the actual trial record after identifying as a

8    misrepresentation Espinoza's contention that the recorded statements used at trial were the "wholesale"

9    police interviews of those witnesses.

10                    **3.      Federal Habeas Relief On Ground One Is Not Available**

11    Habeas relief is available for improperly admitted evidence only if that error rendered the trial

12    so fundamentally unfair as to violate due process.  Estelle, 502 U.S. at 68, 70; *see also* Windham v.

13    Merkle, 163 F.3d 1092, 1103 (9th Cir.1998).  Espinoza does not pursue his evidentiary challenges

14    based on cited federal authority, only vaguely alluding to "federal constitutional due process." (Pet.

15    ECF No. 1-11, p. 25.)  Vague allusions to constitutional rights cannot support federal habeas relief.

16    Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) (holding that a petitioner may not "transform

17    a state law issue into a federal one merely by asserting a violation of due process").  Absent "clearly

18    established Federal law," a federal habeas court cannot conclude the state court's decision was contrary

19    to or an unreasonable application of controlling authority, foreclosing relief under 28 U.S.C. §

20    2254(d)(1).  Carey v. Musladin, 549 U.S. 70, 77 (2006). Espinoza identifies no United States Supreme

21    Court precedent which the state courts unreasonably applied in reaching the result on this issue or to

22    which the result is contrary.

23    The state courts resolved Espinoza's evidentiary challenges applying state law.  In California,

24    failure to object is an adequate and independent state rule foreclosing federal habeas review.  *See, e.g.*,

25    Coleman, 501 U.S. at 729; Park, 202 F.3d 1146.  With respect to the challenges he preserved through

26    contemporaneous objection, the court of appeal demonstrated that each statement was properly

27    admitted under state evidentiary rules.  (Lodgment No. 6, pp. 7-10.)  "[A] state procedural bar may

28    count as an adequate and independent ground for denying a federal habeas petition even if the state

1   court had discretion to reach the merits despite the default." <u>Walker</u>, 131 S.Ct. at 1125, *citing* <u>Kindler</u>,

2   130 S.Ct. 612.  "A federal habeas court will not review a claim rejected by a state court 'if the decision

3   of [the state] court rests on a state law ground that is independent of the federal question and adequate

4   to support the judgment.' "  <u>Beard</u>, 130 S.Ct. 614, *quoting* <u>Coleman</u>, 501 U.S. at 729.

5          Moreover, as observed by the court of appeal, Espinoza relies for this claim on a

6   misrepresentation of the record when he describes the challenged evidence as "wholesale" admission

7   of "all" the witness interviews.  Even if trial error had occurred in connection with the admission of

8   the taped statements, "[a]lthough the [Supreme] Court has been clear that a writ should be issued when

9   constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375, it has

10  not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

11  process violation sufficient to warrant issuance of the writ."  <u>Holley v. Yarborough</u>, 568 F.3d 1091,

12  1101 (9th Cir. 2009).  Federal habeas proceedings cannot be used to set "boundaries" in the

13  presentation of evidence at state trials, as Espinoza proposes occur in connection with Ground One by

14  using the same argument he had presented to the California Supreme Court.  <u>Estelle</u>, 502 U.S. 67-68;

15  *see* <u>Poland v. Stewart</u>, 169 F.3d 573, 584 (9th Cir. 1999).  Considering the entire trial record, it cannot

16  be said that the state court result on this issue was objectively unreasonable, or that the result of the

17  proceeding would have been different absent that evidence.  28 U.S.C. § 2254(d)(2); <u>Brecht</u>, 507 U.S.

18  at 623.  Relief on Ground One should be **<u>DENIED</u>**.

19          **D.    <u>Ground Two:  Provision Of Interview Tapes To The Jury During Deliberations</u>**

20                  **1.    <u>The Claim</u>**

21          Espinoza incorporates by reference "petition attached at pages 25 through 32" as the supporting

22  facts for this claim.  (Pet. 7, ECF No. 1; ECF No. 1-11, pp. 26-33; *see also* Lodgment No. 7.)  He

23  framed this issue in his petition for review as:  "The [California Supreme] Court should review an

24  important and unusual question of law, whether deliberately giving the jury tapes not in evidence

25  during deliberation, constitutes reversible error of receipt of extraneous matters under federal

26  constitutional law."  (Pet. ECF No. 1-11, p. 26.)  He argues "the tapes and transcripts are clearly

27  marked on the official Exhibits List of the case as not being offered or received into evidence as

28  exhibits," nor are they "even placed into the 'ID'd' column in that record, nor is there a mark in the

'Rec'd' column as to either the original or the [somewhat] edited versions of each tape.  ([Lodgment No.] 1 C.T. [vol. 1], p. 24.)" (Id. p. 27.)  He contends that "over strenuous defense objections, the court let the jury have the tapes and a machine to play them" on the basis of the trial court's purportedly erroneous conclusion that the taped evidence "could be given to the jury at their request, in that it was 'part of the record' and only technically not offered or admitted into evidence." (Pet. ECF No. 1-11, p. 26, citing 7 RT 925-933.  He characterizes those materials as impermissible "extraneous information" that was improperly provided to his deliberating jury.

The court of appeal found the trial court erred in ultimately allowing the jury to receive the recordings they had heard in court during the trial along with a playback machine.  (Lodgment No. 6, pp. 14-16.)  However, the court also found "Espinoza waived appellate review of the issue . . . by requesting that the jury hear the tapes and not objecting to the court sending the tapes to the jury room with a tape recorder." (Id., p. 14.)  In addition, the error the court identified was limited to its assessment that the procedure the trial court permitted  "presented a danger the jury would give undue emphasis to the tapes," rather than characterizing the event as an instance of introduction of extraneous information during deliberations.  (Id.)  The court further found that "even without waiver Espinoza's contention lacks merit because he suffered no prejudice and thus any error was harmless" in that the tapes provided had already been played for the jury during the trial.  Id.

