**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ROGELIO CUEVAS ESPINOZA,

                           Petitioner,

     vs.

MATTHEW CATE, Secretary of the
California Department of Corrections
and Rehabilitation,

                        Respondent.

CASE NO. 10cv397 WQH (BGS)

ORDER

HAYES, Judge:

      The matter before the Court is the Report and Recommendation (ECF No. 40) of United States Magistrate Judge Bernard G. Skomal recommending that the Court deny Petitioner Rogelio Cuevas Espinoza's Petition for Writ of Habeas Corpus (ECF No. 1).

**BACKGROUND FACTS[1]**

      On March 10, 2001, Rosea Barajas held a party at a convention hall in National City to celebrate the baptism of her son. (Lodgment 6 at 2). Sandy Barajas, sister of Rosea Barajas and wife of Petitioner, is the child's godmother. *Id.* "[Petitioner] attended the party but there was conflicting evidence about whether he was expected there. Arturo, also known as Pedro Rivera, and his brother, Adan Rivera, were told

---

      [1]The Court recites the facts according to the factual findings of the California Court of Appeal, which Petitioner does not dispute. *See* 28 U.S.C. § 2254(e)(1) (a presumption of correctness attaches to state court determinations of factual issues).

[that Petitioner] would not attend the party." *Id.* at 2-3 (alterations omitted). "[T]here were ill feelings between Adan and [Petitioner] due to a fight between the two about a year earlier." *Id.* at 2.

Shortly after the Rivera brothers arrived at the party, "a fight erupted inside the hall" involving Petitioner, the Rivera brothers and others. *Id.* The evidence conflicted as to whether Petitioner or Adan initiated the fight, but the fight was eventually broken up by others. *Id.* at 2-3. The fight left Petitioner injured. *Id.* at 3. "[O]ne witness described seeing a gash above [Petitioner's] eye." *Id.* "Adan believed he had broken [Petitioner's] nose because he was bleeding profusely." *Id.* Barajas told everyone to leave the party. *Id.* Petitioner exited through a back door and the Rivera brothers and others left through the hall's front entrance. *Id.*

"Soon thereafter, [Petitioner] approached the Rivera brothers with a semi-automatic gun in his hand. Adan ran back towards the hall. [Petitioner] fired into the air. There was evidence [that Petitioner] pointed the gun at [Arturo] Rivera, fired at [Arturo] Rivera's feet or lower body, fired at the ground, fired toward the crowd of people outside the hall and fired toward [Arturo] Rivera as he fled. Some people struggled with [Petitioner] for the gun." *Id.* A neighbor heard a man yell, "I'm going to kill you, motherfucker," and saw the man "chasing [Arturo] Rivera and shooting at him, while [Arturo] Rivera crouched behind a truck." *Id.* Arturo Rivera was shot in the right eye, which he lost as a result. *Id.* "There was not stippling or burning around the entrance wound, indicating the bullet was fired from a distance of more than three or four feet." *Id.* Eight cartridge casings and a bullet fragment were recovered. *Id.* Based on the distribution of the cartridge casings, it was determined that all the bullets had been fired from the same gun by a gunman who had been moving while firing the gun. *Id.* "A number of people from the party went to the police station to be interviewed. [Petitioner's] wife told the group, 'nobody rats, nothing will happen.' The interviews were taped." *Id.*

Petitioner fled to Mexico. *Id.* at 4.

In 2005, San Diego police officers stopped a car with expired registration tags that was driven by Petitioner. *Id.* "[Petitioner] was very nervous, and he provided the officers with a driver's licence in the name of Victor Gallego and said the car belonged to a female friend." *Id.* Suspecting the driver's license was false, the police conducted a records check. *Id.* "As soon as [Petitioner] heard he was going to be arrested, he knocked one of the officers to the ground and fled across a busy street. He was arrested nearby in a culvert." *Id.*

**PROCEDURAL HISTORY**

**I.    State Proceedings**

In March of 2006, roughly five years after the shooting, Petitioner was tried by a San Diego Superior Court jury. During the State's case, the prosecutor examined witnesses on their statements to the police during interviews conducted shortly after the shooting. The prosecutor sought to play excerpts from redacted tapes of the interviews as prior inconsistent statements, past recollections recorded, or nonhearsay statements. (Lodgment 3 at 5). Defense counsel objected to the use of the statements. *Id.* at 6. The trial court instructed defense counsel to raise specific objections to statements on the tapes during the course of witnesses' testimony. *Id.* Ultimately, the court overruled each such objection raised by defense counsel. *Id.*

Petitioner's case consisted entirely of his own testimony. The California Court of Appeal summarized Petitioner's version of the events as follows:

> [Petitioner] testified Barajas invited him to the party because his wife was going to be the child's godmother. He arrived early at the party because his wife said they needed help, but before contacting his wife, he had something to eat at the hall. About 20 to 40 minutes later, he started looking for his wife. He did not find her inside the hall, and he was about to look outside when the Rivera brothers and others arrived. [Petitioner] indicated to Adan that he wanted to go outside. Adan, without warning, punched [Petitioner]. [Petitioner] defended himself.
>
> After the fight ended, [Petitioner] went out the back door of the hall. He had been badly beaten and was afraid and confused. His uncle told him the Rivera brothers wanted to kill him, handed him a gun and showed him how to use it. As [Petitioner] walked toward his car, the Rivera brothers and other people confronted him. He fired the gun into the ground and into the air to keep them away. He was surrounded by people who were trying to get the gun from him, and he believed they would

harm him if they got the gun.  During the struggle, the group moved him into the street; he stumbled but did not fall as they went over the curb.  He fired the gun until it would fire no more.  He also testified the gun fired because people were 'yanking' at his hand.  Someone yelled 'Policia' and everybody dispersed.  [Petitioner] ran to his car and drove home.  He did not turn himself in because he was afraid he would be imprisoned even though he was innocent.

(Lodgment 6 at 4-5; *see also* Lodgment 2, volume 5 at 675-765.).

While the tapes of the police interviews were being played to the jury, the court reporter did not report the audio.   The trial court later explained that "it was not necessary [to report the audio of the tapes] since the prosecutor had prepared transcripts."  (Lodgment 3 at 13).  During jury deliberations, the jury requested the transcripts of the tapes.  The court noted that the transcripts of the tapes had not been admitted into evidence, and suggested that the court reporter read the transcripts to the jury.  Defense counsel objected to playing the tapes or reading the transcripts to the jury, as neither the tapes nor the transcripts had been admitted into evidence.  The court decided to send the tapes into the jury room with a recorder for the jurors to use as a listening device.