Espinoza argues that the appellate court wrongly "minimized [the error] as being other than receipt of extraneous evidence." (Pet. ECF No. 1-11, p. 27.)  He characterizes the jury's notes to the court during deliberations, in particular the impetus for the jury's request for the tapes, in a manner based on wishful speculation about unknowable circumstances.  His argument also misstates the trial court's actual instructions to the jury regarding their use of the recordings.

> Consequently, when the jury had difficulty deciding if petitioner even had the general intent for mayhem or assault, in face of evidence that at least some of the shots were plainly warning shots and/or fired in what prosecution witnesses described as a struggle over the firearm, they asked many questions.  They asked about intent to kill and received no guidance.  They asked to rehear the trial testimony of Ramon Rubio Rodriguez, and Olivia Addison, and to have the tapes and statements which the court and prosecutor had repeatedly told them were part of the evidence, and which the court instructed them were evidence of the truth of everything in the tapes, not just the prior

1    consistent statements.[³]  (6 R.T. p. 806.)  **Nor were they to be satisfied by lesser**
2    **measures of reading what was properly in the record, which was the trial**
     **testimony.  Eventually as noted the court caved in and made a bad situation worse**
3    **by giving the jury tapes and a machine, when the tapes were not in evidence.  (1**
     **C.T. pp. 145-149; 2 C.T. pp. 150-151.)**

4    (Pet. ECF No. 1-11 p. 28 (emphasis in original); *see* Lodgment No. 1, CT vol. 1, pp. 0145-0149.)

5    Espinoza argues that result is "not the law, and th[e] sophistical reasoning [of the court of

6    appeal] circumvents federal due process protections, and calls for review." (Pet. ECF No. 1-11, p. 26.)

7    He attempts to distinguish his circumstances from "extraneous evidence" cases where the error was

8    found to be harmless, given "the central importance of the tapes in this case in helping the jury partly

9    resolve an impasse" and in consideration of defense counsel's "diligent" attempts "to avoid exactly

10   what occurred here . . . ."  (Id., pp. 29-30.)  He also argues the trial court's conduct gave the "jury

11   matters no one sought to place in evidence" and which were "conceded by the prosecutor to be

12   inadmissible in any form as exhibits (5 R.T. p. 585)" raising "inherently" greater "due process

13   implications" than the usual extraneous evidence case.  (Id., p. 31.)  He urges the court to rely on the

14   "five-element test" of United States v. Prime, 431 F.3d 1147, 1156-57 (9th Cir. 2005) to decide the

15   issue.  He also cites Duncan v. Louisiana, 391 U.S. 145, 149 (1968) and Mancuso v. Olivarez, 292

16   F.3d 939, 949-50 (9th Cir. 2002) for the proposition "[e]xtraneous evidence heard by even one juror

17   denies a defendant his Sixth Amendment right to an unbiased jury."  (Id., p. 32.)

18           **2.     State Court Proceedings**

19   The court of appeal summarized the circumstances giving rise to this claim more neutrally and

20   more completely than does Espinoza:

21           Tapes of the redacted interviews were played for the jury but the court reporter
             did not report them.  During deliberations, the jury requested transcripts of the taped
22           interviews.  The court noted the interview transcriptions had not been admitted into
             evidence and suggested the court reporter read the transcripts to the jury.  Defense
23           counsel objected to playing the tapes for the jury or reading the transcripts because
             neither had been admitted into evidence.  The court responded that the contents of the
24           interviews were evidence, which could have been recorded by the court reporter, but
             it had been agreed it was not necessary for the reporter to transcribe the tapes since the
25           prosecutor had prepared transcripts.  Ultimately, when it became clear that the court
             would allow the reporter to read the transcripts to the jury, defense counsel requested
26
         _____
27       ³  The court actually explained to the jury prior to the playing of the redacted taped interviews during
     trial that they could consider "this information you're going to hear for the purposes of testing the credibility
28   of the witnesses as well as for purposes of determining *whether or not what they said on the former occasion*
     *was in fact true.*"  (Lodgment No. 2, RT vol. 5, pp. 644-645 (emphasis added).)

                                               16                              10cv0397-WQH(BGS)

1   that the tapes be played instead because the "tape is the best evidence" and the court
2   agreed to this request.  Defense counsel did not specifically object to the tapes being
    sent to the jury room with a recorder rather than having the court reporter play the tapes
    for the jury.  During a subsequent motion for a new trial, defense counsel indicated he
3   had strategic reasons for requesting that the jury hear the tapes during deliberations.

4   (Lodgment No. 6, p. 13.)

5       In determining no prejudicial result accompanied that procedure, the court of appeal reasoned:

6   The jury was not provided inadmissible or extraneous evidence during deliberations,
    since . . . the redacted tapes contained admissible evidence.  In analyzing potential
7   prejudice, we are mindful that the court declared a mistrial on the charge of attempted
    murder, and we are reviewing his convictions of mayhem and assault with a firearm
8   [which are both general intent crimes].  Many of the statements in the tapes, such as
    whether Espinoza was expected to attend the party or that he instigated a fight in the
9   hall, were primarily relevant to the attempted murder charge and whether he had the
    specific mental state or malice or intent to kill.