On March 3, 2006, the jury found Petitioner guilty of mayhem[2] and assault with a semi-automatic firearm,[3] and deadlocked on a count of attempted murder.  The court declared a mistrial on the attempted murder count.  On September 18, 2006, the court sentenced Petitioner to a prison term of 29 years to life.[4]

On April 13, 2007, Petitioner directly appealed his convictions to the California Court of Appeal on the following grounds: (1) the trial court erroneously admitted audio tape recordings of the police interviews as prior inconsistent statements; (2) the trial court improperly allowed the jury to listen to the tapes during deliberation; and (3) the trial court should have granted Petitioner's motion for a new trial. (Lodgment 3 at 18,

---

[2]Cal. Pen. Code §§ 203; 12022.53, subd. (d).

[3]Cal. Pen. Code §§ 245, subd. (b); 12022.5, subd. (a)(1), 12022.7, subd. (a).

[4]Petitioner was sentenced to a four-year term for mayhem and a 25-year to life term for personally discharging a firearm and causing great bodily injury during the mayhem (Cal. Pen. Code § 12022.53, subd. (d)).

38, 50).  Petitioner's reply brief concluded: "The entire judgment should be reversed on multiple grounds of federal constitutional due process and jury error in considering extraneous evidence not admitted by the court, with respect to police interviews of victims." (Lodgment 5 at 24.).  On March 12, 2008, the California Court of Appeal unanimously affirmed the rulings of the trial court in a written order.  (Lodgment 6).

On April 20, 2008, Petitioner filed a Petition for Review with the California Supreme Court.  Petitioner sought review of the California Court of Appeal's decision denying his direct appeal on the grounds that: (1) the "case presents a unique opportunity ... to delineate the boundaries of cases in which use of batches of tapes can deny federal constitutional due process"; and (2) "[e]xtraneous evidence heard by even one juror denies a defendant his Sixth Amendment right to an unbiased jury," and therefore, "the treatment of even accidental slips in what is given the jury [i]s federal constitutional error."[5] (Lodgment 7 at 24, 31–32).  On June 25, 2008, the California Supreme Court summarily denied the Petition for Review.  (Lodgment 8).

On August 31, 2009, Petitioner filed a habeas corpus petition in the California Supreme Court, asserting several claims for ineffective assistance of counsel and a claim alleging that the prosecution withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[6]  (Lodgment 9).  Petitioner subsequently filed a Motion for Discovery and Interrogatories, dated October 23, 2009, to accompany his habeas petition filed in the California Supreme Court, in which he sought, *inter alia*, evidence to substantiate his ineffective assistance of counsel claims.[7]  (ECF No. 1-1 at 27-48).  On February 10, 2010, the California Supreme Court summarily denied the petition, and did not otherwise rule on the Motion for Discovery and Interrogatories. (Lodgment 10).

---

[5]Petitioner asserts both of these grounds for relief in his federal Petition for Writ of Habeas Corpus as claims 1-2.  *See* ECF No. 1 at 6-7.

[6]Petitioner asserts these grounds for relief in his federal Petition for Writ of Habeas Corpus as claims 3-6. *See* Lodgment 9 at 3-4, ECF No. 1 at 8-9.

[7]Petitioner incorporated by reference pro se discovery motions that he had previously filed in San Diego Superior Court.  (ECF No. 1-2, at 2, 6).

## II.     Federal Proceedings

On February 18, 2010, Petitioner filed the Petition for Writ of Habeas Corpus ("Petition") in this Court pursuant to 28 U.S.C. § 2254.  (ECF No. 1).  In his nearly 600 pages of briefing and exhibits, Petitioner raises six claims for relief – two claims alleging deprivation of Petitioner's right to due process related to the trial court's decision to play and permit the jury to review the police interview tapes; three claims alleging ineffective assistance of counsel related to defense counsel's alleged failure to investigate witnesses to the shooting; and one claim alleging that state prosecutors improperly withheld a list of witnesses favorable to the defense in violation of *Brady v. Maryland*.

On May 28, 2010, Respondent filed an Answer to the Petition, contending that Petitioner exhausted his state court remedies and that the Court should deny the Petition on its merits.  (ECF No. 16).  Respondent contended that claims one and two of the Petition should be denied because they are not cognizable on habeas review, and, alternatively, that the state court's decision to deny claims one and two was not contrary to, or an unreasonable application of, controlling Supreme Court precedent.

On September 7, 2010, Petitioner filed a motion for stay and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005).  (ECF No. 21).  Petitioner requested that the Court stay the Petition in abeyance to permit him to fully exhaust claims one and two before the California Supreme Court.

On September 15, 2011, the Court adopted a Report and Recommendation issued by the Magistrate Judge, and denied Petitioner's motion for stay and abeyance.  (ECF Nos. 27, 28).  The Court found that claims one and two of the Petition are cognizable federal claims that had been exhausted before the Petition was filed.

On December 29, 2011, Petitioner filed a Traverse.  (ECF No. 33).  On January 10, 2012, Petitioner filed a Motion to Amend Traverse, along with a proposed Amended Traverse.  (ECF Nos. 35, 35-1).  On April 18, 2012, the Magistrate Judge granted Petitioner's Motion to Amend Traverse pursuant to Federal Rule of Civil Procedure

15(a)(2), and stated that the Court would consider the Amended Traverse in its entirety. (ECF No. 39).

On September 4, 2012, the Magistrate Judge issued a Report and Recommendation, recommending that the Court deny the Petition in its entirety. (ECF No. 40).

On November 26, 2012, Petitioner filed Objections to the Report and Recommendation. (ECF No. 43). On December 17, 2012, Respondent filed a response to Petitioner's Objections. (ECF No. 45). On February 6, 2013, Petitioner filed a reply pursuant to Local Rule 7.1(e).

## STANDARDS OF REVIEW

*Review of the Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)*

The duties of the district court in connection with a Report and Recommendation of a Magistrate Judge are set forth in Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1). When a party objects to a Report and Recommendation, "[a] judge of the [district] court shall make a de novo determination of those portions of the [Report and Recommendation] to which objection is made." 28 U.S.C. § 636(b)(1). A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed. R. Civ. P. 72(b); *see also* 28 U.S.C. § 636(b)(1).