10
          . . . . Basically, to prove [the mayhem and assault] crimes, the People were only
11  required to establish that Espinoza willfully fired the gun toward Rivera, and that act
    led to the loss of his eye.  Espinoza admitted firing the gun.  He testified he fired the
12  gun into the air and fired the gun at "the floor [ground] to scare them."  His testimony
    also indicated he continued firing the gun as he stumbled into the street and until the
13  gun was emptied.  Numerous witnesses saw Espinoza pointing the gun and/or firing
    at Rivera, including a neighbor who had no connection to either family.  It was
14  undisputed the firing of the gun injured and caused the loss of Rivera's eye.

15  (Lodgment No. 6, pp. 14-15 (footnote omitted).)

16      The court of appeal affirmed the judgment, concluding that "overwhelming evidence

17  support[ed] the aggravated assault and mayhem convictions, [and] there is no reasonable probability

18  Espinoza would have received a more favorable result had the jury not been provided with the tapes

19  during deliberations." (Lodgment No. 6, p. 16.)

20          **3.      Ground Two Warrants No Habeas Relief**

21      Espinoza's reliance on Prime, 431 F.3d at 1156-57, and its "five-element test" for erroneous

22  jury exposure to material extraneous to the evidence is misplaced.  (Pet. ECF No. 1-11, p. 31.)  The

23  Prime court was conducting a direct review of a conviction and sentence imposed in federal court on

24  wholly distinguishable facts and under different standards of review.  In addition, circuit authority

25  cannot be used as controlling authority for purposes of 28 U.S.C. § 2254 relief.  Parker v. Matthews,

26  __ U.S. __, 132 S.Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established

27  Federal law, as determined by the Supreme Court,' 28 U. S. C. §2254(d)(1)," and "[i]t therefore cannot

28  form the basis for habeas relief under AEDPA") (per curiam); see Rodgers, 678 F.3d 1149.

1    Similarly, Espinoza's other cited cases, <u>Duncan</u>, 391 U.S. 145 and <u>Mancuso</u>, 292 F.3d 939,
2  are distinguishable and provide no controlling precedent.  The <u>Duncan</u> Court's holding addressed the
3  scope of the Sixth Amendment right to trial by jury in criminal proceedings extended to the states by
4  the Fourteenth Amendment.  The <u>Mancuso</u> court addressed an issue of juror misconduct potentially
5  affecting the impartiality of the jury in circumstances where the jury foreman during deliberations had
6  announced his belief that the defendant "had committed a prior felony, or felonies, which information
7  he gained after tampering with a trial exhibit."  <u>Mancuso</u>, 292 F.3d at 949.

8    The evidence at issue here was not "extraneous" to the criminal proceedings.  The court of
9  appeal reasonably concluded that since the jury had already heard the redacted tapes during the course
10 of the trial, "the jury was entitled to rehear the tapes or have the transcripts of the tape read back, even
11 though the tapes and transcripts were not admitted as exhibits." (Lodgment No. 6, p. 14.)  The trial
12 court had previously ruled the recorded statements were admissible in each instance where defense
13 counsel had lodged a specific objection. (Lodgment No. 6, p. 14; see Lodgment No. 2, RT vol. 8, pp.
14 935-41, RT vol. 9, pp. 1126-1133, 1140-1148.)  Espinoza has not identified a constitutional error
15 recognized in United States Supreme Court precedent arising from the Ground Two conduct that had
16 a substantial and injurious effect or influence in determining the verdict in his case.  <u>Brecht</u>, 507 U.S.
17 at 623.  Relief accordingly should be **<u>DENIED</u>**.

18    **E.**    **<u>Grounds Three, Four, And Six:  Ineffective Assistance Of Counsel</u>**

19       **1.    <u>Legal Standards</u>**

20    A defendant claiming ineffective assistance of counsel ("IAC") must show both (1) deficient
21 performance under an objective standard of reasonableness and (2) prejudice.  <u>Strickland v.</u>
22 <u>Washington</u>, 466 U.S. 668, 687 (1984).  "The challenger's burden is to show 'that counsel made errors
23 so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth
24 Amendment.' "  <u>Harrington</u>, 131 S.Ct. at 787, *quoting* <u>Strickland</u>, 466 U.S. at 687.  To demonstrate
25 prejudice, the petitioner must show that "but for counsel's unprofessional errors," there is a reasonable
26 probability "the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 690.  "A
27 reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at 694;
28 *see* <u>Harrington</u>, 131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just

18                    10cv0397-WQH(BGS)

conceivable").  "Because failure to meet either [Strickland]  prong is fatal to [an IAC] claim, there is no requirement that we 'address both components of the inquiry if the defendant makes an insufficient showing on one.' "  Gonzalez v. Wong, 667 F.3d 965, 987 (9th Cir. 2011), *quoting* Strickland, 466 U.S. at 697.  "Without proof of both deficient performance and prejudice to the defense . . . the sentence or conviction should stand."  Bell, 535 U.S. at 694 (citation omitted).

"Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)."  Harrington, 131 S.Ct. at 788.  "[T]he question is not whether counsel's actions were reasonable," but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  Id.  Federal habeas courts approach an IAC question with the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Cullen, 131 S.Ct. at 1403. "[C]ounsel's attention to certain issues to the exclusion of others [is presumed to] reflect[] trial tactics rather than 'sheer neglect.' "  Harrington, 131 S.Ct. at 790, *quoting* Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (*per curiam*).  Courts considering IAC claims approach the issue  with the presumption "that counsel's representation was within the 'wide range' of reasonable professional assistance."  Id. at 787, *quoting* Strickland,466 U.S. at 688.  "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."  Id. at 791.