*Review of the Petition pursuant to 28 U.S.C. § 2254(d)*

In this case, review of the Petition is governed by the framework of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because the Petition was filed in 2010, well after the Act's effective date. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). As amended by AEDPA, 28 U.S.C. § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

1

2    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3 28 U.S.C. § 2254(d).

4    "Although AEDPA's scheme is complex, and its provisions have been subjected

5 to multiple, sometimes conflicting, interpretations, this much is clear: deference to state

6 court determinations must follow an adjudication on the merits." *Lambert v. Blodgett*,

7 393 F.3d 943, 965 (9th Cir. 2004). "When a federal claim has been presented to a state

8 court and the state court has denied relief, it may be presumed that the state court

9 adjudicated the claim on the merits in the absence of any indication or state-law

10 procedural principles to the contrary." *Harrington v. Richter*, — U.S. —, 131 S. Ct.

11 770, 784-85 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013)

12 (holding that when a state court rejects some claims on the merits but does not expressly

13 address a federal claim, there is a presumption subject to rebuttal that the state court

14 also adjudicated the federal claim on the merits). "The presumption may be overcome

15 when there is reason to think some other explanation for the state court's decision is

16 more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

17    Under 28 U.S.C. § 2254(d)(1), a state court decision is "contrary to" clearly

18 established precedent if it "applies a rule that contradicts the governing law set forth in

19 our cases" or if it "confronts a set of facts that are materially indistinguishable from a

20 decision of this Court and nevertheless arrives at a result different from our precedent."

21 *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (quotation omitted). A decision is

22 an "unreasonable" application if the state court "correctly identifies the governing legal

23 rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*,

24 529 U.S. at 407-08. "[A] federal habeas court may not issue the writ simply because the

25 court concludes in its independent judgment that the relevant state-court decision

26 applied clearly established federal law erroneously or incorrectly.... Rather, that

27 application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76

28 (2003) (internal quotation marks and citations omitted).

Under 28 U.S.C. § 2254(d)(2), "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## DISCUSSION

## I.    Claims One and Two: Deprivation of Due Process[8]

In claim one, Petitioner contends that the trial court "denied Petitioner due process and a fair trial [by] overruling defense objections to the prosecutor playing entire tapes (with accompanying transcripts) of all the recorded police interviews of the witnesses, [and admitting the tapes] wholesale over valid defense objections of foundation and evidence code section 352." (Lodgment 7 at 16; ECF No. 1 at 17).  In claim two, Petitioner contends that the trial court "deliberately g[ave] the jury tapes not in evidence during deliberation, constitut[ing] reversable error of receipt of extraneous matters under federal constitutional law."  (Lodgment 7 at 25; ECF No. 1 at 26). Petitioner contends that "[t]here would have been no conviction without all these compounded errors, and the case presents grave issues of a denial of basic fairness and due process...."  (Lodgment 7 at 33; ECF No. 1 at 34).

The California Supreme Court summarily denied Petitioner's Petition for Review, which is presumed to be an adjudication "on the merits" within the meaning of AEDPA. *See Harrington*, 131 S. Ct. at 784-85.  This Court must "look through" the California Supreme Court's summary denial and review the state court's last reasoned decision on

---

[8]In support of claims one and two of the Petition, Petitioner incorporates by reference pages 1-32 of his petition for review to the California Supreme Court. (Lodgment 7 at 1-32; ECF No. 1-11 at 2-34).

1   claims one and two, which is the California Court of Appeal's written decision

2   affirming Petitioner's conviction on direct appeal.  *See id.*; *Ylst*, 501 U.S. at 803

3   ("Where there has been one reasoned state judgment rejecting a federal claim, later

4   unexplained orders upholding that judgment or rejecting the same claim rest upon the

5   same ground.").

6       **A.      Decision of the California Court of Appeal**

7           Petitioner does not rebut the following factual summary of the Court of Appeal

8   regarding the trial court's evidentiary rulings:

9

10          The trial occurred about five years after the shooting and by that
        time many of the witnesses could not remember all the details of the
        events or testified to versions that differed from their taped interviews with
11      the police.   At trial, the prosecutor examined the witnesses on the
        statements they made to the police and then sought admission of excerpts
12      from the taped interviews of  [Arturo] Rivera's sister Norma Soltero, his
        cousin Evaelena Soltero, his aunt Joaquina Soltero, Adan, and Barajas on
13      the basis the excerpts were admissible as prior inconsistent statements
        under Evidence Code section 1235, as past recollection recorded under
14      Evidence Code section 1237, or as nonhearsay statements.   Although the
        defense had copies of the entire interviews for a significant period, it
15      received copies of the final redacted interviews shortly before the hearing.

16          The defense filed written objections to the use of the tapes.   At the
        hearing, defense counsel initially objected to playing the tapes rather than
17      reading the interview questions and answers.   Defense counsel generally
        conceded that the taped interviews included statements admissible under
18      Evidence Code sections 1235 and 1237, except for Barajas' taped
        statements, which defense counsel argued were not inconsistent with her
19      trial testimony.   Defense counsel, however, requested the court determine
        admissibility on a line-by-line basis.   The court agreed, but stated it would
20      be more efficient if defense counsel raised specific objections rather than
        going through line-by-line of each redacted tape on the record.   Defense
21      counsel told the court he needed an additional 20 minutes to examine the
        excerpts and the court granted his request.

22
            Following a recess, defense counsel objected to some of the
23      statements in the taped excerpts. The court ruled on the individual
        statements, finding most of the statements were prior inconsistent
24      statements, past recollection recorded or were not hearsay because they
        were not being admitted for the truth of the matter asserted.

25
    (Lodgment 6 at 5-6 (footnote omitted); *see also* Lodgment 2, volume 5 at 582-603, 626-
26
    635, 641-642).
27
        The Court of Appeal rejected claim one on the grounds that (1) the trial court
28
    considered and ruled individually on each specific objection to statements in the

excerpts; (2) the tapes did not contain all the police interviews but were limited to selected statements; (3) the court did not impose an improper burden on defense counsel in requiring specific objections to particular statements;[9] (4) the trial court did not err in admitting any statements under California Evidence Code section 1235, as each challenged statement either constituted a prior inconsistent statement or was not being offered for the truth of the matter asserted; and (5) the trial court properly instructed the jury regarding the statements on the tapes, and any error with the instructions was harmless.  (Lodgment 6 at 5-10).