"We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).' "  Cullen, 131 S.Ct. at 1403 (citation omitted); *see* Harrington, 131 S.Ct. at 788, 791-92 (reversing a Ninth Circuit en banc grant of habeas relief on an IAC claim for lack of sufficient deference to the state court result).  "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  Harrington, 131 S.Ct. at 788 (citations omitted).  "[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly," but rather the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 699 (2002).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Harrington, 131 S.Ct. at 786.

## 2.      Ground Three:  Failure To Investigate Eye Witnesses

Espinoza incorporates by reference "petition attached at pages 33 through 48" as the supporting facts for this claim.  (Pet. 8, ECF No. 1; *see* ECF No. 1-11, pp. 35-50.)  He attaches both the briefing in support of his petition for review to the California Supreme Court of the two claims presented here as Grounds One and Two (*see* Lodgment No. 7, Case No. S162902) for which the court of appeal had supplied a reasoned opinion (Lodgment No. 6), and also portions of his habeas petition to the state high court, where he presented his other federal claims for the first time (*see* Lodgment No. 9).  When the dispositive state court order does not articulate its reasoning, as occurred here on collateral review (*see* Lodgment No. 10), federal habeas courts conduct an independent review of the record  to ensure the result is not contrary to nor an unreasonable application of United States Supreme Court precedent, while still according deference to the ultimate decision.  Pirtle, 313 F.3d at 1167.

Espinoza provides a laundry list of purported shortcomings in his representation.  (Pet. ECF No. 1-11, pp. 35-40.)  As pertinent to his failure to investigate claim, he represents that his wife, Sandy, gave defense counsel a list of  percipient witnesses who should have been called to testify on his behalf, including herself.  (Id., p. 36.)  He faults counsel for not having "any intentions of calling any other witnesses, other than those on the People's list, save for the option to call the (Petitioner) defendant."  (Id., p. 35.)  About seven percipient witnesses testified for the prosecution at trial.   He argues in particular that his attorney should have called Miguel R. Rubio, the father of the baptized baby, who purportedly would have testified "another short male in the group" fired two shots "toward Arturo" after "everyone ran," and that he saw "the gun being taken from Petitioner."  (Id.)  He represents Sylvia Escamilla, the baby's grandmother, would have testified similarly.  (Id., pp. 35-36.)

"Defense counsel has a 'duty to investigate the defendant's 'most important defense,' *Sanders*[*v. Ratelle*], 21 F.3d [1446], 1457 [(1994)], and a duty adequately to investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict.  *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)."  Bragg v. Galaza, 242 F.3d 1082, 1088 (2001).

> However, "the duty to investigate and prepare a defense is not limitless:  it does not necessarily require that every conceivable witness be interviewed."  *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995) (citations and quotations omitted).  "A

1   claim of failure to interview a witness . . . cannot establish ineffective assistance when
    the person's account is otherwise fairly known to defense counsel." *Eggleston v.*
2   *United States*, 798 F.2d 374, 376 (9th Cir. 1986) (citations and quotations omitted). .
    . . Furthermore, "ineffective assistance claims based on a duty to investigate must be
3   considered in light of the strength of the government's case." *Id.*

4   <u>Bragg</u>, 242 F.3d at 1088.

5         To prevail on an IAC claim, the petitioner must satisfy both the deficient performance and the

6   prejudice showings mandated by <u>Strickland</u>.  <u>Bell</u>, 535 U.S. at 694.  If the petitioner fails to satisfy

7   either component, the claim must fail.  <u>Gonzalez</u>, 667 F.3d at 987.   Respondent characterizes defense

8   counsel's decisions regarding trial witnesses as reasonable strategic choices and argues Espinoza "has

9   completely failed to make the requisite showing of prejudice," requiring rejection of his IAC claims

10  "on that basis alone."  (Ans. 21, ECF No. 16-1.)

11        [S]trategic choices made after thorough investigation of law and facts relevant to
          plausible options are virtually unchallengeable; and strategic choices made after less
12        than complete investigation are reasonable precisely to the extent that reasonable
          professional judgments support the limitations on investigation.  In other words,
13        counsel has a duty to make reasonable investigations or to make a reasonable decision
          that makes particular investigations unnecessary. In any ineffectiveness case, a
14        particular decision not to investigate must be directly assessed for reasonableness in all
          the circumstances, applying a heavy measure of deference to counsel's judgments.
15
    <u>Strickland</u>, 466 U.S., at 690–691.
16
          Despite Espinoza's conclusory assertion that particular individuals could have testified that he
17
    was not the only shooter if only his attorney had investigated and called them as witnesses, crediting
18
    *arguendo* his representations, such statements would have created a credibility issue for the jury to
19
    weigh against the contrary testimony of multiple other percipient witnesses.  Each of the several
20
    witnesses who  testified on this issue unequivocally stated that Espinoza repeatedly fired a gun in
21
    proximity to Rivera and was the lone shooter.  Even assuming counsel erred in his investigation as
22
    alleged, it is recommended the Court find, based on the trial record, no reasonable probability of a
23
    more favorable result from any reasonable jury on the mayhem and assault charges had the defense
24
    introduced testimonial evidence there may have been a second shooter.  Espinoza personally testified:
25
         Q      There was only one gun involved; right?
26
         A      There was only one gun involved.
27
         Q      The one you had.
28

                                        21                              10cv0397-WQH(BGS)

| | | |
|---|---|---|
| 1 | A | Excuse me? |
| 2 | Q | The one you had; right? |
| 3 | A | That was the one my godfather handed me. |
| 4 | Q | You never saw anybody else with a gun; did you? |
| 5 | A | No, I didn't. |
| | | . . . |
| 6 | Q | But you still were the only person with a gun; right? |
| 7 | A | That night?  Yes. |

(Lodgment No. 2, RT vol. 5, pp. 751-752, 756, 759: "I fired the first round into the ground.  And they ["the guys who jumped me inside the hall were all there" and] had already grabbed me from my shirt from the side, and they were – they were just yanking me, pulling me around from my arm.  That's when I pushed myself up.  That's, like, when three or four shots went up in the air."; *see also* Id., pp. 752, 754:  ("I wasn't shooting. They were yanking me and bullets were being fired everywhere from the pulling, yankings at my hand. That's how the gun was being fired");  Id., p. 760 ("I never pointed the gun at nobody.").)