Petitioner does not rebut the following summary of the Court of Appeal regarding the trial court's decision to permit the jury to play the police interview tapes during deliberations:

> Tapes of the redacted interviews were played for the jury but the court reporter did not report them.  During deliberations, the jury requested transcripts of the taped interviews.  The court noted the interview transcriptions had not been admitted into evidence and suggested the court reporter read the transcripts to the jury.  Defense counsel objected to playing the tapes for the jury or reading the transcripts because neither had been admitted into evidence.  The court responded that the contents of the interviews were evidence, which could have been recorded by the court reporter, but it had been agreed it was not necessary for the reporter to transcribe the tapes since the prosecutor had prepared transcripts.  Ultimately, when it became clear that the court would allow the reporter to read the transcripts to the jury, defense counsel requested that the tapes be played instead because the 'tape is the best evidence' and the court agreed to this request.  Defense counsel did not specifically object to the tapes being sent to the jury room with a recorder rather than having the court reporter play the tapes for the jury.  During a subsequent motion for a new trial, defense counsel indicated he had strategic reasons for requesting that the jury hear the tapes during deliberations.

(Lodgment No. 6, p. 13.).

Noting that the tapes "were not formally offered and admitted into evidence" (*Id.* at 14), the Court of Appeal found that "the court did err by sending the tapes into the jury room with a recorder, because it presented a danger the jury would give undue

---

[9]The Court of Appeal rejected Petitioner's contention that the court allowed the defense insufficient time to review the interview excerpts to formulate specific objections because "the record reflects that the court gave defense counsel all the time that was requested, that is, 20 minutes," and "[n]othing in the record suggests the court would not have provided additional time had it been requested." (Lodgment 6 at 7 n.3).

emphasis to the tapes." *Id.* Nevertheless, the Court of Appeal denied Petitioner's claim on the grounds that (1) Petitioner "waived review of the issue ... by requesting that the jury hear the tapes and not objecting to the court sending the tapes to the jury room without a tape recorder"; and (2) "overwhelming evidence support[ed] the aggravated assault and mayhem convictions, [and] there is no reasonable probability [Petitioner] would have received a more favorable result had the jury not been provided with the tapes during deliberations." *Id.*

## B.      Recommendation of the Magistrate Judge

With respect to claim one, the Magistrate Judge recommended that the Court deny relief on the grounds that: (1) the California Court of Appeal's decision was based on Petitioner's failure to object to certain statements, constituting a procedural default that is an independent and adequate basis for this Court to deny relief; and (2) the United States Supreme Court has never ruled that the admission of irrelevant or overtly prejudicial evidence by a state trial court is sufficient to warrant issuance of a writ. (ECF No. 40 at 13-14 (citing, *inter alia*, *Coleman*, 501 U.S. at 729; *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009))). The Magistrate Judge recommended that the Court deny claim two on the basis that Petitioner has failed to demonstrate that the jury's review of the police interview tapes during deliberations had a "substantial and injurious" effect on the outcome of the trial. *Id.* at 18 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Petitioner objects to the Magistrate Judge's recommendations on the following grounds: (1) the Magistrate Judge failed to consider whether Petitioner is entitled to relief from the state trial court's "introduction of extraneous information [to the jury] during deliberations;" (2) the Magistrate Judge and the California Court of Appeal "has misconstrued the objection of the tape being played at all and called it harmless error that petitioner waived appellate review because it is said by the Court that defense counsel did not object which in fact defense counsel did object numerous times throughout the proceedings;" and (3) the Magistrate Judge failed to consider

1    Petitioner's argument that the state trial court used the incorrect jury instruction,

2    constituting a "structural error." *Id.* at 4-8.

3       **C.**   **Analysis**

4       "[I]t is not the province of a federal habeas court to reexamine state-court

5    determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

6    In conducting habeas review, a federal court is limited to deciding whether a conviction

7    violated the Constitution, laws, or treaties of the United States. *Id.* The court's habeas

8    powers do not allow for the vacatur of a conviction "based on a belief that the trial

9    judge incorrectly interpreted the California Evidence Code in ruling" on the

10    admissibility of evidence. *Id.* at 72; *see also Randolph v. California*, 380 F.3d 1133,

11    1147 (9th Cir. 2004) ("A violation of state evidence rules is insufficient to constitute

12    a due process violation."); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)

13    ("On federal habeas we may only consider whether the petitioner's conviction violated

14    constitutional norms").

15       In *Jammal*, where the petitioner on federal habeas asserted that certain evidence

16    was improperly admitted against him at his state trial in violation of his right to a fair

17    trial, the Ninth Circuit elaborated on the interplay between state law and federal habeas

18    corpus:

> 19    [W]e note that failure to comply with state rules of evidence is neither a
> 20    necessary nor sufficient basis for granting habeas relief. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even
> 21    when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with
> 22    fundamental fairness. The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law
> 23    violation is largely beside the point.

24    *Jammal*, 926 F.2d at 919-20.

25       In this case, the Court will decline to adopt the recommendation of the Magistrate

26    Judge to deny claim one on the procedural basis that Petitioner failed to object to certain

27    evidence at trial. Respondent failed to raise such a procedural default defense in his

28    answer to the Petition, resulting in its waiver. *See Morrison v. Mahoney*, 399 F.3d

1042, 1046 (9th Cir. 2005) ("Procedural default, like the statute of limitations, is an affirmative defense.... We therefore ... hold that the defense of procedural default should be raised in the first responsive pleading in order to avoid waiver."). However, the Magistrate Judge further recommended denying relief on the substantive merit of the issue raised in claim one.

The Magistrate Judge correctly stated: "Although the [Supreme] Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, *see Williams,* 529 U.S. at 375, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Because no such clearly established federal law exists, the Court cannot conclude that the California Court of Appeal's decision to deny Petitioner relief from the trial court's evidentiary rulings, even if incorrect under California law, was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. 2254(d)(1); *see also Estelle*, 502 U.S. at 67 (rejecting the conclusion that evidence was "incorrectly admitted ... pursuant to California law" as a basis for federal habeas corpus relief); *Holley*, 568 F.3d at 1101. The Court adopts the recommendation of the Magistrate Judge to deny claim one on this basis.