Eyewitness Ramon Rubio Rodriguez helped break up the fight in the hall and escorted Arturo and Adan outside, while others detained Espinoza inside.  He testified that as he, Arturo, and Adan stood talking, within minutes of the fight, Espinoza appeared by himself about three feet in front of them. (Lodgment No. 2, RT vol. 2, pp. 108, pp. 141-142.) He saw Espinoza "standing there, pointing the gun."  He recognized the gun in Espinoza's hand as a semiautomatic and saw him "rack a round" before any of the shooting started.  (Id.,  pp. 123-124.)

| | | |
|---|---|---|
| | A | After that, it's like he started flashing the gun. |
| | Q | Who did? |
| | A | Roger. |
| | | . . . |
| | Q | Was there anybody even close by at that time to give him a gun? |
| | A | Nope. |
| | | . . . |
| | Q | At any point in time, did you ever look back and see what Roger was doing when you were running [towards the hall]? |

A       Yeah. . . [¶]  When I turned around, as I was running in, I just seen Roger out there pointing the gun.

Q       Where was he pointing the gun at?

A       Towards Arturo . . .

(Lodgment No. 2, RT vol. 2, pp.109-112.)

Testifying eye-witness Joaquina Soltero described what she saw after the fight in the hall.  As pertinent to Espinoza's "other shooter" theory, she stated:

Q       Why don't you tell the jury what you saw when you went outside.

A       When we were leaving, when we were outside, then I saw, um, Roger –

Q       Was he holding – did he have anything? Any kind of weapon?

A       I think he did.

Q       Well, did you describe it to the officer later as a silver handgun?

A       Yeah.  Something silver, yes.

Q       What was he doing with what he was holding?

A       Shooting.

Q       So you knew it was a gun; right?

A       Yes.

. . .

Q       Was there only one gun that you saw involved outside?

A       Yes.

Q       Anybody else shooting, other than the defendant?

A       No.

(Lodgment No. 2, RT vol. 2, pp. 180-187.)

Norma Alicia Soltero, the victim's sister and Joaquina Soltera's niece, testified when she looked through the doors of the hall toward the street after the altercation inside the hall between Espinoza and the Rivera brothers, she saw Espinoza with a gun.  (Lodgment No. 2, RT vol. 2, p. 239.)  When she got outside, she saw him shooting the gun, at first up in the air followed by other shots. She saw Espinoza shoot once at Arturo's feet which caused him to turn his back and begin running away.  (Id., pp. 255-256.)

1    Evaelena Gallegos, the Rivera brothers' cousin, Joaquina's daughter, and an acquaintance of

2    Espinoza and his wife, was also a percipient witness to the fight inside the hall and to the shooting

3    outside.  (Lodgment No. 2, RT vol. 3, pp. 376-436.)  She testified at trial inconsistently from her

4    recorded interview statements to police five years earlier.  At trial, she denied she saw anything that

5    went on outside the hall or that she saw Espinoza with a gun that night at all.  (Id., p. 394.)  The

6    prosecutor impeached her with her prior statements to police that she saw Espinoza holding a small

7    silver or chrome handgun in his right hand and saw him walking toward Arturo as if he wanted to go

8    after him.  (Id., pp. 394-395.)

9    Olivia Addison, who lived in a house across the street from the reception hall, also testified as

10    a percipient witness.  (Lodgment No. 2, RT vol. 3, pp. 435-460.)  She had noticed the party at the hall

11    before hearing gunshots because there had been a fight right outside the main entrance.  (Id., p. 440.)

12    Addison estimated about seven shots were fired.  (Id., pp. 459-460.)  She later found a bullet hole

13    inside her bedroom that had come through one of her front windows.[4]  (Id., pp. 437-439.)

14    Q    Did you only see one man with a gun?  Was there only one person with a gun?

15    A    Yes.

16    (Lodgment No. 2, RT vol. 3, p. 448.)

17    Rosea (Rocio) Barajas, the sister of Espinoza's then-wife and the mother of the child baptized

18    the day of the shooting, testified for the prosecution.  (Lodgement No. 2, RT vol. 4, pp. 463-537.)  "A

19    lot of people showed up that weren't invited," including the Rivera brothers and their aunt, Joaquina

20    Saltero.  (Id., pp. 508-509, 511.)  Rosea was aware at the time of some trouble between Espinoza and

21    Adan Rivera, but was not concerned about violence between them that day.  (Id., pp. 467-470.)

22    Among other things, Rosea saw Espinoza being kicked and beaten by the Rivera brothers and others

23    during the indoor fight and told the Rivera brothers to get out.  (Id., pp. 474-479, 503, 512.)  She heard

24    gunshots after Espinoza and the Rivera brothers had gone outside.  From the doorway of the hall, she

25    saw "sparks" or "flashes" but did not see the gun itself.  People began running and screaming, and she

26    ───────────────

[4] Addison also told police in her taped interview at the time that she heard someone say in Spanish,

27    "I'm going to kill ya, motherfucker," but testified she had no independent recollection of those specific words

by the time of trial.  (Lodgment No. 2, RT vol. 3, pp. 442-443, 454.)  Espinoza testified the words witnesses

28    heard, "I'm going to kill ya, motherfucker," were "from the guys with Arturo and they said that to me."  (Id.,

RT vol. 5, p. 753.)

saw people in a circle with hands in the air "fighting for the gun," but not who held it.  Others came

back inside and said Espinoza was the one with the gun, and she was sure he was among the crowd.