With respect to claim two, the Magistrate Judge correctly stated that, under clearly established federal law, a federal habeas petitioner is not entitled to relief from a trial error unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The Ninth Circuit has interpreted "substantial or injurious effect" as meaning the petitioner would have received a more favorable result absent the error. *Bains v. Cambra*, 204 F.3d 964, 971 n. 2 (9th Cir. 2000). The California Court of Appeal recognized that "the [trial] court did err [pursuant to the California Evidence Code] by sending the tapes into the jury room with a recorder, because it presented a danger the jury would give undue emphasis

to the tapes." (Lodgment 6 at 14).  However, in light of Petitioner's admission that he fired the gun, and the eye-witness testimony elicited against Petitioner at trial, the Court finds that Petitioner has failed to adequately demonstrate that the trial court's decision to permit the jury to review the tapes during deliberations "had substantial and injurious effect or influence in determining the jury's verdict" on the mayhem and assault charges. *Brecht*, 507 U.S. at 637.  Accordingly, the Court of Appeal's decision to deny claim two was neither contrary to, nor an unreasonable application of, clearly established federal law. *Id.* at 14-15.  The Court adopts the recommendation of the Magistrate Judge to deny claim two.

Finally, Petitioner objects to the trial court's jury instructions. Petitioner contends the trial court's instructions to the jury regarding the interview tapes violated his Fourteenth Amendment due process rights.  Before playing the tapes, the trial court instructed the jury:

> [T]he People are proposing to play some tapes. These tapes contain statements of witnesses who have testified here before you.  They're being played for your consideration to determine whether or not these previous statements that were recorded were consistent or inconsistent with their testimony before you.  Some of the portions have been redacted because the Court felt that they were not relevant.  And you may consider[] this tape, this information you're going to hear for the purposes of testing the credibility of the witnesses as well as for purposes of determining whether or not what they said on the former occasion was in fact true.

(Lod. 2, 5 RT 644-45).  Before deliberations began, the trial court instructed the jury in part:

> During the trial, certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other. (CALCRIM No. 303.)

> You have heard evidence of statements that a witness made before the trial.  If you decide that the witness made those statements, you may use those statements in two ways:

> 1. To evaluate whether the witness's testimony in court is believable;

> AND

> 2. As evidence that the information in those earlier statements is true. (CALCRIM No. 3.18.)

> "Federal habeas courts ... do not grant relief, as might a state appellate court,

1    simply because the instruction may have been deficient in comparison to the CALJIC

2    model.  The only question for us is 'whether the ailing instruction by itself so infected

3    the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at

4    62 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973)); *see also Donnelly v.*

5    *DeChristoforo,* 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the

6    instruction is undesirable, erroneous, or even "universally condemned, but that it

7    violated some [constitutional right]").  "It is well established that the instruction 'may

8    not be judged in artificial isolation,' but must be considered in the context of the

9    instructions as a whole and the trial record." *Estelle*, 502 U.S. at 62 (quoting *Cupp,* 414

10   U.S. at 147).  The Court has reviewed the trial court's instructions to the jury in the

11   context of the entire record.  The Court does not find that the instructions "so infected

12   the entire trial that the resulting conviction violates due process." *Id.*  Accordingly, the

13   Court of Appeal's decision to deny relief from the trial court's jury instructions was

14   neither contrary to, nor an unreasonable application of, clearly established federal law.

15   **II.    Claims Three, Four and Six: Ineffective Assistance of Counsel**[10]

16          In claim three, Petitioner contends that his Sixth Amendment right to effective

17   assistance of counsel was violated when his trial counsel failed to investigate witnesses

18   to the shooting and failed to call those witnesses to testify.  (ECF No. 1-11 at 35).

19   Petitioner asserts that his wife, Sandy Barajas, gave Petitioner's defense counsel a list

20   of percipient witnesses. Petitioner contends that his counsel should have called these

21   witnesses to testify on his behalf.  Petitioner asserts that Miguel R. Rubio and Silvia

22   Escamilla each informed Petitioner's defense counsel and/or defense counsel's

23   investigator, prior to Petitioner's trial, that they were willing to testify to witnessing

24   someone other than Petitioner shoot Arturo Rivera.  In claim six, Petitioner contends

25   that his counsel was ineffective for failing to consult with and utilize a ballistics expert

26   at trial.  In claim four, Petitioner contends that his appellate counsel was ineffective for

27   ───────────────

28        [10]In support of claims three, four and six of the Petition, Petitioner incorporates by reference pages 33-52 and 59-67 of his habeas corpus petition before the California Supreme Court.  (Lodgment 7 at 33-52, 59-67; ECF No. 1-11 at 35-54, 61-69).

1  not raising an ineffective assistance of counsel claim against his trial counsel on the

2  same grounds raised in claims three and six of the Petition.

3       Respondent contends that Petitioner has failed to meet his burden of

4  demonstrating ineffective assistance of counsel under the "doubly deferential" standard

5  applied on collateral review.  With respect to claim three, Respondent asserts that "it

6  appears ... defense counsel was aware of the alleged eyewitnesses and made a strategic

7  decision not to call them to testify on Petitioner's behalf."  (ECF No. 16-1 at 22).

8  Respondent contends that "[d]efense counsel's alleged failure to interview any of the

9  witnesses noted by Petitioner could not have prejudiced the defense in this case"

10 because "[t]he alleged eyewitnesses' testimony would have been contradicted by

11 Petitioner's own testimony.  No rational jury could have concluded Petitioner did not

12 possess a gun and fire it repeatedly, given the overwhelming evidence, including

13 Petitioner's testimony, which was presented in this case."  *Id.*  With respect to claim six,

14 Respondent contends that Petitioner has failed to identify any specific ballistic expert

15 testimony that would likely have resulted in a more favorable outcome at trial.  With

16 respect to claim four, Respondent contends that Petitioner's appellate counsel was not

17 ineffective for failing to raise claims three and six on direct appeal because these

18 underlying claims have no merit.

19      Petitioner raised his ineffective assistance of counsel claims for the first time in

20 his habeas petition filed before the California Supreme Court.  (Lodgment 9).  The

21 California Supreme Court summarily denied the petition (Lodgment 10), which is

22 presumed to be an adjudication "on the merits" within the meaning of AEDPA.  *See*

23 *Harrington*, 131 S. Ct. at 784-85.  Because no reasoned state court decision exists as

24 to claims three, four, or six, the Court must independently review the state court record.