(Id., pp. 483-485, 506, 520-521.)  Like a number of the other witnesses, Rosea testified she didn't

remember making certain of her recorded statements to the police.

Respondent identifies some of the more salient defects in Espinoza's effort to ascribe as an

instance of IAC warranting federal habeas relief his attorney's alleged failure to pursue and produce

additional eyewitnesses who could have testified there was another shooter.

> The alleged eyewitnesses' testimony would have been contradicted by Petitioner's own
> testimony.  No rational jury could have concluded Petitioner did not possess a gun and
> fire it repeatedly, given the overwhelming evidence, including Petitioner's testimony,
> which was presented in this case.  Moreover, Petitioner's argument fails to note that
> defense counsel achieved a very favorable outcome when the jury was unable to reach
> a verdict on the most serious charge against Petitioner, the attempted murder count.

(Ans. 22, ECF No. 16-1.)

"Representation is constitutionally ineffective only if it 'so undermined the proper functioning

of the adversarial process' that the defendant was denied a fair trial.' "  Harrington, 131 S.Ct. at 791,

*quoting* Strickland, 466 U.S. at 686, 687.  In contrast, "strategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland,

466 U.S. at 690.  Espinoza's defense theory reflects an appropriate trial strategy, considering the

"overwhelming" evidence to support the mayhem and assault charges.  (Lodgment No. 6, p. 8.)  The

presentation of evidence that another unidentified man was the shooter would have conflicted with the

stronger defense theory counsel selected in consideration of the prosecution evidence.  Counsel's

reasonable tactical decision to exclude inconsistent defenses satisfies counsel's duty "to make

reasonable investigation or to make a reasonable decision that makes particular investigation

unnecessary."  Strickland, 466 U.S. at 691; *see* Turk v. White, 116 F.3d 1264, 1266-67 (9th Cir. 1997).

According the "double deference" owed by federal habeas courts to state court rejections of

IAC claims, it is recommended the Court find the state court  result denying Espinoza relief on this

ground comports with controlling federal authority, is objectively reasonable,  and is amply supported

by the trial record, foreclosing federal habeas relief.  28 U.S.C. § 2254(d).

\\

### 3.    Ground Six:  Failure To Consult With And Use Ballistics Experts

Espinoza incorporates by reference "petition attached at pages 59 through 67" as the supporting facts for this claim.  (Pet. 11, ECF No. 1, ECF No. 1-11, pp. 61-69; *see* Lodgment No. 9.)  He argues his trial counsel was ineffective for failure "to consult with and utilize at trial a ballistics expert[]." (Pet. 11, ECF No. 1.)  He vaguely characterizes the contribution a ballistics expert would have made to his defense as "cast[ing] reasonable doubt on the theories the prosecution relied on to support all charges," then summarily concludes his counsel's failure to present that expert testimony falls "below an objective standard of reasonableness . . . under prevailing professional norms."  (Pet. ECF No. 1-11, p. 67, *quoting* Strickland, 466 U.S. at 686, 696.)

A forensic specialist testified for the prosecution that eight nine-millimeter shell casings and a bullet fragment were recovered at the crime scene.  (Lodgment No. 2, RT vol. 4, pp. 542-543.)  The prosecution also called a criminologist specializing in firearms.  (Id., pp. 565-578, RT vol. 5, pp. 609-617.)  Among other things, he testified that the trial exhibit cartridge cases and bullet fragment were all fired from the same nine-millimeter gun.  (Id., RT vol. 5, pp. 575-577.)  Defense counsel objected to certain hypotheticals the prosecutor posed, then briefly cross-examined the expert, making the point that he could not know for certain from what distance the victim was shot.  (Id., pp. 614-617.)

Espinoza suggests that an expert witness for the defense could have exonerated him by reconstructing the crime and testifying regarding such facts as his state of mind as he fired the gun, "petitioner did not shoot at the victim, and the injury came from another shooter of petitioner's gun." (Pet. ECF No. 1-11, p. 67.)

> If Defense Counsel had consulted with a ballistics expert, then petitioner could have presented expert testimony that would have supported the fact that petitioner was shooting in the air to warn his attackers off, from beating, continuing to injure, or beating him to death.  A ballistics expert would have been able to see that petitioner was not going [to] hurt anyone, nor did he.  The shots which were fired by petitioner, were in the air, and on the ground only.

(Pet. ECF No. 1-11, pp. 65-66, 67.)

The testimony Espinoza suggests a defense ballistics expert could have offered but for the IAC of defense counsel in not engaging one lacks any foundation whatsoever.  No expert witness could have contributed to Espinoza's defense in the manner he proposes, that is with competent testimony

such as that "petitioner did not fire the shot that hit the victim. . . ." (Pet. ECF No. 1-11, p. 69.)  Not only is "[t]he choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference,' " Turner, 281 F.3d at 876, *quoting* Strickland, 466 U.S. at 691, but also, as Respondent observes, "[n]o rational jury could have concluded Petitioner did not possess a gun and fire it repeatedly" in the victim's direction based on the evidence presented at trial.  (Ans. 22, ECF No. 16-1).

Espinoza satisfies neither prong of the Strickland standard on this theory.   After an independent review of the record, Pirtle, 313 F.3d at 1167, and according the requisite "double deference" to the state court's rejection of Espinoza's IAC claims (Harrington, 131 S.CT. at 788), it is recommended the Court **DENY** habeas relief on Ground Six.  The state court result comports with controlling federal authority and is objectively reasonable.  28 U.S.C. § 2254(d).