25      **A.**    **State Court Record**

26          **1.**    **Trial Testimony**

27      During the prosecution's case, Ramon Rubio Rodriguez testified that he

28 witnessed Petitioner pointing a gun at Arturo Rivera  (Lodgment 2, volume 2 at 109-

112), while Norma Alicia Soltero, sister of Arturo Rivera, testified that she witnessed Petitioner shooting a gun into the air and at Arturo Rivera's feet. *Id.* at 255-56. Evaelena Gallegos, cousin of Arturo Rivera, testified that she witnessed the events but did not see Petitioner with a gun; the prosecutor impeached Gallegos with her prior statement to police that she witnessed Petitioner holding a small silver or chrome handgun, walking towards Arturo Rivera. *Id.* at 394-95. Olivia Addison, who lived across the street from the convention hall at the time of the shooting, testified that she heard roughly seven gunshots, and that Petitioner was the only individual she witnessed holding a gun. (Lodgment 2, volume 3 at 448).

Petitioner was the only witness called to testify by the defense. On direct examination, Petitioner testified that he was beaten by the Rivera brothers inside the convention hall, eventually left through the back exit, was given a gun by his godfather to protect himself, and attempted to get in his car to drive home. Petitioner provided the following answers to the following questions regarding the events that followed:

> Q:    Where were you going to go when you got to your car?
> A:    I was going to go home.
>
> Q:    So what happened?
> A:    I got to the door. Boom, they come out and they say (Spanish word), which means, you know, 'that fucker's there.' And they immediately surrounded me.
> ...
> Q:    ...[H]ow many people were out in front at that point?
> A:    There was a group of people. Probably like ten.
>
> Q:    All right. Did they confront ya?
> A:    The one who confront[ed] me was Adan, Arturo and them guys.
>
> Q:    All right. Did they grab ya?
> A:    Yes, they did.
>
> Q:    Describe what happened.
> A:    Okay. As I approached the door, they came out and they came towards me. And I say – I say, you know, 'stay back.' They grab me by my shirt. They are just yanking me all over the place. I had the gun in my hand and I pulled back I said, 'Look, man, I've got a gun. Let me alone.' As I pulled the gun, pop, I shot one [bullet] into the floor.
>
> Q:    Why did you do that?
> A:    So I could scare them off.

Q:   Was anyone else holding on to you?
A:   Yeah, they were holding me.  They were yanking me all over the place.  As they came towards me – as they were there punching me – they were punching me, hitting me.  I just – I pulled the gun – I put the gun up in the air.  I said to them like two or three times, 'Come on, guys, leave me alone.'  Pop.  'Come on.  I've got a gun.  I don't want to hurt nobody.  You guys want to beat me up.  Leave me alone.'  But they continue struggles.  All those people were grabbing me, they were pulling me.  I remember one in the floor to scare them.  It was two to four shots in the air – pop, pop, pop – so I can scare them off....

Q:   Was a struggle going on?
A:   Yeah, struggle going on in the circles.  We were going to the left, going to the right as the gun in the air's going off.  Next thing you know, we were by the sidewalk.  I lost my balance.  I lost my balance.  And I caught them pulling my arm down.  That's when the rest of the shots – I was like pop, pop, pop.  There were all kinds of, like, shots fired – maybe three, four – while I went over to the sidewalk.

...

Q:   Did you ever intentionally shoot anybody?
A:   No, I never aimed my gun at nobody.  I never shot at nobody.

Q:   Did you ever intend to kill anybody?
A:   No.

Q:   All right.  Now, about how many shots were fired, if you know?
A:   Like I said, it was one in the ground, maybe, like three or four in the air while all that struggling was going on, and then, like another three, four, maybe, when I went over to the street when I kind of lost my balance.  I kind of went back – oh excuse me – I kind of went back like – pow.  They were pulling my hand down.  Pow.  I remember, like, turn – they were, like, turned me – pow – another one.

Q:   Now, did you ever chase anybody with a gun?
A:   No, I didn't. I never chased nobody.

Q:   Did you ever chase anybody with a gun pointed at them?
A:   No, I never chased nobody pointing a gun at nobody.

Q:   Now, at some point did the fight stop?
A:   Well, actually, when the – when the – when the last shot was going off, somebody – somebody said 'the police' or something like that.  It was a woman's voice.  I guess everybody scattered, started running....  I went ... to my car and left.

Q:   Where did you go?
A:   I went straight home.

Q:   Where was the gun?
A:   Still had the gun with me when I got home.

...

(Lodgment 2, volume 5 at 708-12).

Petitioner provided the following answers to the following questions on cross-examination:

> ...
> Q:  [H]ow many bullets were in [the gun] after you left?
> A:  I didn't check that.
>
> Q:  [W]hen you got into your car and you went home – ... you had that gun with ya, right?
> A:  Yes.
> ...
> Q:  Did you shoot that gun until the bullets stopped coming out?
> A:  Like I said, the bullets ran out – when we went pow, pow, the bullets – it just stopped shooting.
> ...
> Q:  To your knowledge, the gun was empty?
> A:  I figured it was as soon as it stopped shooting.
>
> Q:  Was [Pedro] on the ground then?
> A:  I didn't see him get hurt.
>
> Q:  Well, what was the last thing you remember when the gun stopped shooting?
> A:  When they said – they mentioned 'calle policia,' and they mentioned it in Spanish.  I guess everybody just scattered.  I took off....
> ...

*Id.* at 745-46.

### 2. Declarations attached to Petitioner's habeas petition before California Supreme Court

Sandy Barajas, Escamilla and Rubio submitted written declarations that Petitioner attached to both his habeas petition before the California Supreme Court and his Petition before this Court.  In her sworn declaration, Sandy Barajas stated:

> [O]n March 10, 2001, I attended the baptismal celebration in K-P Hall, in the city of National City, California.  I contacted the Law Firm of Jan Ronis & Ronis on numerous times to ask [Petitioner's] legal counsel (Jan Ronis) why weren't any of [Petitioner's] witnesses being called to testify.  He explained to me that they were going too and also advised me that I would be called to testify therefore, I could not be present or attend any of the trial hearings.  I was never called or contacted to be subpoena to the trial nor any of tile witnesses on his behalf.  To this day, I have no knowledge of why any of us were never contacted.  I provided the Jan Ronis Law Firm with several witnesses that were there on that day and never contacted for their statements.  I will provide a list of witnesses names at the end of this statement.  I believe [Petitioner] was unjustly

1    sentenced and deprived from his freedom without given the opportunity
2    to present the []evidence on his behalf....

(ECF No. 1-7 at 7).