### 4.   Ground Four: Failure Of Appellate Counsel To Investigate And Raise Ineffective Assistance Of Trial Counsel Claims

Espinoza incorporates by reference "petition attached at pages 49 through 52" as the supporting facts for this claim.  (Pet. 9, ECF No. 1, ECF No. 1-11, pp. 51-54; *see* Lodgment No. 9.)  He contends he received ineffective assistance of appellate counsel for failure to argue on appeal that his trial counsel was ineffective.  He received no reasoned decision on any of his IAC claims, all of which the California Supreme Court rejected in summarily denying his habeas petition.

The Strickland performance and prejudice standards apply to challenges to representation by appellate counsel as well as by trial counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000).  Appellate counsel need not raise every possible question, no matter how remote, in order to be shielded from the risk of an IAC determination.  Turner, 281 F.3d at 872.  A petitioner is "not prejudiced by appellate counsel's decision not to raise issues that had no merit." Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (Where "trial counsel's performance, although not error-free, did not fall below the Strickland standard," no IAC can be ascribed to appellate counsel for failure to argue the petitioner's conviction should be overturned because of trial counsel's purportedly ineffective assistance).

As discussed in connection with Grounds Three and Six above, the state court reasonably concluded Espinoza failed to demonstrate prejudicially deficient performance of trial counsel under the Strickland standards on the merits of either of the separate claims he attempts to substantiate.  He

27

1   does not sufficiently support from the record his other complaints about his trial representation to

2   satisfy AEDPA relief standards.   Accordingly, his appellate counsel did not provide deficient

3   representation by not raising those claims.   The state court result denying Espinoza relief on all three

4   IAC grounds comports with controlling United States Supreme Court authority, and is objectively

5   reasonable in consideration of the state court record.   Relief on Ground Four should be **DENIED**.

6                    **F.    Ground Five:  Withheld Exculpatory Evidence**

7                            **1.    The Claim**

8           Espinoza incorporates by reference "petition attached at pages 53 through 58" as the supporting

9   facts for this claim. (Pet. 10, ECF No. 1, ECF No. 1-11 pp. 55-60; *see* Lodgment No. 9.)  He contends:

10  "The People's failure to comply with the requirements of Brady v. Maryland violated Petitioner's right

11  to due process and a fair trial and warrants reversal of the conviction; along with a violation of Brady

12  v. Maryland on collateral attack."  (Pet. 10, ECF No. 1, ECF No. 1-11, pp. 55-59.)  "But for the

13  People's Constitutional and Statutory violations, Petitioner would not have been convicted." (Pet. ECF

14  No. 1-11, p. 59.)  Concerning the constitutional component of this claim, he relies on United States

15  v. Bagley, 473 U.S. 667, 682 (1985) and United States v. Agurs, 427 U.S. 97, 106-08 (1976) for the

16  proposition that the prosecution must disclose to the defense material evidence favorable to the

17  defendant or "hurt[ful] to the prosecution as impeachment evidence."  (Pet. ECF No. 1-11, p. 56.)

18          Espinoza identifies the purportedly undisclosed evidence as "concerning Mrs. Sandy B.

19  Espinoza (Sandy Barajas) knowing that there were many eyewitnesses, including herself, who knew

20  petitioner was not the person who shot the victim."  (Pet. ECF No. 1-11, p. 58, 59:  "The evidence

21  favorable to petitioner was required to be turned over to his counsel as soon as the prosecution knew

22  that Sandy Barajas, being [listed as] a prosecution witness, had evidence, in the form of eyewitnesses

23  (8) who would have and still will testify to the fact that petitioner did not sho[o]t the victim.")

24          If the prosecution would not have with held [*sic*] Sandy Barajas' information, the
            defense counsel would have been able to impeach the testimony of not only Raman
25          Rubio, who  grew up with the victim; but also the testimony of Joaquina Soltero and
            Olivia Addison. . . .  Under Brady and its federal and California progeny, petitioner's
26          right to a fair trial imposed on the prosecution the duty to disclose to trial counsel the
            information in the prosecution team's possession which is disclosed by this petition:
27          that at least eight (8) eyewitnesses to the crime knew that petitioner was not the person
            who shot at the victim; and the Ninth person who know was the prosecution's own
28          witness, Mrs. Sandy Barajas[]; hence, also the prosecutor.

                                                    28

1  (Pet. ECF No. 1-11, pp. 58, 59: "Had those facts been disclosed to petitioner's trial counsel, as they

2  should have been in compliance with Brady v. Maryland, trial counsel would have been able to

3  impeach [those witnesses] when they testified against petitioner. . . .")

4  **2.   Constitutional Standards**

5  "[T]he suppression by the prosecution of evidence favorable to an accused upon request

6  violates due process where the evidence is material either to guilt or to punishment, irrespective of the

7  good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  The Supreme

8  Court later clarified "that the duty to disclose such evidence is applicable even though there has been

9  no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty

10 encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473

11 U.S. 667, 676 (1985)." Strickler v. Greene, 527 U.S. 263, 280 (1999) (parallel citations omitted).

12 Such evidence "is material 'if there is a reasonable probability that, had the evidence been disclosed

13 to the defense, the result of the proceeding would have been different.' " Id. at 280, *quoting* Bagley,

14 473 U.S. at 682.  The purpose of the Brady rule is "to ensure that a miscarriage of justice does not

15 occur." Bagley, 473 U.S. at 675.  "[T]he question is not whether the defendant would more likely than

16 not have received a different verdict with the evidence, but whether in its absence he received a fair

17 trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S.