In her sworn declaration, Escamilla stated:

> I ... attended a baptismal celebration on March 10, 2001. I am the
> grandmother of the child who was baptized. The baptismal celebration
> was held in K-P Hall in the city of National City, California. On March 10,
> 2001, I witnessed the shooting and struggle for the gun outside of this hall
> where the event took place. I was standing in front of the building K-P
> Hall front door smoking a cigarette when the Rivera brothers were
> walking out with other people. Both Rivera brothers (Adan and Arturo)
> and their friends were all yelling, screaming and seem to be mad, excited
> and they all had an aggressive attitude. They immediately headed towards
> [Petitioner], yelling 'There he is, get that puto.'  They immediately
> surrounded [Petitioner] and began to kick him, punch him and beat him
> down to hurt [Petitioner]. [Petitioner] tried to get away from the kicks and
> punches of his attackers. I remember [Petitioner] telling the Adan and
> Arturo (Rivera brothers) pleading them to stop, that he did not want to
> fight and that he ([Petitioner]) had a gun.  [Petitioner] continued warn
> them about the gun, and one of the brothers said to him that he did not
> have the balls to shoot anyone. They kept kicking him and attacking him.
> Then [Petitioner] shot one or two shots into the ground and the brothers
> began to struggle and more shots were fired in the air, while someone in
> the crowd at the same time was trying to struggle for the weapon.  That is
> when I believe the shots began to go in all directions. **I then remember
> hearing someone saying police, and I saw someone else grab the gun
> and tried to shoot [Petitioner] as he ran across the street.  I believe
> from what I witnessed the guy who had the gun was the one who shot
> Arturo and not [Petitioner] because he had already ran off and no one
> was hurt at that moment.**  I can identify all involved even the person
> who shot the gun at the end of the struggle.  If summon[ed] to testify, I
> will attest and testify in favor of [Petitioner]. I also contacted the Law
> Firm of Jan Ronis and Ronis and spoke with one of his investigators Juan
> Lopez along with Jan Ronis in regards to my testimony. I told the
> investigator that [Petitioner] had not shot the victim, and that I would
> testify to my testimony.   However I was never contacted again and I
> contacted them a few times and left messages. I was never asked to appear
> in trial or submit my testimony in front of a judge.

*Id.* at 4 (emphasis added).  In his sworn declaration, Rubio stated:

> I was inside the KP Hall location greeting incoming guest, and
> friends who had previously arrived when I heard an argument or what
> sounded like a fight in the opposite room where I was in. I was told about
> a fight in the dancing room area and I immediately ran towards the
> individuals, but whatever it was it had been stopped.  The individual
> [Petitioner] was bleeding from different areas in his face, and I looked to
> see who had been involved, and noticed my friends Adan and Arturo the
> brothers were being held back by a few people they had arrived with. I
> was a little upset since they were ruining my celebration for my son, and
> they had arrived with lots of friends who I had never known or invited to
> the celebration. I was also concern with [Petitioner] bleeding heavily from
> the face and looked really injured, I guess Adan, Arturo and the friends

along with family were still very angry because names were being yelled to [Petitioner].  By this time everyone was making their way towards the front entrance, once outside either Adan or Arturo yelled there is that puto let's get him, and I turned to see who it was and it was [Petitioner] once surrounded by at least 4-5 people another fight began, but this time [Petitioner] was being jumped, there was someone screaming to leave me alone, I have a gun and I don't want to hurt anyone I saw it was [Petitioner] trying to warn or scare people, the fight continued that's when I heard and saw a gun being shot in the air.  **A struggle for the gun began and everyone was trying to take control of it, while at the same time kicking was going on and [Petitioner] stumble to the floor and a lot of gun shots were fired towards all directions, someone yelled hey Police people ran all directions.  Once everyone ran 2 shots were fired towards Arturo from another short male in the group.**  I had always told this story to the attorney's helper a Juan, and I was told I would need to tell this to the courts, but I never received a call or a time to appear and tell my side.  I also recall leaving 2-3 messages for a Ronis Lawyer.  I was never asked to come to courts to tell them I was a witness to this fight.

*Id.* at 2 (emphasis added).

## B.       Recommendation of the Magistrate Judge

The Magistrate Judge recommended denying claim three, concluding that Petitioner's counsel made a reasonable tactical decision not to investigate or call Escamilla or Rubio to testify. (ECF No. 40 at 25).  The Magistrate Judge did not consider the above declarations, and found that the Petition contains merely a "conclusory assertion that particular individuals could have testified that he was not the only shooter if only his attorney had investigated and called them as witnesses...."  *Id.* at 21.  The Magistrate Judge recommended denying claim six on the ground that defense counsel did not perform in an objectively unreasonable manner by failing to call a ballistics expert.  The Magistrate Judge recommended denying claim four, concluding that Petitioner's appellate counsel could not have been ineffective for failing to raise claims three and six on direct appeal because these underlying claims are without merit.

Petitioner objects to the Magistrate Judge's recommendation to deny claim three on the grounds that: (1) "deficient performance ... has been established in this case" because his counsel "failed to present any defense to the crime of which Petitioner was charged [and] failed to interview witnesses who would corroborate third party culpability"; and (2) prejudice has been established because evidence "that raise[s]

sufficient doubt ... to undermine confidence in the verdict" would have been introduced had his counsel performed reasonably. *Id.* at 9.   Petitioner objects to the recommendation to deny claim six on the basis that the Magistrate Judge improperly found that "no expert witness could have contributed to Petitioner's defense in the manner presented." *Id.* at 11.

### C.   Analysis

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id*.  Second, he must show that counsel's deficient performance prejudiced the defense. *Id*.  This requires showing that counsel's errors were so serious that they deprived Petitioner "of a fair trial, a trial whose result is reliable." *Id*.  The standards under both *Strickland* and section 2254(d) are highly deferential, and they become "doubly deferential" when *Strickland* and section 2254(d) apply "in tandem." *Harrington v. Richter*, 131 S. Ct 770, 788 (2011).  Federal habeas courts approach an ineffective assistance of counsel claim with the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, 131 S. Ct. 1488, 1403 (2011).

The state court record shows that Rubio and Escamilla each stated, in sworn declarations, that they informed Petitioner's defense counsel prior to trial that they (1) witnessed Petitioner shooting at the ground and into the air; (2) witnessed a struggle for Petitioner's gun involving several people; (3) heard someone yell "police"; and (4) witnessed someone other than Petitioner shoot Rivera as everyone was dispersing from the scene.  Rubio and Escamilla each stated that Petitioner's defense counsel did not follow up with them prior to trial.  Neither Rubio nor Escamilla were called to testify at trial.