18 419, 434 (1995).

19 Thus, the essential "components of a true *Brady* violation" are:  "The evidence at issue must

20 be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence

21 must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

22 ensued." Strickler, 527 U.S. at 281-82.  "[U]nless the [suppression] deprived the defendant of a fair

23 trial, there was no constitutional violation requiring that the verdict be set aside; and absent a

24 constitutional violation, there was no breach of the prosecutor's duty to disclose. . . ." Agurs, 427 U.S.

25 at 108.  As Respondent argues, if there was no suppression of evidence, a Brady claim necessarily

26 fails, inevitably so when "a defendant knows or should have known the essential facts permitting him

27 to take advantage of any exculpatory information or where the evidence is available to defendant from

28 another source." Benge v. Johnson, 474 F.3d 236, 243 (6th Cir. 2007) (internal punctuation and

1  citation omitted) (defendant knew of essential facts and could have called the allegedly undisclosed

2  witness himself, foreclosing a finding of <u>Brady</u> error).

3            **3.      The State Court Result Comports With Federal Law**

4            The California Supreme Court summarily denied Espinoza's <u>Brady</u> claim, along with all the

5  other grounds he presented for habeas relief.  (Lodgment No. 10.)  Accordingly, this Court has

6  conducted an independent review of the record to ensure the state court's result comports with

7  controlling federal authority and is objectively reasonable.  <u>Pirtle</u>, 313 F.3d at 1167.

8            Espinoza alleges that his wife knew of several witnesses who would testify that he "did not

9  shoot the victim," and that the prosecution knew of but suppressed her knowledge of that information.

10 He identifies in particular the testimony of Ramon Rubio Rodriguez, Joaquina Soltero, and Olivia

11 Addison on the issue of no second or different shooter that could have been impeached at trial if only

12 the prosecution had revealed that Sandy knew "that there were many eyewitnesses, including herself,

13 who knew petitioner was not the person who shot the victim."  (Pet. ECF No. 1-11, p. 58.)

14           However, Espinoza argued in support of his Ground Three IAC claim for failure to investigate

15 eyewitnesses that his wife actually gave those names to defense counsel.  (Pet. ECF No. 1-11, p. 36.)

16 As Respondent observes, Espinoza fails to make out a <u>Brady</u> violation because the prosecution cannot

17 have concealed "the names of witnesses that were well known to the defense, including Petitioner's

18 wife," and "Defense counsel was obviously aware of these alleged witnesses, who apparently were on

19 the prosecution's witness list, but were ultimately not called." (Ans. 24, ECF No. 16-1.)  Espinoza

20 remained in contact with his wife after he fled to Tijuana, returning about a year later to sign the

21 ownership of their house over to her and staying for a couple of days.   After he returned to Tijuana,

22 he continued to send support money to his wife and two children in San Diego for the next year and

23 a half or two years, then moved back several months before his arrest for these crimes.  (Lodgment No.

24 2, RT vol. 5, pp. 722-726.)  His trial testimony also makes clear that he personally knew many of the

25 attendees at the reception who were witnesses to the shooting, knowledge imputable to his attorney.

26           Moreover, even if other witnesses might have rendered the trial testimony of eyewitnesses less

27 than unanimous that Espinoza was the lone shooter, there is no reasonable probability the result on the

28 mayhem and assault with a firearm charges would have been different had the prosecution redundantly

informed defense counsel that Sandi Espinoza purportedly knew of such potential witnesses.  As discussed above, counsel had broad discretion as a matter of trial tactics to pursue what was in his professional judgment a stronger defense strategy inconsistent with an alternative shooter theory. There was neither suppression of information nor prejudice to Espinoza.  Kyles, 514 U.S. at 434; Bagley, 473 U.S. at 678; Strickler, 527 U.S. at 281-82.  He does not challenge the sufficiency of the evidence from the multiple eyewitnesses that there was only one gun and only one shooter, including his own admissions to support his convictions.  Vague and speculative suggestions that the prosecution knew of other potential witnesses who might have testified differently on this point do not satisfy either the materiality or the prejudice prong of a Brady violation.  See Strickler, 527 U.S. at 280-81; Bagley, 473 U.S. at 682, 675; Agurs, 427 U.S. at 108.  Relief on Ground Five should be **DENIED**.

For all the foregoing reasons, it is recommended the Court find that the state courts' rejection of Espinoza's federal claims comports with controlling United States Supreme Court authority and is objectively reasonable, foreclosing federal habeas relief.  28 U.S.C. § 2254(d).  He has made no showing adequate to warrant an evidentiary hearing.  28 U.S.C. § 2254(e)(1), (2); Cullen, 131 S.Ct at 1398, 1400.  The Court should **DENY** the Petition in its entirety, as Espinoza is not in custody in violation of federal law.  28 U.S.C. § 2254(a).

## III.     CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For all the foregoing reasons, **IT IS RECOMMENDED** this habeas Petition be **DENIED** on the grounds that Petitioner is not in custody in violation of any federal right.  **IT IS FURTHER RECOMMENDED** the Court issue an Order (1) approving and adopting this Report and Recommendation and (2) directing that judgment be entered denying the Petition.

**IT IS HEREBY ORDERED** no later than **September 25, 2012**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and served on all parties no later than **October 12,2 012**.  The parties are advised that failure to file

objections within the specified time may waive the right to raise those objections on appeal of the Court's Order.  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).


DATED:  September 4, 2012

Hon. Bernard G. Skomal
U.S. Magistrate Judge
United States District Court

10cv0397-WQH(BGS)