On federal habeas review, "counsel's attention to certain issues to the exclusion of others [is presumed to] reflect[] trial tactics rather than 'sheer neglect.'" *Richter*, 131 S. Ct. at 790 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)). "[T]he question is not whether counsel's actions were reasonable," but rather, "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 788. To the extent Escamilla and/or Rubio would have testified that an individual other than Petitioner acquired possession of Petitioner's gun and shot Arturo Rivera after "police" was yelled, this testimony would have conflicted with Petitioner's testimony that he retained possession of the gun at all times, that shots were fired before, but not after, he heard "police," and that the gun would no longer fire bullets when he heard "police." To the extent Rubio would have testified that an individual other than Petitioner used a different gun to shoot Arturo Rivera after "police" was yelled, this testimony would have conflicted with Petitioner's testimony that he possessed the only gun at the scene, and that shots were fired before, but not after, he heard "police." Such conflicting testimony would have impugned Petitioner's credibility. Jurors would have been less likely to believe Petitioner's testimony that he did not intentionally shoot anyone and that he possessed the gun merely to protect himself. As a result, a conviction on the attempted murder count, for which jurors were unable to reach a verdict, would have been more likely. Accordingly, the Court finds that reasonable, strategic, reasons existed for defense counsel not to investigate or call these witnesses, even if these witnesses did contact defense counsel prior to trial. Pursuant to the "doubly deferential" standard of review required under *Strickland* and § 2254(d), the Court concludes that the decision of the California Supreme Court to deny relief as to claim three was neither contrary to, nor an unreasonable application of, clearly established federal law.[11]

With respect to claim six, the Court has considered Petitioner's contentions that

---

[11]In light of the sworn declarations submitted by Rubio and Escamilla, the Court will grant a certificate of appealability as to claim three of the Petition.

his counsel was ineffective for not retaining an independent ballistics expert to testify at trial.  In light of the Court's decision as to claim three, the Court concludes that Petitioner has failed to adequately demonstrate that the decision of the California Supreme Court to deny relief was contrary to, or an unreasonable application of, clearly established federal law.  *See Turner*, 281 F.3d at 876 ("The choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'" (quoting *Strickland*, 466 U.S. at 491)).

Finally, in claim four, Petitioner contends that his appellate counsel was ineffective for failing to raise claims three and six of the Petition on direct appeal.  For the same reasons the Court denied claims three and six, discussed above, the Court concludes that the decision of the California Supreme Court to deny claim four was neither contrary to, nor an unreasonable application of, clearly established federal law.

The Court adopts the recommendation of the Magistrate Judge to deny claims three, four and six of the Petition.

## III.   Claim Five: *Brady* Violation[12]

In claim five, Petitioner contends: "The People's failure to comply with the requirements of *Brady v. Maryland* violated Petitioner's right to due process and a fair trial and warrants reversal of the conviction; along with a violation of *Brady v. Maryland* on collateral attack."  (ECF No. 1-11 at 55-59).  Petitioner asserts that the prosecution failed to disclose evidence "concerning[Sandy Barajas] knowing that there were many eyewitnesses, including herself, who knew petitioner was not the person who shot the victim."  *Id.* at 58.  "But for the People's Constitutional and Statutory violations, Petitioner would not have been convicted."  *Id.* at 59.

Petitioner raised claim five for the first time in his habeas corpus petition (Lodgment 9) filed before the California Supreme Court.   The California Supreme Court summarily denied the petition (Lodgment 10), which is presumed to be an

---

[12]In support of claim five, Petitioner incorporates by reference pages 53-58 of his habeas corpus petition before the California Supreme Court.  (Lodgment 7 at 53-58; ECF No. 1-11 at 55-60).

adjudication "on the merits" within the meaning of AEDPA. *See Harrington*, 131 S. Ct. at 784-85. Because no reasoned state court decision exists as to claim five, the Court must independently review the record to determine whether Petitioner is entitled to relief.

The Magistrate Judge recommended that the Court deny claim five because Petitioner's defense counsel was aware of the witnesses Petitioner alleges the prosecution failed to disclose. (ECF No. 40 at 30-31). Petitioner objects to this recommendation on the basis that the Magistrate Judge improperly relied on a Sixth Circuit case that "does not have a link to Supreme Court precedent." (ECF No. 43 at 10-11).

The Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment. *See Brady*, 373 U.S. at 83; *United States v. Agurs*, 427 U.S. 97 (1976). A *Brady* claim contains three essential elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999)). To be found unconstitutional, a failure to disclose must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Agurs*, 427 U.S. at 108.

In this case, even if the prosecution did fail to disclose Sandy Barajas' list of witnesses to defense counsel, Petitioner cannot establish that he was prejudiced as a result. As discussed above, Sandy Barajas stated in her sworn declaration: "I provided the Jan Ronis Law Firm with several witnesses that were there on that day and never contacted for their statements. I will provide a list of witnesses names at the end of this statement." (ECF No. 1-7 at 7). There is no evidence that Sandy Barajas gave any name to the prosecution that was not also given to defense counsel. Accordingly, any failure to disclose by the prosecution could not have been "of sufficient significance to

result in the denial of the defendant's right to a fair trial." *Agurs*, 427 U.S. at 108. The Court concludes that the decision of the California Supreme Court to deny claim five was neither contrary to, nor an unreasonable application of, clearly established federal law.

The Court adopts the recommendation of the Magistrate Judge to deny claim five of the Petition.

## IV.   Evidentiary Hearing

The Court adopts the recommendation of the Magistrate Judge to deny Petitioner's request for an evidentiary hearing. *See Pinholster*, 131 S. Ct. at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court.").

## CERTIFICATE OF APPEALABILITY

A certificate of appealability must be obtained by a petitioner in order to pursue an appeal from a final order in a Section 2254 habeas corpus proceeding. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). It must appear that reasonable jurists could find the district court's assessment of the petitioner's constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The Court concludes that jurists of reason could find it debatable whether this Court was correct in denying claim three of the Petition. A certificate of appealability is granted as to claim three.

## CONCLUSION

IT IS HEREBY ORDERED that the Report and Recommendation (ECF No. 40) is **ADOPTED**, in part, in accordance with the rulings of this Order. The Petition for

Writ of Habeas Corpus (ECF No. 1) is **DENIED**.  A certificate of appealability is **GRANTED** as to claim three.

DATED:  September 10, 2013

**WILLIAM Q. HAYES**
United States District Judge