**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROGELIO CUEVAS ESPINOZA,<br><br>                              Petitioner,<br><br>v.<br><br>SHAWN HATTON, Warden,<br><br>                              Respondent. | Case No.:  10cv397-WQH-BGS<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS POST REMAND AND EVIDENTIARY HEARING** |

## I.    INTRODUCTION

Rogelio Cuevas Espinoza ("Petitioner"), a state prisoner proceeding in forma pauperis,[1] filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition") on February 18, 2010 seeking relief from his March 2006 convictions of

---

[1] Petitioner was initially proceeding *pro se*, but was appointed counsel on appeal by the Ninth Circuit. (*See* ECF No. 55.)

mayhem and assault with a semi-automatic firearm in San Diego County Superior Court, Case No. SCS158094. He is serving a sentence of 29 years to life for those convictions.[2]

As is relevant to this proceeding, the Petition included an ineffective assistance of counsel claim against Petitioner's trial attorney for failing to interview two witnesses, Miguel R. Rubio ("Rubio") and Silvia Escamilla ("Escamilla"), whose sworn declarations were submitted with the Petition. On September 10, 2013, United States District Judge William Q. Hayes adopted in part a Report and Recommendation issued by the undersigned judge, denying the Petition and granting a certificate of appealability as to the ineffective assistance of counsel claim discussed above. (ECF No. 47.) On December 19, 2016, the Ninth Circuit issued a 2 to 1 decision remanding this action back to this Court "for an evidentiary hearing on counsel's failure to interview the two witnesses." (Memorandum Disposition, ECF No. 64 at 5.)[3] Following remand, Judge Hayes referred the matter to the undersigned judge to hold the evidentiary hearing ("Hearing") and issue a report and recommendation. (ECF No. 65.)

This case is before the undersigned Magistrate Judge pursuant to Southern District of California Civil Local Rule 72.1(d) for a report and recommendation. The Court submits this Report and Recommendation to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule HC.2 of the United States District Court for the Southern District of California.

Upon consideration of the evidence and testimony adduced at the Hearing, the parties' post-Hearing briefing and controlling authority and for the reasons discussed

---

[2] Petitioner was sentenced to a four-year term for mayhem and a 25-year to life term for personally discharging a firearm and causing great bodily injury during the mayhem. (Cal. Pen. Code § 12022.53(d)).

[3] ECF citations reference the CM/ECF pagination system. Citations to Lodgments reference the Lodgment's pagination. "EHRT" refers to the to the Reporter's Transcript for the Evidentiary Hearing and "Ex." refers to an exhibit admitted at the Hearing. Unless otherwise indicated throughout this order, page references for the EHRT and Exhibits proffered by the parties at the Hearing refer to internal pagination.

below, it is **RECOMMENDED** that Judge Hayes find: (1) Miguel Rubio and Sylvia Escamilla are not credible witnesses; (2) trial counsel was not deficient in not interviewing them and presenting their testimony at trial; (3) trial counsel's actions did not constitute ineffective assistance of counsel; and accordingly, (4) the Petition should be **DENIED.**

## II.     BACKGROUND

### A. Factual Background

The following summary of the events at issue is taken from the Ninth Circuit's decision:

> On March 10, 2001, Espinoza attended a relative's party at a convention hall in celebration of a baptism. At the party, a fight erupted between Espinoza and two brothers, Arturo Rivera (Arturo) and Adan Rivera (Adan). Espinoza was wounded during the fight, and then retreated. Espinoza's uncle handed him a semi-automatic handgun and showed him how to use it.
>
> Shortly thereafter, a second confrontation occurred outside the party. Espinoza fired the gun several times at the ground, in the air, and in Arturo's general direction to keep Arturo and Adan at bay. A crowd quickly gathered, and a struggle ensued to wrest the gun away from Espinoza. Espinoza fired the gun during this struggle several times in various directions, by his account, "because people were 'yanking' at his hand." Arturo was shot in the right eye, which he consequently lost. Forensic evidence suggested that Arturo was shot from a distance of more than three or four feet. Eight cartridge casings and a bullet fragment were recovered. Forensics showed the bullets had all been fired from the same gun, while the shooter was moving.
>
> Espinoza was charged with attempted murder, mayhem, and assault with a semi-automatic weapon. Espinoza was the only defense witness at his trial, testifying that the shooting was accidental, that he did not intend to actually shoot Arturo. The jury deliberated for three days and requested the taped interviews during deliberations. Ultimately, the jury deadlocked on the attempted murder charge, but convicted Espinoza on the assault and mayhem charges. He was sentenced to four years for mayhem and a consecutive term of 25 years to life in prison for the assault conviction.

(Mem. Disp. at 2–4.) Additional summaries of the underlying facts of this case are provided in this Court's September 4, 2012 Report and Recommendation (ECF No. 40)

10cv397-WQH-BGS

and District Judge William Q. Hayes' September 10, 2013 Order (ECF No. 47). (*See* ECF Nos. 40 at 2–4; 47 at 1–3.)

### B. Procedural Background

In March of 2006, roughly five years after the shooting, a jury convicted Petitioner of mayhem involving the intentional and personal discharge of a firearm that caused great bodily injury, Cal. Pen. Code §§ 203, 12022.53(d), and assault with a semi-automatic firearm involving the personal use of the firearm and personal infliction of great bodily injury. *Id.* §§ 245(b), 12022.5(a)(1); 12022.7(a). The jury deadlocked on a count of attempted murder and the court declared a mistrial on that count. The court sentenced Petitioner to a four-year middle term for mayhem and a consecutive term of 25 years to life for personally discharging a firearm and causing great bodily injury during the mayhem. *Id.* § 12022.53(d). The court stayed the remaining terms for the other counts and enhancements. *Id.* § 654. (Lodgment 6.)

Petitioner then appealed the convictions in the Fourth District of the California Court of Appeal. (Lodgments 3–5.) On direct appeal, he raised no ineffective assistance of counsel claims. (Lodgment 3 at 18, 38, 50; Lodgment 6 at 2.) The state appellate court unanimously affirmed the trial court's decision. (Lodgment 6 at 16.) Next, Petitioner sought review of the appellate court decision before the California Supreme Court. (Lodgment 7.) The California Supreme Court denied Petitioner's state petition without comment. (Lodgment 8.)

On August 31, 2009, Espinoza filed a Petition for Writ of Habeas Corpus with the California Supreme Court. (Lodgment 9.) The state habeas petition raised claims alleging ineffective assistance of trial and appellate counsel. The California Supreme Court denied the state petition without comment.[4] (Lodgment 10.)

---

[4] Petitioner also attached an October 23, 2009 Motion for Discovery And Interrogatories with his habeas petition to the California Supreme Court, Case No. S175936 (Petition.\ Appendix B at 27–37, 39–45, ECF No. 1-1) seeking, among other things, evidence to

On February 18, 2010, Espinoza filed a Petition for Writ of Habeas Corpus (the "Petition") in this Court asserting three grounds for review, including Petitioner's Sixth Amendment ineffective assistance of counsel claim regarding trial counsel's purported failure to interview witnesses. ("Petition", ECF No. 1.) Respondent filed an answer on Mary 28, 2010. (ECF No. 16.)

On September 4, 2012, this Court issued a Report and Recommendation recommending the Petition be denied. (ECF No. 40.) On September 10, 2013, United States District Judge William Q. Hayes adopted the Report and Recommendation in part, denying the Petition and granting a certificate of appealability as to the ineffective assistance of counsel claim discussed above. (ECF No. 47.) Petitioner appealed. (ECF No. 49.)

On December 19, 2016, the Ninth Circuit issued a 2 to 1 decision reversing the Petition's denial and remanding this action back to this Court "for an evidentiary hearing on counsel's failure to interview the two witnesses." (Mem. Disp. at 5.) Following remand, Judge Hayes referred the matter to the undersigned judge to hold an evidentiary hearing ("Hearing") and issue a Report and Recommendation. (ECF No. 65.)

The Hearing took place over four days: February 28, 2018; March 2, 2018;[5] March 9, 2018; and September 14, 2018.[6] (ECF Nos. 110, 111, 112, 136.) Following numerous

_____

substantiate his ineffective assistance of counsel claims. His post-trial pro se discovery motion failed twice in the superior court (*see* Petition Ex. 3, ECF No. 1-2, at 2, 6), and he received no evidentiary hearing or other response to that Motion when the supreme court summarily denied his habeas petition on February 10, 2010. (Petition at 4; Petition Appendix A, at 24, ECF No. 1-1.)

[5] Due to the last-minute unavailability of trial counsel Jan Ronis, no witnesses were called on March 2, 2018. The Court discussed the evidence with counsel for both parties and entered some exhibits into evidence.

[6] After the Hearing, the parties submitted briefing on the admissibility of Petitioner's proposed *Strickland* expert's testimony. On March 29, 2019, this Court excluded Petitioner's *Strickland* expert's testimony, finding that an expert would not assist the Court in its analysis of Petitioner's ineffective assistance of counsel claim. (ECF No. 140.) On

extensions, Respondent's post-Hearing brief was filed on August 15, 2019 (ECF No. 152) and Petitioner's post-Hearing brief was filed on September 12, 2019 (ECF No. 157).[7]

### III.   SCOPE OF EVIDENTIARY HEARING ON REMAND

In their post-Hearing briefs, Petitioner and Respondent take differing views of the scope of the Ninth Circuit's remand. Consistent with prior filings, Petitioner argues for a more expansive view of the Ninth Circuit's remand. He argues now that the Ninth Circuit's order requires the Court to address whether trial counsel was deficient for (1) failing to interview witnesses *other* than Miguel Rubio and Sylvia Escamilla who provided statements in police reports purportedly identifying a shooter whose description did not match that of Petitioner and thus (2) selecting the "weak and inconsistent defenses" of self-defense and accidental shooting. (ECF No. 157 at 13–16, 26–29; s*ee* ECF No. 138 at 2.) Respondent argues the rule of mandate limits the issues to be decided in this proceeding to whether (1) Rubio and Escamilla are credible witnesses and (2) if trial counsel was deficient for failing to investigate and present their testimony at trial. (ECF No. 152 at 5–6.) In keeping with its prior ruling, this Court disagrees with Petitioner's framing of the scope of the remand. (*See* ECF No. 140 at 4–5.)

The Ninth Circuit has "repeatedly held, in both civil and criminal cases, that a district court is limited by this court's remand in situations where the scope of the remand is clear." *United States v. Thrasher*, 483 F.3d 977, 982–83 (9th Cir. 2007) (quoting *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006)) (holding the district court did

---

April 23, 2019, Judge Hayes granted Petitioner's unopposed motion (ECF No. 141) to file written objections to this Court's order excluding the *Strickland* expert's testimony in his post-evidentiary hearing brief or in his final objections to the instant Report and Recommendation. (ECF No. 143.) Petitioner makes no such objection in his post-evidentiary hearing brief. (*See* ECF No. 157.)

[7] Briefing was to be fully submitted on May 31, 2019, but was extended until September 16, 2019 based on requests by the parties. Petitioner's counsel requested four continuances. (ECF Nos. 144, 146, 148, 155.) Respondent's counsel requested one continuance. (ECF No. 150.)

not err in refusing to consider the merits of an ineffective assistance of counsel argument based on new evidence presented during a post-appeal evidentiary hearing, as the case was "remanded for a single purpose", a hearing to resolve a critical disputed fact, and thus "the plain language of the disposition precluded the district court from considering any other arguments concerning [counsel's] effectiveness"); *see Holmes v. Miller*, 768 F. App'x 781, 782–83 (9th Cir. 2019) (affirming the district court "correctly understood the scope of [it's] remand", which did not include taking evidence concerning an ineffective assistance of counsel claim regarding counsel's trial strategy that had not been raised in her petition); *see also Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 883 (9th Cir. 2005) ("There is nothing in our prior decision that indicates that we issued an open remand. Rather, in remanding to the district court, our opinion contemplates a trial to resolve the only remaining genuine issue of material fact."), *abrogated on other grounds by Rimini St., Inc. v. Oracle USA, Inc.*, ___ U.S. ___, 139 S. Ct. 873 (2019); *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005) (when ineffective assistance of counsel claim is remanded for evidentiary hearing, petitioner may not add "unrelated alleged instances of counsel's ineffectiveness" but may "develop additional facts supporting *that particular claim*" (emphasis added)).

Under the rule of mandate, "[a] district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it.  At the same time, the rule of mandate allows a lower court to decide anything not foreclosed by the mandate." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) (citations omitted).  "[I]n construing a mandate, the lower court may consider the opinion the mandate purports to enforce as well as the procedural posture and substantive law from which it arises." *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000). "'[T]he ultimate task is to distinguish matters that have been decided on appeal and are therefore beyond the jurisdiction of the lower court, from matters that have not . . . .'" *United States v Perez*, 475 F.3d 1110, 1113 (9th Cir. 2007).  A violation of the

rule of mandate is jurisdictional error. *Hall*, 697 F.3d at 1067 (citing *Thrasher*, 483 F.3d at 982).

Here, the scope of the remand is clear: the Ninth Circuit "REVERSE[D] and REMAND[ED] for an evidentiary hearing before the district court on Espinoza's *Strickland* claim to consider whether trial counsel was deficient as well as Escamilla and Rubio's credibility." (Mem. Disp. at 12.) Petitioner's ineffective assistance of counsel claim regarding trial counsel's failure to interview declarants Rubio and Escamilla was the only claim certified for appeal to the Ninth Circuit. (ECF No. 47 at 24 n.11 ["In light of the sworn declarations submitted by Rubio and Escamilla, the Court will grant a certificate of appealability as to claim three of the Petition."]; *see* Mem. Disp. at 5 ["The district court denied Espinoza's claims, but certified for appeal Espinoza's *Strickland* claim regarding his counsel's failure to interview Escamilla and Rubio. Espinoza's failure to interview claim is the only claim before this court on appeal."].)

Ineffective assistance of counsel claims involve a two-part inquiry. First, under *Strickland v. Washington*, 466 U.S. 668 (1984), Petitioner must show that his counsel's performance was deficient, that it "fell below an objective standard of reasonableness." 466 U.S. at 688. In representing his client, trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Second, Petitioner must show that "the deficient performance prejudiced the defense." *Id.* at 687. To make this showing, he must prove that "there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." *Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995).

Because there was no evidence in the state court record to explain trial counsel's behavior regarding Escamilla and Rubio, the Ninth Circuit assumed that the California Supreme Court decided Petitioner's case on prejudice grounds. (Mem. Disp. at 7.) It proceeded to find that based on the contents of Escamilla and Rubio's declarations, Petitioner had satisfied *Strickland*'s prejudice prong. (*Id.* at 7–8.) The Ninth Circuit

8

recounted exactly what Escamilla and Rubio would have testified to: "that Espinoza fired several shots in [the victim's] direction before a struggle ensued"; "[d]uring this struggle, numerous people tried to get control of the gun and several more shots were fired in all directions"; and "someone got the gun away from Espinoza and fired it at [the victim]." (*Id.* at 8.) Ultimately, the Ninth Circuit was "convinced that Escamilla and Rubio's testimony creates 'a reasonable probability' that 'the fact-finder would have had a reasonable doubt as to Espinoza's guilt,' *Strickland*, 466 U.S. at 696 (other citation omitted)." (*Id.* at 9.) Thus, the Ninth Circuit held that *Strickland*'s prejudice prong was satisfied provided Escamilla and Rubio are found credible.

Because of this determination, the Ninth Circuit specifically framed its remand in the context of *Strickland*'s deficiency prong and the two declarants, Escamilla and Rubio. The order states, "[w]e reverse the district court's denial of Espinoza's petition and remand to the district court for an evidentiary hearing on counsel's failure to interview *the two witnesses*." (*Id.* at 5 [emphasis added].) The Court further elaborated that "[b]ecause there is no record about trial counsel's *failure to investigate Escamilla and Rubio*, there is an issue as to whether an evidentiary hearing on the matter is appropriate." (*Id.* at 9 [emphasis added].) It found, "Espinoza is entitled to an evidentiary hearing because 'his allegations,[8] if proved, would entitle him to relief.'" (*Id.* at 11 [citation omitted].)

_____

[8] As set forth in his Petition, Petitioner's allegations are made in reference to counsel's failure to investigate and interview Rubio and Escamilla. (ECF No. 1-11 at 44–46.) In his original Petition, Petitioner references "Nine (9) potential known witnesses" that were not investigated, consulted, or called to testify for the defense. (ECF No. 1-11 at 46.) Including Sandy Espinoza herself, there are *eight* witness names provided in Sandy Espinoza's declaration: Silvia Escamilla, Miguel Rubio, Julieta Sillas, Rosafe Cuevas, Adolfo Cuevas, Leticia Hernandez, and Antonio Hernandez. (ECF No. 1-7 at 7.) Escamilla and Rubio were the only individuals who allegedly witnessed the shooting and provided declarations in support of the Petition. (*See* ECF No. 1-7 at 1–5 [Escamilla and Rubio declarations].) Despite Petitioner naming these additional "known witnesses" in his failure to interview claim, the Ninth Circuit *only* addressed Escamilla and Rubio. This fact underscores the limited scope of the Ninth Circuit's remand. Further, of the remaining "known witnesses",

Ultimately, the Ninth Circuit reversed and remanded "for an evidentiary hearing to consider whether trial counsel was deficient as well as Escamilla and Rubio's credibility." (*Id.* at 12.) Given that the Ninth Circuit has already found Petitioner satisfied *Strickland*'s prejudice prong based on the contents of Escamilla and Rubio's sworn declarations, the scope of the evidentiary hearing on remand requires this Court to assess *Strickland*'s deficiency prong, and whether trial counsel was deficient *in light of* the Court's assessment of Escamilla and Rubio's credibility. (*See id.* at 9 ["Because there is no record about trial counsel's failure to investigate Escamilla and Rubio, there is an issue as to whether an evidentiary hearing on the matter is appropriate."].)

Accordingly, this Court finds that the scope of the remand regarding *Strickland*'s deficiency prong is clear: the district court must conduct "an evidentiary hearing on counsel's failure to interview *the two witnesses*", Escamilla and Rubio. (*Id.* at 5 [emphasis added].) *See Thrasher*, 483 F.3d at 982 (district court did not err in refusing to consider the merits of an ineffective assistance of counsel argument based on new evidence presented during a post-appeal evidentiary hearing, as "the plain language of the [Ninth Circuit's] disposition precluded the district court from considering any other arguments concerning [counsel's] effectiveness"); *see Holmes*, 768 F. App'x at 782–83 (affirming the district court "correctly understood the scope of [it's] remand", which did not include taking evidence concerning an ineffective assistance of counsel claim regarding counsel's trial strategy that had not been raised in her petition); *Love v. Scribner*, 691 F. Supp. 2d 1215, 1232–33 (S.D. Cal. 2010) (holding that the Ninth Circuit's remand to district court was limited to holding an evidentiary hearing to decide if respondent struck juror because she was African-America), *aff'd sub nom. Love v. Cate*, 449 F. App'x 570 (9th Cir. 2011);

---

Julieta Silas, Rosafe Cuevas, and Adolfo Cuevas provided police statements following the shooting saying they did not see the shooting and did not know who the shooter was. (*See* Ex. M at 3, 6, 78–79.) Other than Sandy Espinoza and Silvia Escamilla, none of the other "known witnesses" testified at the Hearing. (*See* EHRT vol 1 at 2; EHRT vol 3 at 2; EHRT vol 4 at 2.)

*Love v. Scribner*, 278 F. App'x 714, 718 (9th Cir. 2008) ("We therefore REVERSE and REMAND for an evidentiary hearing to determine whether the prosecution struck Ms. M. from the jury because of her race."); *Olivas v. Whitford*, No. 14-CV-1434-WQH-BLM, 2019 WL 3974086, at *5 (S.D. Cal. Aug. 22, 2019); *Lane v. McGrew*, No. CV 13-8448-GW (PLA), 2016 WL 8737522, at *3 (C.D. Cal. Dec. 7, 2016) ("clear remand order prohibits the Court from addressing the issues that petitioner has asserted for the first time on remand" as the remand order "prohibit[ed] this Court from examining any issue other than the sole issue set forth in the remand order"), *report and recommendation adopted*, No. CV 13-8448-GW(PLA), 2017 WL 1395602 (C.D. Cal. Apr. 14, 2017), *aff'd sub nom. Lane v. Swain*, 910 F.3d 1293 (9th Cir. 2018). This requires assessing the credibility of the declarants and whether trial counsel was deficient in not calling them to testify. Notwithstanding, this Court addresses Petitioner's additional claims regarding trial counsel's deficiency in the body of this Report and Recommendation.

## IV. EVIDENTIARY HEARING

Over the course of the four-day Hearing, Petitioner and Respondent offered extensive evidence on the issues of trial counsel Jan Ronis' purported deficiency and the credibility of the two declarants Silvia Escamilla and Miguel Rubio in the forms of live testimony and numerous exhibits.[9] The following witnesses testified: Daniel Alatorre, Silvia Escamilla, Sergeant Steve Shephard, Sergeant Estella Cordero, Jan Ronis, Esq., Juan Antonio Lopez, Sandy Barajas[10] and Barbara Ann Smith, Esq. Despite Petitioner's attempts to contact Miguel Rubio, he did not present at the Hearing.

### A. Daniel Alatorre

a. <u>Hearing Testimony</u>

---

[9] Rulings on evidentiary issues are addressed below. *See* Section VII.

[10] Sandy Barajas is Petitioner's ex-wife with whom he has two children. While they were married and at the time the shooting took place, her name was Sandy Barajas-Espinoza. In various documents, she is referred to as Sandi. The Court uses Sandy for consistency.

Daniel Alatorre,[11] the first witness called by Petitioner, testified via video conference from Las Vegas, Nevada on February 28, 2018. (Evidentiary Hearing Reporter's Transcript "EHRT", vol. 1 at 10–25.) Alatorre was around twelve years old at the time of the shooting. (Lodgment 2, vol. 3 at 437:7–14 [trial testimony from Alatorre's mother Olivia Addison].) Alatorre testified that he resided in National City in 2001 and recalled the "frightening" incident that took place in front of KP Hall on March 10, 2001. (*Id.* at 12.) The exact sequence of events that took place is unclear from Alatorre's testimony.

At the outset of direct examination, Alatorre gave a high-level description of his recollection of the events:

> I remember it was very, very frightening. My mother and I and my brother were just minding our own business in our home and we heard gunshots. We went outside, and I remember there was a man wearing a cowboy hat. And he was wearing a white shirt. All I remember is my mother telling me and my brother to drop down to the ground, and I mean, I heard shots at the house, but we didn't know until later, about some gunshots. But other than that, that's what happened.

(*Id.* at 12–13.) In keeping with his initial summary of events, Alatorre at first testified when he first heard gunshots, he was in his living room with his mother and brother:

Q: Mr. Alatorre, when you first heard gunshots, where were you?

A: We were in the living room.

(*Id.* at 13.) However, Mr. Alatorre then testified that when he heard the initial gunshots, he was outside:

Q: Mr. Alatorre, just to clarify were you outside when you heard the initial shots?

A: No we weren't we went outside. I'm getting echos and I can't hear.

Q: Sure, I can ask you again, Mr. Alatorre. When you first heard the initial gunshots, where were you?

---

[11] Petitioner's Closing Brief incorrectly refers to Daniel Alatorre as Danielle Alatorre. (ECF No. 157 at 12.)

A: We were outside.

(*Id.* at 14.)  Alatorre then stated he was outside in the porch area, he heard gunshots, and his mother told his brother and him to go inside and drop to the ground.  (*Id.* at 14–15.)  He remembers hearing more gunshots after that but does not remember how long he was on the floor.  (*Id.* at 15, 17.)  After he got up from the ground, he did not see a person shooting more shots.  (*Id.* at 15.)  But, he reiterated that he did initially see a man with a hat and white shirt.  (*Id.* at 16.)  He heard more shots after the police arrived.  (*Id.*)

Alatorre testified he heard a second round of gunshots in the living room and that there was an open window that allowed him to see "the whole commotion that was going on."  (*Id.* at 18.)  He remembers just standing there after the second round of gunshots and all he can recall "from his memory is a man with a white hat, white shirt."  (*Id.* at 18–19.)  Alatorre does not remember the man's face.  (*Id.* at 19.)

Alatorre stated that while on the front porch, he saw the "man with a white hat initiating the whole, the whole thing by reaching over a vehicle and then shooting somebody else . . . ."  (*Id.*)  Alatorre does not know who the victim was.  (*Id.*)  He only saw one person with a gun and he only saw one gun, a handgun.  (*Id.*)  While Alatorre was on the porch, the man with the gun was 25 to 30 feet away from him.  (*Id.* at 20.)

Initially, Alatorre said it was a correct statement that "the man [he] saw shooting after [he] got up from the floor, the man that [he] saw shooting had a cowboy hat on and a white shirt[.]"  (*Id.* at 22.)  However, upon questioning from the Court, Alatorre stated that he was outside when he observed the individual shooting the gun.  (*Id.* at 23.)  He was still "able to see the man with the cowboy hat before and after [he] dropped to the ground."  (*Id.*)  Alatorre testified the man with the cowboy hat was running away from "the situation" before the police arrived.  He then claimed police took him into custody at the scene:

Q: Where was he at the scene when the police arrived?

A: Well, they had him in custody.  They had to have him in custody.

Q: Well, did you see the police have him in custody?

A: That (pause) – Well, your Honor, it's a little blurry. I can't really recall. (*Id.* at 24.) Alatorre's mother called the police the night of the incident.[12] (*Id.* at 20.) He was interviewed by a police officer that night (*id.*), but was not contacted by any attorney or investigator regarding his statements. (*Id.* at 16.) He reviewed his police report, which was provided by Petitioner's counsel, in preparation for his testimony. (*Id.* at 21.) He stated that he would have had a better memory if they had found "the guy before", but many years passed. (*Id.* at 20.)

The Court questioned Alatorre as to why he kept looking down throughout his testimony, and Alatorre explained he needed to look down to hear and that his throat was rough from sinuses. (*Id.* at 21–22.) Alatorre was never asked to identify Petitioner as the shooter. (*See id.* at 10–25.)

b. Police Report Statement

Reporting Officer M. Remmers authored a March 14, 2001 Police Report in which he summarized Alatorre's statement to police following the March 10, 2001 incident at KP Hall. Relevant portions of the report reads:

> Daniel Alatorre (Witness) was inside his residence, located at 207 E. Plaza Blvd., watching television. He stepped outside to the front porch area, which faces south toward E. Plaza Blvd. to see his mother (Olivia Addison) and younger brother (Jesse Addison). Alatorre's mother told him to get inside the house. At that moment, Alatorre heard people screaming and cussing across the street from the house. He then saw a Hispanic male (Suspect) firing a gun at a man while standing about "a car length away" from him. Alatorre heard approximately seven gunshots. Several people ran toward a white colored car.
>
> Alatorre, his brother, and mother all ran into the house and closed the front door. They dropped to the living room floor while Alatorre's mother called 9-1-1.
>
> Alatorre said he heard what sounded like a car speeding away from the area.

---

[12] Alatorre's mother, Olivia Addison, testified at Petitioner's trial. (Lodgment 2, vol. 3, at 435–60, ECF No. 16-7 at 165–90.) She also gave a statement to police the night of the shooting that was included in a police report. (Ex. 2.)

He did not see the car or its occupants.

Alatorre said when the police arrived he heard more gunshots.

One bullet was discovered in his mother's bedroom.

Alatorre described the suspect as being a Hispanic male adult, late twenties, unknown height, wearing a white short and a cowboy hat. Alatorre said he could identify the suspect if seen again.

(Ex. 1.)

## B. Silvia Escamilla

### a. Declaration Submitted with Petition

Counsel for the parties stipulated to the admission of Silvia Escamilla's sworn declaration submitted with the Petition. (Joint Exhibit List, ECF No. 116 at 7.) The declaration states it was executed under penalty of perjury on May 5, 2009, but was signed by Escamilla on June 5, 2009, and was notarized on June 5, 2009 by Sandy Barajas Espinoza, Escamilla's daughter and Petitioner's ex-wife. (Ex. K.)[13] It states the following:

> I Silvia Escamilla, attended a baptismal celebration on March 10, 2001. I am the grandmother of the child who was baptized. The baptismal celebration was held in K-P Hall in the city of National City, California. On March 10, 2001, I witnessed the shooting and struggle for the gun outside of this hall where the event took place. I was standing in front of the building K-P Hall front door smoking a cigarette when the Rivera brothers were walking out with other people. Both Rivera brothers (Adan and Arturo) and their friends were all yelling, screaming and seem to be mad, excited and they all had an aggressive attitude. They immediately headed towards Rogelio Espinoza, yelling "There he is, get that puto". They immediately surrounded Rogelio Espinoza and began to kick him, punch him and beat him down to hurt Rogelio. Rogelio tried to get away from the kicks and punches of his attackers. I remember Rogelio telling the Adan and Arturo (Rivera brothers)

---

[13] Escamilla's declaration (Ex. K) was also entered into evidence at the Hearing on February 28, 2018. (EHRT vol. 1 at 193–94.) The Court notes that there was a month gap between when the declaration was typed up and when Escamilla signed off on it. (*See* Ex. K.)

pleading them to stop, that he did not want to fight and that he (Rogelio) had a gun. Rogelio continued warn them about the gun, and one of the brothers said to him that he did not have the balls to shoot anyone. They kept kicking him and attacking him. Then Rogelio, shot one or two shots into the ground and the brothers began to struggle and more shots were fired in the air, while someone in the crowd at the same time was trying to struggle for the weapon. That is when I believe the shots began to go in all directions. I then remember hearing someone saying police, and I saw someone else grab the gun and tried to shoot Rogelio as he ran across the street. I believe from what I witnessed the guy who had the gun was the one who shot Arturo and not Rogelio because he had already ran off and no one was hurt at that moment. I can identify all involved even the person who shot the gun at the end of the struggle. I summon to testify; I will attest and testify in favor of Rogelio Espinoza. I also contacted the Law Firm of Jan Ronis and Ronis and spoke with one of his investigators Juan Lopez along with Jan Ronis in regards to my testimony. I told the investigator that Rogelio had not shot the victim, and that I would testify to my testimony. However I was never contacted again and I contacted them a few times and left messages. I was never asked to appear in trial or submit my testimony in front of a judge. I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and that this affidavit was executed on May 5, 2009, at San Diego, California.

Sylvia Escamilla
06/05/09

(Ex. K.)

      b. <u>Hearing Testimony</u>

      Escamilla testified on February 28, 2018 that Petitioner was her daughter's husband. (EHRT, vol. 1 at 26:15–19.) On March 10, 2001, Escamilla attended a baptism party for her grandchild at KP Hall in National City. Her daughter, Rocio Barajas, hosted the party. (*Id.* at 26:20–25, 27:1–3.) She was outside of the party smoking a cigarette when she observed a group of people approaching and attack Petitioner. (*Id.* at 27:12–15.) She heard and saw two gunshots "shot up" and did not know who shot the gun because "there were a lot of hands." "It was like they were struggling to try to take the gun, something like that." (*Id.* at 27:20–25, 28:1.) The shooting occurred around 7:00 or 7:30 p.m. (*Id.* at 29:3–6.) After she heard the gunshots, she saw Petitioner cross the street and run away. She

observed another young man shoot the gun. (*Id.* at 28:2–6.) The man she saw shooting was dressed in black, wearing a black hat "like a Texan cowboy" and "his eyes were, like, a little slanted." (*Id.* at 28:7–12, 54:1–5.)

Escamilla was interviewed by the police at the police station in National City that night, and said she was nervous and frightened during the interview. (*Id.* at 28:17–25, 29:1–2, 14–18.) She testified that she gave the police the following description of the shooter that night – a short person, dressed in a black shirt, dressed in black and wearing a hat. (*Id.* at 30:19–25.) However, she later testified that she could not remember whether she gave a description of this man, the "second shooter" to the police. (*Id.* at 41:21–25, 42:1, 46:3–7, 47:18–21, 56:10–19.)

Escamilla saw the Petitioner's lawyer once and he told her that they would speak but he never reached out to her. She tried to contact him by telephone three or four times, but he never got back to her. (*Id.* at 33:7–18.) She stated on direct examination that she also tried contacting the lawyer's "detective" but no one ever picked up. (*Id.* at 33:19–22.) At the prompting of Petitioner's counsel, Escamilla identified this man as Juan Lopez, who she mentioned in her declaration. (*Id.* at 52:15–23.) However, upon further questioning by this Court, she changed her testimony and said that she never actually called the detective or investigator. (*Id.* at 51:23–52:1.) Escamilla testified that she wanted to "make clear whatever they might have needed" from her. (*Id.* at 33:23–34:2.) She further stated that the Petitioner's defense attorney's "detective" came to her house to ask her to give a statement, but she never heard from him again. (*Id.* at 35:4–19.) She did not give him a statement. He asked her whether she knew Petitioner and what relationship they had and she told him that he was her son-in-law. Lopez then left her his business card and said he would reach out to her but he never did. (*Id.* at 50:16–23.) She did not tell the investigator about the man with the hat and the black clothing that she saw. (*Id.* at 50:24–51:1.)

Escamilla could not remember the name of Petitioner's defense attorney. (*Id.* at 34:23– 35:3.) She was asked to be a witness for Petitioner's trial, but "they never had me

take the bench." The Court asked Escamilla to clarify who "they" are, and she responded "when the attorney went to see me, he's the one who told me that, he's the one who told me that I had to show up in court." (*Id.* at 34:12–21.) When asked on cross-examination when Escamilla reached out to Petitioner's attorney, she said it was not during the trial but she could not remember when it was. (*Id.* at 48:25–49:6.) She testified that she would call the attorney and leave messages on his voicemail asking him to return her call, but she did not give a reason for the call. (*Id.* at 51:7–22.) She tried to call him three or four times. (*Id.* at 57:4–9.)

In 2009, Escamilla wrote a declaration for Petitioner. While being questioned about the creation of her declaration, the Court commented that she seemed "to be very suggestable" given that she kept changing her testimony. (*Id.* at 38:23–39:3.) She first testified that the declaration was in Spanish (*id.* at 32:10–15), but later changed her testimony and said she had stated the declaration orally in Spanish and her daughter, Sandy Barajas, translated it and wrote it out in English. (*Id.* at 36:13–18, 37:1–4, 15–18.) Upon further direct examination, Escamilla conceded that she did not remember whether she actually wrote out the declaration or stated it orally. (*Id.* at 40:9–12.) On cross-examination, Escamilla acknowledged that the declaration was in English and that she had not read that version because she does not speak or read English, but she supposed that her daughter would have written down what she told her. (*Id.* at 48:1–9.) She then testified that her declaration was translated into Spanish for her by her daughter, and that she had a written copy of the Spanish translation at her house. (*Id.* at 48:10–19.) She reiterated she could not remember whether she wrote the declaration herself or told it to her daughter orally. (*Id.* at 48:20–24.)

Escamilla testified that she executed this declaration "to preserve [it] in case [Petitioner] needed it in the future, [s]ince neither the attorney nor the 'detective' decided to reach out to [her]." (*Id.* at 37:19–24.) She stated that the declaration accurately reflects what she remembered of the incident. (*Id.* at 40:15–20.) However, she also testified that

during the interview at the police station, she told the truth about what she saw. (*Id.* at 47:22–24, 58:17–19.) Escamilla denied that Petitioner or anyone else asked her to prepare the declaration (*id.* at 49:13–14, 51:5–6), and that she prepared the declaration and gave it to her daughter just in case there was ever a trial. (*Id.* at 49:17–24.)

On cross-examination, Escamilla testified that she heard two gunshots when she was standing outside of KP Hall but she did not know who fired the shots. (*Id.* at 42:10–16.) She saw the shots fired into the air, but she did not see who fired them or the gun because "there were a lot of hands that were in the struggle." (*Id.* at 42:14–22.) The shots were fired from a group of people that included Petitioner, who she saw running away after the shooting. (*Id.* at 23–25, 44:1–7.) Escamilla testified that after Petitioner ran away, she saw another man — the man with slanted eyes who was wearing black clothing and a hat — fire more shots; he was "shooting all over the place." (*Id.* at 43:8–15.) Escamilla had seen this man a couple of times before and would be able to identify him if she saw him again. (*Id.* at 43:16-19.) As stated above, she then said she could not remember whether she gave a description of this man, the "second shooter" to the police. (*Id.* at 41:21–42:1, 46:3–7, 47:18–21, 56:10–19.)

As stated above, Escamilla testified that during the interview at the police station she told the truth about what she saw, but she could not remember what she said during the interview. (*Id.* at 47:20–24, 58:17–19.) She further testified that the facts were freshest in her mind when the incident took place in 2001. (*Id.* at 59:2–4.)

Escamilla could not remember if she was interviewed by the police at KP Hall after the incident, but if she had been, she would have given an accurate statement of what she saw. (*Id.* at 44:1–25, 45:1–2.) She could not remember telling a police officer at the scene that she saw Petitioner shoot a handgun into the air. (*Id.* at 46:8–10.) She also could not remember telling a police officer at the scene that her husband grabbed Petitioner and tried to hold him and that Petitioner yelled to her husband, "let me go!" because she could not recall whether the interview took place. (*Id.* at 46:11–47:3.) Escamilla testified on cross-

examination that she did not see Petitioner fire any shots because there were a lot of hands up in the air and she could not see who had the gun.  (*Id.* at 47:5–9.)

Escamilla stated she was certain she saw someone other than Petitioner fire a gun on March 10, 2001 in front of KP Hall.  (*Id.* at 56:24–57:3.)  The Court confirmed with her that she was truthful and accurate during her police interview and that facts were freshest in her mind when the incident took place.  (*Id.* at 58:17–19; 59:2–4.)  When asked if she would have told the police of the other shooter during the interview, she stated she thinks so but does not remember.  (*Id.* at 58:20–23.)  But, she remembers 17 years later that she knows the shooter was not Petitioner.  (*Id.* at 58:24–59:1.)

### c.  Prior Police Report Statement and Interview

Escamilla gave two statements to police following the shooting on March 10, 2001. The first was an on-scene interview conducted by Sergeant Steve Shephard that was both recorded (Exs. L, O [transcript]) and summarized by Sergeant Shephard in his Officer's Report (Ex. A.).  The second was an interview conducted by Sergeant Estella Cordero at the National City police station at approximately 12:57 a.m. following the shooting.  The interview was recorded (Ex. C) and transcripts in English (Ex. E) and Spanish (Ex. D) were provided to the Court.  Sergeant Cordero also authored a Detective Follow-Up Report regarding her March 11, 2011 interview of Escamilla (Ex. B).

#### 1.  *Sergeant Shephard's Officer's Report and Recording of Interview*

In Sergeant Shephard's Officer's Report (Ex. A) dated March 12, 2001, then-Officer Shephard provided a narrative of his investigation of the shooting at the crime scene on March 10, 2001.  He interviewed several witnesses that evening, including Escamilla and Rubio, both of which he recorded (Ex. L).  He included a summary of each witness' account in his Report.  His summary of Escamilla's statement is as follows:

> Silvia Dominguez Escamilla is the mother-in-law of the suspect, Roger Espinoza.  Escamilla was inside the building at 200 E. Plaza Blvd. when she saw Espinoza and Rivera get into an argument.  Escamilla saw security escort both Espinoza and Rivera to the front of the building.  Escamilla went to the front to make sure that Rivera was ok.

> As Escamilla exited the building, she saw Espinoza firing a handgun straight up into the air. Escamilla's husband grabbed Espinoza with both arms and tried to hold him. Espinoza yelled, "Let me go." Escamilla's husband let go of Espinoza. Espinoza left in a small dark vehicle.

> Escamilla never saw Espinoza shoot at any person. Escamilla only saw Espinoza shoot the handgun above his head into the air. Escamilla can positively identify Espinoza.

(Ex. A.)

During the interview, an unidentified witness translated for Escamilla. (Exs. L, O.) Via the witness' translation, Escamilla stated that she saw "the guy with the weapon was just shooting up on the air, she didn't see that he pointed the gun and he started shooting at the other, victim." (Ex. O at 2.) When asked "Who was it that was shooting the gun?" Escamilla replied it was her son-in-law and specifically named Petitioner. (*Id.* at 2–3 [naming Rogelio].) She told Sergeant Shephard that her son-in-law Rogelio "started shooting up." (*Id.* at 3.) She did not see Rogelio shoot "this other guy." (*Id.*)

The parties stipulated to the admission of the recording (Ex. L) and transcript (Ex. O) of Sergeant Shephard's interview of Escamilla for the limited purpose of impeachment. (ECF No. 116 at 7.) They stipulated to the admission of the summary included in Sergeant Shephard's Officer's Report (Ex. A) for the limited purposes of (1) impeachment and (2) the effect of the report on Petitioner's trial counsel Jan Ronis. (*Id.* at 5.)

## 2. *Sergeant Cordero's Interview*

Sergeant Cordero interviewed Escamilla on March 11, 2001 at approximately 12:57 a.m. after the incident took place. (Exs. C, D, E.) During the interview, Escamilla said that she arrived at the baptism party on March 10, 2001 at 4:00 in the afternoon with her "husband" and son. (Ex. E at 5.) She believes her daughter, Sandy Espinoza, and her husband at the time, Petitioner, "Roger" Espinoza, "more or less" arrived around 5:30 or 6:00 p.m. (*Id.* at 2–3, 6–7.) She did not see if they arrived together. (*Id.* at 7.)

Later that night, Escamilla was standing outside smoking a cigarette and talking with security when she saw a commotion outside. (*Id.* at 11.) She observed a group of "people/boys" and she heard gunshots. She did not see who had the gun, she just saw gun shots "fired up." (*Id.* at 8.) When asked "Did you see that Roger had the gun?" she responded "No, not at all." (*Id.* at 9, 14 ["I did not see who who shot/was shooting."].) Escamilla admitted Petitioner was among the group of boys that was fighting, pulling and shooting, but she "did not exactly see him with the gun." (*Id.* at 10–11.) After she heard the two gunshots, she went back inside and was "fainting from the shock." (*Id.* at 12.) She denied that she had told another lady that she saw that Petitioner had the gun and was shooting it up. (*Id.* at 9–10.) She later said she saw the group fighting inside the hall before running through the back door and going outside. (*Id.* at 15.) She assumed it was the same group of people she saw fighting outside, but could not see them in the dark outside. (*Id.*)

Escamilla made several statements indicating there was only one gun involved in the shooting during her interview with Sergeant Cordero. She stated that she "did not exactly see [Petitioner] with *the* gun" and that she "did not see that he had *it*." (*Id.* at 12 [emphasis added].) When asked "what type of gun was *it*?" she replied "No, no I don't know what type *it* was, I didn't see *it*." (*Id.* at 13 [emphasis added].)

Escamilla denied knowing of any problems between Petitioner and Adan Rivera. (*Id.* at 16.) She admitted that her daughter Sandy knows Adan and Arturo Rivera. (*Id.* at 16–17 ["Yes. Because I, that family, we are like, like one in the same family/one big family."].) She stated she did not know why her daughter Sandy had told police that she did not know Adan and Arturo. (*Id.* at 17.) She denied that anyone had told her Petitioner would hit her daughter. (*Id.* at 13.) She stated the following about Petitioner:

> Well for me, I've always loved him a lot, as a matter of fact, even his mom says, she always would say, I see that you love him a lot, because as far as I go, I don't have anything to say about [Petitioner], nothing because with me ever since I have known him he has gotten along well with me. He and I have never had any problems.

(*Id.* at 13.) The parties stipulated to the admission of the recording (Ex. C) and transcripts (Exs. D, E) of Sergeant Cordero's interview of Escamilla for the limited purpose of impeachment. (ECF No. 116 at 5.)

### 3. *Sergeant Cordero's Detective Follow-Up Report*

In Sergeant Cordero's Detective Follow-Up Report dated March 14, 2001 (Ex. B), Sergeant Cordero provided the following synopsis of her interview of Escamilla, which was obtained in Spanish and recorded:

> Silvia Dominquez Escamilla lives at 834 30th Street San Diego, with her daughter Rosea "Rocio" Barajas.
>
> On 031001, at about 1600 hours, Silvia Dominguez Escamilla arrived at the baptism party with her live in boyfriend, Jose Juan Bolanos and her son, Jose Juan Bolanos, Jr.
>
> Silvia Dominguez Escamilla believes that Sandi Espinosa Barajas arrived between 1730 to 1800 hours. Silvia Dominguez Escamilla does not know if Sandi Espinosa Barajas and Roger Espinosa arrived at the same time; however, she first saw Sandi Espinosa Barajas and then later saw Roger Espinosa sitting at a table with his mother and uncle.
>
> Sometime later, Silvia Dominguez Escamilla was smoking a cigarette outside and saw a group of unknown males fighting in the middle of the street. Silvia Dominguez Escamilla then saw someone (unknown) who fired several shots in the air. Silvia Dominguez Escamilla later admitted that Roger was with-in the group of males fighting in the street; however she denied seeing him with a handgun. After hearing two shots fired, Silvia Dominguez Escamilla went inside the dance hall.
>
> Silvia Dominguez Escamilla could not provide a description of the handgun or the shooter.
>
> Silvia Dominguez Escamilla then stated she saw several people fighting inside the dance hall. The fight was taken outside and then the shots were fired.

(Ex. B.) The parties stipulated to the admission of the summary included in Sergeant Cordero's Detective Follow-up Report (Ex. B) for the limited purposes of (1) impeachment

and (2) the effect of the report on Petitioner's trial counsel Jan Ronis. (*Id.* at 5.)

**C. Miguel Rubio**

Miguel Rubio did not present at the Hearing. Petitioner's counsel attempted to locate Rubio to no avail by contacting him via his listed phone number and consulting with an investigator. (ECF No. 78 at 2; *see* ECF No. 82 at 10 [listing Rubio as a witness at the evidentiary hearing]; ECF No. 92 at 2–3 [no longer listing Rubio as a witness at the evidentiary hearing].) Rubio is the brother-in-law of Sandy Barajas and son-in-law of Sylvia Escamilla. He was the father of the baby whose baptism was being celebrated at KP Hall when the shooting occurred. (*See* Ex. N.)

a. Declaration Submitted with Petition

Counsel for the parties stipulated to the admission of Rubio's sworn declaration submitted with the Petition. (Joint Exhibit List, ECF No. 116 at 5.) The Court addresses the admissibility of the declaration below. *See* Section VI.B.b. The declaration, which states it was executed under penalty of perjury on May 30, 2009, and was signed by Rubio and notarized on June 2, 2009.

> My name is Miguel R. Rubio, and I want to state what I witnessed on 3/10/01 in my son's Baptism, an event we had at KP Hall in National City, CA.
>
> I was inside the KP Hall location greeting incoming guest, and friends who had previously arrived when I herd (sic) an argument or what sounded like a fight in the opposite room where I was in. I was told about a fight in the dancing room area and I immediately ran towards the individuals, but whatever it was it had been stopped. The individual Roger Espinoza was bleeding from different areas in his face, and I looked to see who had been involved, and noticed my friends Adan and Arturo the brothers were being held back by a few people they had arrived with. I was a little upset since they were ruining my celebration for my son, and they had arrived with lots of friends who I had never known or invited to the celebration. I was also concern (sic) with Roger bleeding heavily from the face and looked really injured, I guess Adan, Arturo and the friends along with family were still very angry because names were being yelled to Roger. By this time everyone was making there (sic) way towards the front entrance, once outside the either Adan or Arturo yelled there is that puto let's get him, and I turned to see who

it was and it was Roger once surrounded by at least 4-5 people another fight began, but this time Roger was being jumped, there was someone screaming to leave me alone, I have a gun and I don't want to hurt anyone I saw it was Roger trying to warn or scare people, the fight continued that's when I heard and saw a gun being shot in the air. A struggle for the gun began and everyone was trying to take control of it, while at the same time kicking was going on and Roger stumble[d] to the floor and a lot of gun shots were fired towards all directions, someone yelled hey Police people ran all directions. Once everyone ran 2 shots were fired towards Arturo from another short male in the group. I had always told this story to the attorney's helper a Juan, and I was told I would need to tell this to the courts, but I never received a call or a time to appear and tell my side. I also recall leaving 2–3 messages for a Ronis Lawyer. I was never asked to come to courts to tell them I was a witness to this fight.

I Miguel Rubio Declare under penalty, of perjury under laws of the United States of California that the foregoing is true and correct and this declaration was executed on May 30, 2009 in San Diego, CA.

Miguel Rubio
6/2/09

(Ex. 28.)

      b. <u>Prior Police Reports and Interviews</u>

Rubio gave an on-scene interview conducted by Sergeant Steve Shephard that was recorded (Exs. L, N [transcript]) and summarized by Sergeant Shephard in his Officer's Report (Ex. A). Sergeant Shephard's summary of Rubio's statement is as follows:

Miguel Rodriguez Rubio was the host of the party taking place at 200 E. Plaza Blvd. Rubio is acquainted with both the victim and the suspect.

Rubio was inside dancing when he saw two guys fighting. Rubio did not realize that the two were fighting until security escorted the two outside. A short time later Rubio saw a crowd of people run back inside the building. Rubio went outside to see what was going on and saw Arturo lying on the sidewalk bleeding from the face. Police arrived and told Rubio to go back inside.

Rubio did not see or hear a gun. Rubio did not see who shot Arturo."

(Ex. A.) During the interview, Rubio said that he was inside dancing and he saw people fighting but at first he thought they were wrestling. He then ran outside because he saw "everybody c[o]me outside running" and he saw Arturo Rivera bleeding from his face. Rubio told Sergeant Shephard that he did not see or hear anything and did not see anyone with a gun. (Ex. N.) When asked if he saw the "guy that shot em", Rubio replied "I didn't see nothing." (*Id.*)

The parties stipulated to the admission of the transcript of Sergeant Shephard's interview of Rubio (Ex. N) for the limited purpose of impeachment. (ECF No. 116 at 7.) They stipulated to them admission of the summary included in Sergeant Shephard's Officer's Report (Ex. A) for the limited purposes of (1) impeachment and (2) the effect of the report on Petitioner's trial counsel Jan Ronis. (*Id.* at 5.)

### D. Sergeant Steve Shephard Hearing Testimony

Sergeant Shephard testified on February 28, 2018. (EHRT, vol. 1 at 63–87.) He was working as a patrol officer for the National City Police Department on March 10, 2001 when he was called to respond to an incident at KP Hall in which it was reported that shots had been fired and a person had been shot in the face. It was a high-priority call to which multiple officers responded. (*Id.* at 63:21–64:14.)

Sergeant Shephard testified that when he arrived, he saw a large crowd of people. He intended to find the victim and get medical aid for them, but someone first grabbed his attention and directed him to a vehicle that was fleeing the scene. (*Id.* at 64:16–24.) He received information that the suspect was in that vehicle, so he advised dispatch that he was going to attempt a stop on the vehicle. He did stop the vehicle but did not find the suspect. After stopping the vehicle, he returned to the scene and was assigned to start taking witness statements. (*Id.* at 65:1–9.) He interviewed several witnesses, including Escamilla. (*Id.* at 65:15–20.) Sergeant Shephard reviewed his Officer's Report (Ex. A) and stated that he prepared it and had seen it before. (*Id.* at 66:11–22.) He recorded his interview of Escamilla, as well as several other witnesses. (*Id.* at 67:3–14.) Escamilla

identified the shooter as her son-in-law, Roger Espinoza. (*Id.* at 69:18–70:19.) If she had given Shephard a description of an additional shooter or someone other than the Petitioner, he would have noted it in his report. (*Id.* at 70:11–14.)

On cross-examination, Petitioner's counsel asked Sergeant Shephard if he conducted Escamilla's interview in English. (*Id.* at 71:19–21.) Sergeant Shephard responded that he believed so, and that from what he recalled, he understood everything she was telling him and she understood his questions, and did not recall whether he had any assistance from a translator. He said he would have documented if someone was translating their interview. (*Id.* at 71:22–72:5.) On cross-examination, Sergeant Shephard said he was not one-hundred percent certain that Escamilla spoke to him in English when she gave him her statement, but since he does not understand Spanish he would likely not have interviewed someone who only spoke Spanish and instead he would have had a Spanish-speaking officer conduct the interview. (*Id.* at 80:11–81:2.)

Sergeant Shephard testified that he arrived at the scene within minutes after the shooting. (*Id.* at 72:11–20.) He did not hear gunshots when he arrived. (*Id.* at 72:21–73:1.) He further stated that his standard practice was to review the recording of the interview and write the synopsis of the statement at the same time. (*Id.* at 73:5–13) When questioned about the standard practice of investigating at the scene of a crime with large numbers of people present, Sergeant Shephard testified that they do not detain people if they are not suspected of committing a crime but they try to obtain cooperation from witnesses so they can take their information so detectives can follow up later. (*Id.* at 77:10–78:2.) When asked by Petitioner's counsel if there is a possibility that people could have fled the scene without giving a statement to police, Sergeant Shephard said it could have happened. (*Id.* at 78:3–9.)

Sergeant Shephard testified that he prepared his police report at or around the time the incident occurred, the report was kept in the ordinary course of business, and it was his regular practice to write police reports regarding incidents. (*Id.* at 85:12–20.) He further

testified that to the extent he did not recall, after reviewing the report his recollection was refreshed as to the witness interviews of Escamilla and Rubio. (*Id.* at 85:21–86:9.) Sergeant Shephard also stated that he accurately described what Rubio told him in the report. (*Id.* at 86:7–9.)

### E. Sergeant Estella Cordero Hearing Testimony

Sergeant Cordero, now retired, testified on February 28, 2018 that she worked for National City police department for twenty-six years. (EHRT, vol. 1 at 90–118.) In March 2001, she was assigned to crimes of violence as a detective. (*Id.* at 90:11–12, 23–24.) On March 10, 2001, she was called out to respond to a report of a shooting at KP Hall. (*Id.* at 90:25, 91:1–7.) She arrived at the scene around 9:00 p.m. (*Id.* at 91:8–12.) Later that night, she interviewed Escamilla at the police station because she was a witness to the shooting at KP Hall. (*Id.* at 91:19–92:5.) Sergeant Cordero recorded the interview with an audio tape recorder and entered the tape into evidence. (*Id.* at 92:6–23.) The entire interview of Escamilla was recorded; there were no additional conversations before or after recording. (*Id.* at 96:20–25.) Sergeant Cordero prepared a report of her interview, which she identified at the Hearing (Ex. B). She testified that she prepared the report, which was a synopsis of her interview with Escamilla. The report was prepared in the ordinary course of business, and it is compatible with her recollection of the interview. (*Id.* at 92:24–94:4.) Sergeant Cordero speaks Spanish fluently so she conducted Escamilla's interview in Spanish. (*Id.* at 95:3–10.) She got the impression based on Escamilla's demeanor and statement that she did not want to get involved. (*Id.* at 95:15–20.)

Sergeant Cordero could not recall if she was provided with the name of a suspect during the initial briefing she received upon arriving at the crime scene. (*Id.* at 98:1–15.) She denied that she had already made up her mind that Roger Espinoza was the shooter when she interviewed Escamilla. (*Id.* at 102:8–11.) Before interviewing Escamilla, Sergeant Cordero interviewed Escamilla's daughter, Sandy Espinoza-Barajas. (*Id.* at 99:5–14.) When asked on cross-examination why she mentioned in her interview that a lot of

people had identified the Petitioner as the shooter, Sergeant Cordero explained that she probably received that information from other officers during a briefing at the police station. (*Id.* at 99:15–100:4.) Sergeant Cordero explained that there are multiple briefings throughout an investigation because they have different people interviewing different individuals, so as they get information they share it with the other detectives. (*Id.* at 100:5–9.). Sergeant Cordero testified that during the interview, at first Escamilla denied seeing anyone shoot the gun, and then later she said she saw another male shoot the gun. (*Id.* at 100:22–101:5.) Escamilla told Sergeant Cordero in her interview that she did not see the Petitioner with a gun that night, but she did see him involved in a "scuffle" with a large number of "boys." (*Id.* at 101:10–20.) Upon further questioning by the Court and rehabilitation by Respondent's counsel, Sergeant Cordero reviewed the transcript of the interview to refresh her recollection with respect to what Escamilla said she saw on the night of the shooting. (*Id.* at 106:3–107:110.) After reviewing the transcript, Sergeant Cordero said that "the males were the ones fighting and someone, obviously, in the group was the one that shot the gun." (*Id.* at 110:10–11.) Sergeant Cordero clarified that when she said Escamilla claimed an "unknown male" shot the gun, that was based on the totality of the interview and that Escamilla said she did not witness a gun or see who shot the gun. (*Id.* at 110:19–111:2.)

Sergeant Cordero was further questioned on cross-examination whether Escamilla seemed as if she was being truthful during the interview. (*Id.* at 104:13–14.) Sergeant Cordero said that at first, it seemed like Escamilla was not being truthful because she denied ever seeing anything. However, she later "admitted" that she did witness a fight in which the Petitioner was involved, so Sergeant Cordero believed that Escamilla was being honest toward the end of the interview. (*Id.* at 104:15–105:5.)

Sergeant Cordero did not ask Escamilla for a description of the shooter because she said she could not identify the shooter. (*Id.* at 112:6–10, 113:17–18 ["If she told me she didn't see the shooter and couldn't identify him, I would not ask her what she observed."].)

Escamilla did not provide a description of what the males in the group were wearing and Sergeant Cordero did not ask for one. (*Id.* at 114:2–12.)

### F. Jan Ronis

Jan Ronis served as Petitioner's trial counsel in the underlying state court criminal case. In addition to testifying at the Hearing, Ronis was also deposed November 13, 2017. (Ex. I.) The parties stipulated to the admission of the deposition transcript into evidence. (ECF No. 116 at 7.)

a. <u>Deposition Testimony</u>

At his deposition, Ronis testified he is a criminal defense attorney with 45 years of experience who has tried over 350 jury trials. (Ex. I at 5:13–6:3.) He was retained to represent Petitioner and did so through judgment but not on appeal. (*Id.* at 7:24–8:14.)

The trial took place in 2005 and Petitioner was arrested in 2004. (*Id.* at 7:15–21.) Ronis recalled his theory of defense in the case was self-defense, as that is what the evidence pointed to. He recalled Petitioner was in a fight, was beaten up badly, felt his life was threatened and used a weapon to defend himself. (*Id.* at 8:15–9:3.) Ronis was certain that at the time he made his decision to proceed on a self-defense theory and "conducted an investigation", but could not remember which investigator he used. (*Id.* at 9:9–22.) Specifically, he could not remember whether he used Juan Lopez as his investigator in this case although Lopez worked on his cases during that time period. (*Id.* at 10:5–18)

Ronis did not have any recollection of being contacted by Miguel Rubio during his representation of Petitioner. (*Id.* at 10:22–25.) Upon reviewing Rubio's declaration (Ex. 28), Ronis stated that he had "absolutely no recollection of ever seeing a message or getting a call from that individual." (*Id.* at 11:6–14.) He does not have any independent recollection of Lopez contacting him about Rubio. (*Id.* at 18–21.)

Ronis also did not recall the name Silvia Escamilla or having been contacted by her during his representation of Petitioner. (*Id.* at 11:25–12:4.) Upon reviewing Escamilla's declaration (Ex. K) at the deposition, Ronis testified that he had no independent

recollection of any communication with her. (*Id.* at 12:6–18.) He further stated if someone called him and asserted the claims made in Escamilla's declaration, he "can't believe that [he] wouldn't remember that." (*Id.* at 12:18–13:1.) He also did not recall Lopez communicating with him about Escamilla. (*Id.* at 13:2–4.) If either Lopez or Escamilla had said in the police reports they did not see anything regarding the shooting and then called his office and gave a different description, Ronis testified that he would have interviewed them. (*Id.* at 54:11–21.)

Ronis testified that he received and reviewed discovery from the prosecution in the case, including police reports. (*Id.* at 13:8–14.) He did not recall seeing reports from either Rubio or Escamilla or have an independent recollection of reading the reports. (*Id.* at 13:15–18, 14:13–15:17.) However, upon reviewing police reports with statements from Rubio and Escamilla, they refreshed his memory and seemed to be consistent with what "everybody, you know, said that they witnessed." (*Id.*)

During his representation of Petitioner, Ronis was not aware of any facts that would lead him to believe that there was another shooter at the scene of the incident. (*Id.* at 15:18–22, 28:20–23.) Ronis testified that if he had information that there were witnesses who were prepared to testify that someone other than Petitioner committed the crime, he would have pursued it. (*Id.* at 17:25, 18:1–5, 28:1–15.) He would not have proffered a self-defense theory without investigating all other possible defenses. (*Id.* at 17:15–24.) If there were witnesses who indicated a willingness to testify that someone else had committed the offense but they had made prior inconsistent statements to the police, Ronis testified he would still have interviewed those witnesses. (*Id.* at 19:1–18.) He explained, however: "[T]he witnesses have to fit the facts. So if the witnesses don't fit the facts, you undermine your credibility by putting them on, if you have other facts to go with that are credible, the jury might believe." (*Id.* at 19:14–18.) His belief that there was only one shooter was based on the investigative reports, his conversations with the Petitioner, the defense they chose and the absence of any other credible evidence pointing to another shooter. (*Id.* at

31

28:23–29:6, 42:3–17.)

Ronis testified that it was decided that self-defense would be Petitioner's defense. (*Id.* at 27:10–12.) He did not recall that he also argued an accidental defense at trial, but said that it sounds like the two defenses could have gone hand-in-hand in this case based on the reports of shots being fired into the air and into the ground. (*Id.* at 27:13–24)

Ronis did not recall the police reports indicating that any witnesses said the shooter was of Asian or Chinese descent, and he would be surprised to hear that they did. (*Id.* at 30:25–31:7.) He further testified that if there were reports to that effect and they appeared to be credible and stronger than the other defense that was offered, he would have pursued it. (*Id.* at 31:14–32:6.) Ronis was asked if he remembered the evidence indicating that the shell casings were spread around in different areas of the street. (*Id.* at 33:23–34:1.) He did not recall (*id.* at 34:2), but he recalled there were reports saying that the person with the gun, who was identified as Petitioner, was at one point chasing the person who turned around and then got shot in the eye. (*Id.* at 35:2–14.) He later testified that he recalled "ample reports and witness statements that [Petitioner] . . . chased the victim and continued to fire." (*Id.* at 46:10–13.)

When asked whether he would have chosen a different defense if he had information indicating that the description of the shooter was different than that of Petitioner, Ronis said he would have if it was "really credible evidence that outweighed the other defense," but that his recollection is that the credible defense is the one that was asserted. (*Id.* at 37:1–9.) Ronis conceded no witness testified that they saw the Petitioner actually shoot the victim, but that he recalled witness statements that Petitioner was seen firing a gun into the air. (*Id.* at 47:11–48:4.) Given that gang members were involved, Ronis explained "there was a lot of the rule of the streets . . . applying to what people were willing to come to court and testify to . . . ." (*Id.* at 26:21–27:9, 46:14–25, 56:4–12.)

When asked to justify his decision to utilize a self-defense theory rather than a second shooter theory, Ronis explained that "I think the evidence was that he – I think the

credible evidence was that he – there was a gun in his hand. People described the gun in his hand. People described him, you know, taking shots, as I recall. And you know, it seemed to me that was a far more credible defense than somebody else did it." (*Id.* at 48:20–49:7.)

Ronis did not recall the circumstances surrounding the Petitioner's decision to take the stand and testify but he knows there were discussions about it. (*Id.* at 39:15–21.) On redirect, Ronis testified that he had a great interest in the outcome of this case and was highly motivated to do the best job that he was capable of because he liked Petitioner and loathed the prosecutor. (*Id.* at 57:8–17.)

When describing his practice when he gets on a case, Ronis explained that police reports are "always the thing you are most anxious to get, because they really tell you what – it tells you more a complete picture than what you just get from interviewing a defendant." (*Id.* at 26:6–10.) Also, Ronis testified it is his practice to pull the relevant jury instructions when he gets a case as part of his preparation for the preliminary examination or discussions with a client. (*Id.* at 58:18–22.) He would have researched relevant legal issues during his representation of Petitioner. (*Id.* at 58:10–13.)

Ronis searched his office pursuant to a subpoena and does not have any records of this case. His practice is to send the entire box of case materials to the appellate attorney once he is contacted by him or her. (*Id.* at 20:1–10.) He no longer has hard copy records stored with Iron Mountain. (*Id.* at 22:11–12.) He was also unable to find any electronic records relating to the case. (*Id.* at 21:5–11.) However, he remembers interviewing witnesses, although not specifically which ones, and there being investigative reports of witness statements. (*Id.* at 37:20–38:24.)

b. Hearing Testimony

Ronis testified at the Evidentiary Hearing on February 28, 2018 (EHRT, vol. 1 at 120–48) and March 9, 2018 (EHRT, vol. 3 at 3–47.)

During his first day of testimony, Ronis stated that since the time of his deposition,

he had not located his case file.  (EHRT, vol. 1 at 120:21–25).  He also had no further recollection about having had a conversation with Escamilla, and stated, "I find it incredible that I would not have remembered a conversation of the nature that's alleged." (*Id.* at 121:3–12.)  Ronis testified that his practice was and currently is to prepare his client to testify and thus he is sure he knew the substance of what Petitioner was going to testify to at trial. (*Id.* at 121:16–122:4.)  Ronis recalled having many conversations with Petitioner and Petitioner did not mention a second shooter.  (*Id.* at 122:10–14.)  If the Petitioner had told him about a second shooter, that likely would have entered his decision-making process as to the choice of defense.  (*Id.* at 122:15–18.)  Petitioner told Ronis that he fired a gun.  (*Id.* at 122:19–20.)  He did not tell Ronis that someone took the gun away from him, nor did he tell him that there was someone else with a different gun.  (*Id.* at 122:21–123:1.)

Ronis testified on cross-examination that in the course of his investigation he reviewed all of the police reports, and his investigator interviewed the witnesses that were at the scene.  (*Id.* at 126:20–127:1.)  He did not recall coming across witness statements regarding the suspect wearing a cowboy hat.  (*Id.* at 126:4–14.)  He was asked to review police reports summarizing witness statements (Exs. 1–3) from Daniel Alatorre, Olivia Addison, and Antoinette Gonzalez that described the suspect as wearing a cowboy hat.  He stated that these were the kinds of witnesses he would have interviewed or would have wanted to interview.  (*Id.* at 127:4–129:10.)  He could not recall if he interviewed Addison or Gonzalez.  (*Id.*)  Ronis had no recollection of the subject of a cowboy hat coming up at trial.  (*Id.* at 129:11–14.)  Ronis was asked to review a portion of the trial transcript in which the prosecutor was questioning Petitioner and asked if Petitioner was wearing a cowboy hat.  (Ex. 23 at 3.)  Ronis admitted that the transcript made it appear as though the prosecutor thought Petitioner was the shooter with a cowboy hat on.  (EHRT, vol. 1 at 133:10–17, 134:1–10.)

When asked if he had interviewed the above witnesses and they described someone with a cowboy hat, would he still have gone with his chosen defense, Ronis said yes. (*Id.*

34

at 130:1–6.)  Ronis explained that it was his belief and understanding that there were no other shooters, because "it would have occurred among other ways in conversations with my client."  (*Id.* at 130:7–9.)  Ronis further stated "there's no question in my mind that I read every report and I was familiar with it at the time."  (*Id.* at 131:20–23), and that because the Petitioner told him that he "was the guy with the gun" he assumed that to be the truth.  (*Id.* at 131:10–14.)  Ronis said that although he did nott have any independent recollection of much of the case at the time of the Hearing, he did recall that any witness he felt was important to interview would have been interviewed.  (*Id.* at 132:5–8).

Ronis also reviewed a portion of a transcript (Ex. 14 at 8) from a 2007 post-trial status conference.  (*Id.* at 141:16–21.)  Petitioner requested on the record that new counsel be appointed for him and accused Ronis of not presenting all the evidence and testimony available to him at trial.  (Ex. 14 at 8 ["Your Honor, I didn't shoot this man and there is proof that there is another shooter."].)  Ronis did not recall if he asked Petitioner about his comments to the judge as they "could have been at cross-purposes with one another." Ronis stated that "If that's what he told the judge, it's different than what I knew at the time of trial and what I had known before the trial, and I don't want to get, you know, into an argument with my client at that point." (EHRT, vol. 1 at 141:19–142:5.)  Ronis testified that his memory was refreshed that he had read all of the reports and even though some witnesses testified to someone wearing a cowboy hat, he still felt that he had chosen the most credible defense.  (*Id.* at 144:9–16.)

During his second day of testimony, Ronis stated that if thought that the person with the cowboy hat was the shooter, he would interview witnesses who had identified a shooter with a cowboy hat.  (EHRT vol 3. at 4:13–20.)  He had no independent recollection if he had done so in this case.  (*Id.* at 5:1–8.)  Generally, Ronis would have an investigator conduct the interviews.  (*Id.* at 5:11.)  Ronis did not recall if he personally interviewed anyone in this case, but that did not exclude the likelihood that reports were presented to him by investigators that he read at the time.  (*Id.* at 9:18–20, 11:24–25, 12:1–4.)

Ronis testified he always reads police reports in preparation for trial and did so in preparation for this trial. (*Id.* at 6:6–8; 7:2–4.) When pressed further about witness Daniel Alatorre, Ronis said if someone asked him whether he would have interviewed him in a vacuum, he would say yes; however, depending on who he knew the shooter to be at that time he saw the report, it may not have caused him to interview anyone else because he had another defense. (*Id.* at 7:5–8:2.) He does not have an independent recollection of whether he interviewed anyone for this case. (*Id.* at 8:3–14.) He recalls conversations with Petitioner's ex-wife and other family members but otherwise does not recall. (*Id.* at 11:15–22.)

Ronis does not remember who his investigator was in this case, however he assumes it was Juan Lopez given that he was subpoenaed as a witness for the Hearing. (*Id.* at 12:16–25.) Typically, an investigator would interview witnesses at Ronis' direction and then Ronis would be provided a report. (*Id.* at 13:1–16.) "If there was a need for a report, [Ronis] would have expected one." (*Id.* at 14:4–7.) Ronis testified that if he thought somebody other than his client was the shooter, he would have directed his investigator to interview a witness who described the shooter as wearing a cowboy hat, but that "wasn't the premise of [his] defense based upon [his] conversations with Mr. Espinoza." (*Id.* at 15:10–22.)

Petitioner told Ronis that Petitioner was the lone shooter:

Q: Well let's talk about that. How did you come to a conclusion that [Petitioner] was, in fact the lone shooter?

A: Because that's what he told me.

Q: [Petitioner], in fact, told you that he's the guy who shot [the victim]?

A: Yes

Q: He told you that?

A: Yes.

(*Id.* at 15:23–16:5.) Ronis saw his client several times in jail. (*Id.* at 16:18–25.) They

36

discussed the events and felt Petitioner had a good self-defense argument. Ronis explained an attorney cannot "proffer a self-defense argument unless the person [they] are representing was truly the mechanism of injury and [Petitioner] told [him] the circumstances surrounding the obtaining of the weapon and the shooting." (*Id.* at 17:1–5.) Ronis did not recall what Petitioner testified to at trial but did recall what his client told him. (*Id.* at 17:7–9.) He "certainly" did not remember Petitioner telling him there was another shooter. (*Id.* at 17:17–18.) Ronis could not recall that he had any reason to believe Petitioner was uncertain about the fact that he was the shooter, nor any reason to believe he was lying. (*Id.* at 27:5–15.) Ronis further testified that forensic evidence involved a trail of shell casings that were all from the same weapon, which was consistent with Petitioner's statement to him. (*Id.* at 18:14–20.)

Ronis had no independent recollection of anyone calling his office and leaving messages for him saying there was another shooter. (*Id.* at 24:8–11.) He stated, "I can just tell you what my practice as a lawyer would have been had somebody come to me at the time of these events and made a statement such as that, I certainly would have moved on it and it wouldn't have been something that would have been overlooked." (*Id.* at 19:25–20:4.)

When asked if someone always answers the phone at his office or if there is only voicemail, Ronis said he has always had staff in his office answering telephones. Messages are written down on a carbon copy form and placed in the attorney's file. (*Id.* at 24:12–20.) Ronis was confident that no one ever left a message about another shooter, "because it was such a profound issue that we're talking about." (*Id.* at 24:22–25:1)

Ronis said it is not uncommon for defendants after a conviction to change their view of the case, but that does not change his belief and opinion that what Petitioner told him at the time fit with all the facts that he knew, was a truthful statement and it was probably the best defense. (*Id.* at 35:19–25.) As Ronis explained, "I felt it was a very good self-defense case and based upon what [Petitioner] told me about the assault on him and the shooting

that that was the most viable, credible defense to pursue and that's what was pursued." (Id. at 36:22–37:2.) When asked about how Petitioner testified to there being no chase, despite the forensic evidence indicating there was a chase, Ronis stated "I can't control exactly what he testified to. I thought that the facts that [Petitioner] testified to fit the facts as I knew them and that's my belief here today." (Id. at 38:2–20.) Ronis does not believe there was any credible evidence or reports of another shooter based upon the reports he had at the time he represented Petitioner up to and including the trial. (Id. at 38:21–39:2 ["I don't think there were any reports that would credibly indicate another shooter involved."])

Ronis was asked hypothetically if a police report indicated that the shooter was wearing a white cowboy hat or another report indicated that the shooter was of Asian descent, would that cause him to believe there was another shooter. He answered that if that was all he knew then he could have had a reasonable belief that there was another shooter, however that was not all he knew at the time. (Id. at 39:3–11.) Ronis had no reason to disbelieve that Petitioner was the shooter and that there were no other shooters based on everything he knew about the case and the fact that Petitioner told him he was the shooter. (Id. at 42:17–24.)

Ronis does not have any independent recollection of interviewing Escamilla. (Id. at 43: 9–14.) When asked whether he would have put on the same defense of self-defense if Escamilla had called him and told him there was another shooter, Ronis said that it would have to fit the facts and it would not be advisable to put on perjured, fabricated, or testimony that is inconsistent with all other reports and facts of the case. (Id. at 43:21–44:14.) Ronis said if Escamilla had called his office and left a message that there was another shooter, he "absolutely" would have interviewed her. (Id. at 44:18–20.) With respect to any other witnesses who may have reported another shooter, he said it "possibly" would have been a good idea to interview them, but that it "just didn't fit the facts as [he] understood them." (Id. at 44:21–45:14.) When questioned about whether he would have interviewed other witnesses who gave a description of a shooter that did not match

38

Petitioner, Ronis said, "It's not uncommon for people to misidentify and to attribute clothing and facial hair and things that other witnesses contradict. So I can't reconcile inconsistent statements in-between witnesses but based upon everything I knew about the case I proffered the evidence, I proffered the defense which I thought was credible." (*Id.* at 45:15–21.)

### G. Juan Lopez

Juan Antonio Lopez routinely served as Ronis' investigator during the time period of Petitioner's trial. In addition to testifying at the Hearing, Lopez was also deposed on November 13, 2017. (Ex. J.) Counsel stipulated to the admission of the deposition transcript into evidence.[14] (ECF No. 116 at 7.)

#### a. Hearing Testimony

Lopez testified at the Hearing on February 28, 2018. (EHRT, vol. 1 at 149–73.) Lopez was a licensed private investigator. When interviewing a witness, he would show his investigator's license and I.D., as well as provide the witness with a business card. (*Id.* at 151:2–152:5.) Lopez has no records pertaining to Petitioner's case. (*Id.* at 150:5–11.) He has no recollection of the case at all. He does not recall going to the home of Sylvia Escamilla. (*Id.* at 150:12–24.)

On cross-examination, Lopez reiterated that while possible he spoke to Escamilla and Rubio, he had "no memory of it at all whatsoever." (*Id.* at 152:13–20.) He also reiterated that he had no memory of Petitioner's case. (*Id.* at 152:21–25.) Typically, he would interview a witness by himself and does not recall going to interview someone with Ronis. (*Id.* at 153:17–25.) Lopez testified as to his general practice of taking notes from witness interviews, and if the witness was going to be called at trial or was an important witness, he would write a report. (*Id.* at 156:2–23, 157:3–13, 158:14–23, 159:21–160:7.) He would interview a witness, takes notes, and then give the notes or read the notes to

---

[14] Exhibit J was entered into evidence at the Hearing on March 2, 2018. (EHRT, vol. 2 at 24:4–7.)

Ronis. Ronis would then decide which if any of those witnesses were going to be used at trial because there is a legal obligation to provide a report to the prosecution. (*Id.* at 159:21–160:8.) Lopez stated that in general, his obligations as an investigator on a case are to take down a statement, forward that statement to the attorney and the attorney has the primary responsibility to determine what to do with that information. (*Id.* at 162:4–10.)

If a witness gave him a description of a shooter that was different than the defendant, he would "obviously write a report" and follow up on it. (*Id.* at 163:13–25.) However, he would not follow up on his own and try to develop the case without instructions from the attorney, even if a witness contacted him after their initial statement. (*Id.* at 166:15–23.)

On redirect examination, Lopez was asked what he would do if someone he interviewed and given his business card to later called and told him that "they've got the wrong guy, there's another shooter." He said he would talk to them, and take notes, and then communicate that to the attorney. Lopez said that information would never have stopped with him. (*Id.* at 167:19–168:7.) When asked whether Lopez recalled ever interviewing a witness along with Ronis, as Escamilla's declaration indicates, he said it is possible that a witness came to the office but he did not recall ever going out in the field with Ronis to interview anyone. (*Id.* at 172:10–19.)

### b. Deposition Testimony

During his deposition, Lopez testified he has been employed as a private investigator for 40 years and worked with Ronis in that capacity in 2005. (Ex. J at 5:16–20.) Lopez had no independent recollection of Petitioner's case, but said it was possible he worked on it. (*Id.* at 5:21–6:5.) Typically, while working on a case with Ronis he would review all of the discovery, which included police reports and witness interviews, and discuss with Ronis who he should locate or interview. (*Id.* at 6:6–24.) After reviewing Miguel Rubio's declaration, Lopez stated he could not place the case and that "it doesn't really come back to me." (*Id.* at 7:1–14.) He did not recall Rubio or ever speaking to him. (*Id.* at 7:15–17.)

Lopez also reviewed Silvia Escamilla's declaration at his deposition and could not recall the case or ever talking to Escamilla. (*Id.* at 8:1–11.)

Lopez stated that if he were to work on a case with Ronis in which the client was accused of shooting someone and a witness were to contact Lopez claiming to have seen someone else commit the shooting, he would have relayed the information to Ronis and prepared a written report if Ronis requested. (*Id.* at 8:15–24.) Lopez testified that he would not have ignored that information in the hypothetical scenario. (*Id.* at 8:25–9:1.) Lopez testified that typically, when he prepares investigative reports for an attorney, he turns them over to the attorney and he would "probably" keep it in his file, although he "looked all over" and could not find any records from this case. (*Id.* at 9:2–11.) Lopez testified that at the time Petitioner's case was pending, he kept files in a filing cabinet; his practice is to keep files for five years and then purge them. (*Id.* at 9:12–21.) If he wrote reports in a case, they would have been turned over to the attorney during the case. (*Id.* at 10:6–9.) Lopez used a computer in 2005, but has since obtained new computers and did not keep the old one. Whatever information he had in a case, he would turn it over to the attorney and he does not really keep anything on the computer. (*Id.* at 10:10–11:10)

On cross-examination, Lopez confirmed he could not recall anything about the case. (*Id.* at 11:20–23.) He said some of it looked familiar, but that he had many cases involving shootings in National City. (*Id.* at 11:23–12:1.) Lopez further stated that in certain cases Ronis would hire him to perform a specific task rather than being assigned throughout the entirety of the case. (*Id.* at 14:9–13.) Lopez worked with Ronis on mainly federal cases, and if he needed something on a state case, he would call Lopez; they were collaborative. (*Id.* at 17:1–22.) Lopez was asked if he has ever been contacted by a witness in a case in which he was not involved. He said it has happened, but that he always refers them to Ronis because he does not talk to his client unless Ronis wants him to. (*Id.* at 17:25–18:22.) Lopez testified that Ronis worked with many other investigators, but in 2005, he was Ronis's "go-to guy." (*Id.* at 18:23–19:8.)

Lopez did not recall speaking to Sandy Espinoza, Antoinette Gonzales, Daniel Alatorre, Jessie Addison, Olivia Addison, Lupe Barrera, Jose Sanchez, or Petitioner. (*Id.* at 21:2–20.) Lopez also did not recall an incident at KP Hall. (*Id.* at 21:23–24.)

**H. Sandy Barajas[15]**

Sandy Barajas is Petitioner's ex-wife with whom he has two children. (EHRT, vol. 1 at 174:12–20.) She notarized Escamilla's sworn declaration submitted with the Petition. (*See* Ex. K.)

a. Hearing Testimony

Sandy Barajas testified at the Hearing on February 28, 2018. (EHRT, vol. 1 at 173–93.) She is the Petitioner's ex-wife and mother of his two children. (*Id.* at 174:12–20.) The two were married at the time of the shooting at KP Hall. (*Id.*) She is the daughter of Escamilla and helped prepare her mother's declaration. (*Id.* at 174:21–77:12.)

Barajas testified that Escamilla's dictated what had happened and then Barajas wrote down that information on a piece of paper. Barajas then wrote her notes on a computer. She then translated her notes into English and put it into Escamilla's declaration. Escamilla dictated the statement on May 5, 2009. Barajas testified that she and Escamilla were having a conversation about the situation, and when Barajas mentioned that Petitioner was "going to fight his case", her mother wanted to "make sure that her information, what she knew, was in writing if it was ever needed by anybody." (*Id.* at 176:22–177:12.) Barajas is not a certified translator but did the best she could with English being her second language. (*Id.* at 177:17–24.)

Barajas stated she did not ask her mother to provide the declaration. Escamilla wanted to preserve what she remembered happening if it was ever needed in the future. (*Id.* at 178:4–24.) Barajas further elaborated about the details of her conversation with

---

[15] Sandy Barajas is Petitioner's ex-wife with whom he has two children. While they were married, her name was Sandy Barajas-Espinoza. In various documents, she is referred to as Sandi as well.

Escamilla.  Barajas informed her mother that Petitioner was going to file an appeal and the two discussed how they were never contacted.  (*Id.* at 179:10–13.)  Barajas clarified that Escamilla never wrote a statement in Spanish that Barajas translated.  It was given orally.  (*Id.* at 180:5–21.)  When asked if it was a verbatim translation, Barajas responded that it was.  (*Id.* at 180:22–24.)

Barajas is a certified notary public and believes she got her license in 2009, the same year Escamilla's declaration was notarized.  (*Id.* at 182:7–19.)  It was her idea to notarize Escamilla's declaration.  (*Id.* at 182:20–24.)  She stated Escamilla's declaration accurately reflects her recollection of what her mother told her.  (*Id.* at 183:7–25.)  She testified that there were no mistakes or errors that she saw.  (*Id.* at 183:21–25.)

Upon redirect examination by Petitioner's counsel, Barajas stated she did not tape record her mother's statement.  (*Id.* at 184:6–10.)  She testified that due to English being her second language it is possible that she mistranslated certain words.  (*Id.* at 184:11–23, 186:9–13.)  She stressed repeatedly that English is her second language and while she has improved, her "English is not the best."  (*Id.* at 184:13–16; 186:9–13.)  She stated her "knowledge of English back then is not what it is today . . . ."[16]  (*Id.* at 192:5–7.)

Petitioner's counsel directed her to the portion of Escamilla's declaration which refers to someone grabbing "the gun" from Petitioner, and asked her if that could possibly mean "a gun."  (*Id.* at 185:11–18, 190:15–22.)  She stated it "could be one or the other" and that "in our language, in Spanish, certain words can be translated into English, but it doesn't have the same significance or value . . . ."  (*Id.* at 190:23–191:14.)  The Court clarified by stating that "a gun" in Spanish is "un pistola" and "the gun" is "la" and that Barajas just testified to there being a mistake in Escamilla's declaration.  Barajas then

---

[16] At the Hearing, Barajas spoke English fluently.  Given the Court's impression, it requested the recording of her interview with Sergeant Cordero following the shooting to assess her ability to communicate in English at the time of the drafting of Escamilla's declaration.  (*See* Ex. G.)

clarified, "No, I'm not, I'm not saying that it's a mistake . . . ." (*Id.* at 191:15–192:7.) When asked if she recalls making an error, she stated "to the best of my ability at that time, this is what I understand to be what she had given me." (*Id.* at 192:8–12.)

The Court asked Barajas if she translated the declaration back to her mother before she signed it. (*Id.* at 186:29–21.) After much back and forth, she said she did. (*Id.* at 186:22–188:5.) She confirmed that she translated the statement "I saw someone else grab the gun and tried to shoot Rogelio as he ran across the street" to Escamilla, and Escamilla concurred that was the way it happened. (*Id.* at 188:8–14.)

Barajas testified that the first time Escamilla told her that someone else grabbed the gun from Rogelio and shot at him was while preparing Escamilla's 2009 declaration. (*Id.* at 188:15–25.) She testified she was there when Escamilla tried to call Ronis, but she was unable to speak with someone and left a message. When asked why Barajas tried to speak with Ronis, Barajas said she "wanted to know what was going on." (*Id.* at 189:1–22.) She stated that she was interviewed and said she saw Petitioner with a gun:

> The Court: But in terms of being a witness, you were interviewed and you said you
> saw [Petitioner] with a gun.
>
> The Witness: Correct.

(*Id.* at 189:23–25.)[17]  She did not remember her own declaration in which she listed the names of witnesses, but she remembers giving names of witnesses to Ronis. (*Id.* at 190:2–11.)

### b. Declaration Submitted with Petition

Petitioner's ex-wife Sandy Barajas submitted a sworn declaration with the Petition. (ECF No 1-7 at 7–8.) The declaration is signed by Barajas using her former married name,

---

[17] This is not accurate. Barajas maintained in her interview with Sergeant Cordero that she did not see Petitioner at the party. (Ex. H at 28.) Further, she stated she "never saw anybody with a gun", "never saw any fights", and "didn't see anything going on." (*Id.* at 21.) Thus, her admission at the Hearing, that she told authorities she saw Petitioner with a gun, brings into question the veracity of her previous statements to authorities.

dated May 25, 2009, and was notarized by M.G. Cordova.  (*Id.*)

> I Sandy B Espinoza, want to declare under penalty of perjury that on March 10, 2001 I attended the baptismal celebration in K-P Hall, in the city of National City, California.  I contacted the Law Firm of Jan Ronis & Ronis on numerous times to ask Rogelio Espinoza's legal counsel (Jan Ronis) why weren't any of Rogelio Espinoza's witnesses being called to testify.  He explained to me that they were going too and also advised me that I would be called to testify therefore, I could not be present or attend any of the trial hearings.  I was never called or contacted to be subpoena to the trial nor any of the witnesses on his behalf.  To this day, I have no knowledge of why any of use were never contacted.  I provided the Jan Ronis Law Firm with several witnesses that were there on that day and never contacted for their statements. I will provide a list of witnesses names at the end of this statement.  I believe Rogelio Espinoza, was unjustly sentenced and deprived from his freedom without given the opportunity to present the evidence on his behalf.  This statement might not have any weight of any kind but I feel it's my duty as a citizen to present my statement to inform the courts of the injustice the Judicial System and how these negligent acts deprive the citizens of this country their freedom unjustly. Name of witnesses provided to the firm.
>
> Sandy Espinoza 5/25/09
>
> Silvia Escamilla
> Miguel Rubio
> Julieta Sillas
> Rosafe Cuevas
> Adolfo Cuevas
> Leticia Hernandez
> Antonio Hernández

### c.  Prior Police Reports and Interviews

Barajas was interviewed by Sergeant Cordero on March 10, 2001, the night of the shooting at KP Hall.  There is a Detective Follow-Up Report written by Sergeant Cordero summarizing the interview (Ex. F), as well as a two-part recording of the interview (Ex. G) and accompanying transcripts (Ex. H).

### 1.  *Detective Follow Up Report:*

Sergeant Cordero drafted the Detective Follow Up Report dated March 14, 2001

summarizing her interview of Barajas:

> On March 10th 2001, at about 2010 hours, I interviewed Sandi Espinosa[18] Barajas. Espinoza-Barajas is the wife of the suspect, Rogelio Quevas Espinosa. Detective D. Grande was present during the interview. The interview with Sandi Espinoza Barajas was captured on audiotape. The audiotape containing Sandi Espinoza Barajas' statement was later impounded at NCPD. Following is a synopsis of Espinoza Barajas' statement.

>> Sandi Espinosa-Barajas lives at 3682 Logan Ave., San Diego with her husband Rogelio "Roger" Quevas Espinosa, their two children, Rogelio Espinosa Jr. (11 years old) and Adolfo Espinosa (6 years old.) Roger's mother, uncle, and two nephews (Jorge Marin, 8 or 9 years old and Eduardo Morales 3 years old) also live at 3682 Logan Ave., San Diego.

>> On March 10th, 2001, Sandi Espinosa Barajas' sister, Rosella Rubio Barajas baptized her son Angel Miguel Rubio. The Baptism took place at 1100 hours and the party was to begin at 1600 hours. Sandi Espinosa Barajas remained at the party for about thirty minutes and then went home. Sandi Espinosa Barajas arrived home at about 1700 hours. Roger Quevas Espinosa was not home at the time.

>> At about 1900 hours, Sandi Espinosa Barajas returned to the party with her children, two nephews, uncle, mother-in-law, and the mother-in-law's brother. Sandi Espinosa Barajas had been at the party for about half an hour before hearing several people screaming, "Get in there, get in there, somebody is shooting, somebody is shooting." Sandi Espinosa Barajas began to panic and started looking for her children. Sandi Espinoza Barajas gather her children, mother-in-law and uncle, got in her car and was driving off when she was stopped at gun point by the police.

>> Sandi Espinosa Barajas did not witness the fight before the shooting, nor did she witness the shooting. Sandi Espinosa Barajas denied seeing Roger Quevas Espinosa at the party nor did she know his whereabouts. Sandi Espinosa Barajas last saw Roger Quevas Espinosa at about 1300 hours when he and the kids left to get their haircuts.

(Ex. F.)

_____

[18] Espinoza and Cuevas are intermittently misspelled throughout the Report.

*March 10, 2001 Interview*

Sergeant Cordero's interview with Barajas was conducted in English. (Exs. G [recording], H [transcript].) During the interview, Barajas stated that she did not go to the baptism with Petitioner and had not seen him since 1:00 PM earlier that day. (Ex. H at 16–17.) She stressed she did not see Petitioner at the party. (*Id.* at 28.) She "didn't see anything happen." She was "inside, and [she did not] know exactly what happened . . . ." She "never saw anybody with a gun", "never saw any fights", and "didn't see anything going on." (*Id.* at 21.) She denied knowing anyone named Adam Rivera. (*Id.* at 29.)

## I. Barbara Ann Smith

Petitioner's state court appellate attorney, Barbara Ann Smith testified on the final day of the Hearing, September 14, 2018, via videoconference. (EHRT, vol. 4 at 7–51.) At the outset of her testimony, the Court held that Petitioner had expressly waived any attorney-client privilege that may exist as to the unredacted portions of Smith's letters to Petitioner during the course of her representation of him (Ex. P). (EHRT, vol. 4 at 6:9–18.)

Smith is an appellate attorney who does criminal appeals in the courts of appeal in California. (*Id.* at 7:19–25.) She represented Petitioner during his direct appeal in 2008. (*Id.* at 8:4–10.) During her representation of Petitioner, she had the opportunity to review Ronis' file, which she received from Ronis in 2007. (*Id.* at 8:11–25.) Smith testified she reviewed every page in Ronis' file and considered matters that she discussed with Petitioner. (*Id.* at 9:1–5.) After reviewing the file for ineffective assistance of counsel claims, Smith returned the file to Ronis. (*Id.* at 9:6–11.) She did not retain a copy of the file. (*Id.* at 9:12–14.)

Smith recalled discussing with Petitioner and Barajas their statements that they gave the names of exonerating witnesses to Ronis and Petitioner's initial attorney, David Bartick. Smith talked with Bartick and "what he had said, and what matched with what I had seen in the file, that there was this person, Sylvia Escamilla who was said to be an

47

exonerating witness but didn't exonerate him from my review of the police and investigation reports." (*Id.* at 9:17–10:7.) There were no documents in the file indicating that Escamilla saw someone other than Petitioner fire the weapon that Smith can recall. (*Id.* at 10:8–15.) She went over "dozens of witness statements" in the file, and there "wasn't anyone saying that someone else did the shooting." (*Id.* at 10:15–17.) She did not recall seeing any documents indicating that Miguel Rubio made statements that someone other than Petitioner fired a weapon. (*Id.* at 11:10–19.) Her recollection of the contents of the file was much better in 2008 than it is today, as she "was very specific and went over each statement and looked at it and compare it with things that the client had said to [her] and check[ed] for the evidence of third-party culpability." (*Id.* at 11:4–9.)

Smith was questioned about letters she wrote to Petitioner while representing him (Ex. P)[19]. (*Id.* at 14:7–15:5.) Smith had conversations with Barajas regarding witnesses who could exonerate Petitioner. (*Id.* at 16:20–19:10.) Barajas promised to give Smith a list of names, but then would not name anyone. Eventually, Barajas made reference to Sylvia Escamilla.

Smith was questioned about the following portion of a letter she wrote to the Petitioner on June 15, 2007:

> I went over all of your letters again, and went over the trial attorney's file repeatedly. I do not see where you tell me the names or general substance of the testimony of the five to eight witnesses, whom you say would have proved you were not the shooter. You only say that unidentified witnesses in an unknown situation would have said the victim had a gun, you were not the shooter, and/or someone grabbed the gun after you fired in the air and then someone else shot the victim. That is extremely vague, and I see nothing in the file or record of appeal to support this. According to the trial attorney notes there was nothing like this in interviews of you or your wife Sandi. Nor is there any area in which there is a 'hole' in the record, which would suggest to me that there was a major exculpatory witness whose statements of information was purged from the file.

---

[19] These letters were originally appended as Exhibit "B" to the Petition for Writ of Habeas Corpus filed on February 18, 2010 (ECF No. 1-7).

The letter goes on to say:

> The file has dozens and dozens of witness statements, not one of which suggests there were two shooters, or puts a gun in the victim's possession at any time. Per all of them one man shot a gun during the events, so if you shot the gun then you put out the victim's eye, as he himself said. . . . . Moreover, at this juncture, you have to do more than hint to me that there were exculpatory witnesses not presented at trial to raise a third party culpability error, particularly as an [ineffective assistance of counsel] issue.

(Ex. P at 38.)  Following review of these excerpts, Smith explained her recollections of her conversations with Petitioner about the existence of exonerating witnesses.  (EHRT vol 4. at 18:3–24.)  Generally, Petitioner said he or Barajas gave Bartick a physical list of eight exonerating witnesses who would say someone else did the shooting.  Smith repeatedly asked them for this information and did not find anything in the attorney file.  Smith further testified that Petitioner and his wife gave her varying accounts that Petitioner was not the shooter, or someone grabbed the gun after he fired it, or "someone else shot the victim or even that the victim had the gun and then someone took it from him and shot, but not [Petitioner]."  (*Id.* at 18:15–19.)  They never provided any names except they might have mentioned Escamilla.  Smith spoke with Bartick and "looked through every single sheet of paper in the trial attorney files . . . and there was not such a note."  (*Id.* at 18:3–24.)

On cross-examination, Smith answered questions about her description of ineffective assistance of counsel claims to Petitioner.  (*Id.* at 20–23:11.)  She testified that she did not recall the exact amount of time she spent reviewing the file, but on average it can take six or eight hours to review a file.  (*Id.* at 25:8–12.)  In preparation for her testimony, she reviewed Exhibit P, flipped through the file, and reviewed notes she had from talking with Bartick and Ronis.  (*Id.* at 26:2–7.)  She remembers reviewing investigation reports and police reports in the file.  Her best recollection is that the investigation reports were from Bartick.  She cannot recall seeing any that she could attribute to Ronis.  (*Id.* at 26:10–20.)

Regarding her review of Ronis' file, Smith recalled there were police reports and investigation reports. (*Id.* at 27:13–18.) She recalled seeing investigative reports from Bartick, but did not recall seeing any case notes from Ronis. (*Id.* at 27:20– 28:1.) She later clarified, "I'm not saying that I can say I looked through the file and saw none. I do recall some notes from Mr. Bartick from his investigator, like investigator reports, but those are the only ones I specifically recall, and I don't recall any from Mr. Ronis." (*Id.* at 47:13– 20.) Smith testified that since representing Petitioner some ten or eleven years prior to the Hearing in this case, she has reviewed approximately 20 case files in that time, and her memory of the file was much more accurate at the time she wrote the letters to Petitioner in 2007 and 2008. (*Id.* at 48:11–21.)

Smith did not interview Escamilla during her representation of Petitioner. (*Id.* at 29:15–16.) When asked how she determined Escamilla would not be a good witness, Smith said she made that decision based on her review of her statements in the file, either from police reports or investigative reports. (*Id.* at 29:17–22.) Smith recalled that Escamilla's statements did not exonerate Petitioner. (*Id.* at 29:23–30:2.)

Smith recalled that out of the dozens of witness accounts in the file there were a few descriptions of "a Chinese guy in a cowboy hat who obviously wasn't [Petitioner]," but her recollection was that "no one was saying that the Chinese guy in a cowboy hat shot in place of [Petitioner]." (*Id.* at 32:1–8.) Smith was asked to review the following letter excerpt:

> I did not say I was unaware of witness statements that you were not the shooter, to investigators for attorneys Bartick and Ronis. I said there weren't any in the file I, which I reviewed in depth, and repeatedly. I have been over my analysis of various witnesses and nothing you or Sandy has said has been able to be verified by anything in the file.

(Ex. P at 42.) She explained that in this letter, she was summarizing things she had discussed previously with Petitioner, "because there were references to the Chinese guy with the cowboy hat; there were people who weren't sure if [Petitioner] was the shooter, but they weren't saying that somebody else did it…There were a couple witnesses, one or

two, who didn't say [Petitioner] did it, but they weren't sure, and they weren't identifying a third-party culprit. That's my view of the file." (EHRT, vol 4 at 39:12–23.)

Smith was the final witness called and the Hearing closed on September 14, 2018.

## J. Police Reports

Respondent introduced the police reports Ronis received from the District Attorney's office in connection with Petitioner's case as Exhibit M.[20] More than ninety potential witnesses amongst party-goers and residents surrounding KP Hall were interviewed about the shooting. Their responses are documented in various police reports. (*See* Ex. M.) Of the total potential witnesses, over seventy did not see the shooting and/or only heard shots fired. (*Id.*) These witnesses include those closest to Petitioner, his ex-wife Sandy Barajas-Espinoza, his mother Rosa Fe Cuevas, and his uncle Adolfo Cuevas (*Id.* at 3, 46–47, 50, 78–79 ["Rosa at times was reluctant and evasive to give any information about her son Rogelio [and] implied she was protecting her son"].) Two of the witnesses to the shooting, Jose Sanchez and Joaquina Soltero expressly stated they only saw one individual with a gun. (*Id.* at 4, 53 ["At no time did Joaquina Soltero see anyone else other than Roger Espinosa armed with a handgun."].) Critically, no witnesses to the shooting described a second shooter or anyone else brandishing or using a gun during the altercation. (*See* Ex. M.)

Eight witnesses stated Petitioner ("Roger Espinoza", "Roger", or "Rogelio Espinoza") was shooting the gun and provided detailed statements to the police: Eva Gallegos (*id.* at 8, 62);[21] Roman Rodriguez Rubio (*id.* at 47–48, 69–70); Joaquina Soltero

---

[20] Exhibit M includes Petitioner's Exhibits 1, 2, and 3, which are police reports in which witnesses state the shooter was wearing a cowboy hat or sombrero. (*See* Exs. 1, 2, 3.)

[21] Eva Gallegos saw Petitioner holding a gun in his hand and saw him shoot the gun two times in the air at an upward angle while Roman Rubio and Juan Bolanos grabbed him in an effort to keep him from shooting. She then ran inside the hall for protection and heard additional gunshots. She did not return outside until the shooting was stopped. She stated although she "did not see [Petitioner] shoot [the victim], [Petitioner] was the only person who was outside shooting a gun." (*Id.* at 62.) Gallegos positively identified Petitioner as

(*id.* at 24, 37, 52–53); the victim Pedro Arturo Rivera (*id.* at 24, 26, 75–77); Norma Soltero (*id.* at 27, 72–73); Adan Rivera (*id.* at 56–58, 64–66);[22] Juan Bolanos (*id.* at 79–80);[23] and Herman Lopez (*id.* at 80).[24]   Additionally, as detailed above Sylvia Escamilla initially stated she saw Petitioner fire the gun up into the air.  (*Id.* at 37; Ex. A.)

Pedro Arturo Rivera, the victim, provided a detailed account of Petitioner shooting him in the eye.  He:

> turned around and saw [Petitioner] shoot at him.  Pedro saw the muzzle flash from the gun.  As he saw the muzzle flash, Pedro felt a pain in his head and described it as feeling like he had run his hear into a metal pole.  After being shot, Pedro believed [Petitioner] was going to continue to shoot him.  Pedro continued to walk for about "five yards" and collapsed.

(Ex. M at 77.)   Further, Joaquina Soltero witnessed Petitioner approach the victim, Petitioner shoot at the victim, and then the victim fall to the ground as Petitioner "chased him and shot him."  She stated Petitioner shot at the victim about ten times.  (*Id.* at 53.) Norma Soltero saw Petitioner shooting at the victim's feet area, the victim running away, and then Petitioner shooting at the victim.  She looked away for "maybe two seconds" to

---

the same person who got in a fight at the party, was in possession of a gun and shooting a gun outside the party.  (*Id.* at 8, 59.)

[22] Adan Rivera saw Petitioner run up from behind when he and his brother, the victim, left KP Hall.  Petitioner was holding a semi-automatic gun in his hand.  Petitioner fired one or two shots into the air and then pointed the gun at Adan and the crowd.  Adan ran to hide and looked back to see Petitioner shooting numerous times in the direction of the crowd in front of the hall.  He heard a total of ten to fifteen gunshots (Ex M at 57, 65.)  His girlfriend Eliza Marez ran to a parked car with Adan.  (*Id.* at 57.)  She is described in police reports as witness to the shooting (*id.* at 59), but it is noted she met Petitioner for the first time the night of the shooting and did not know if she could identify him if she were to see him again.  (*Id.* at 60.)

[23] Bolanos, the boyfriend of Sylvia Escamilla, stated he was "concerned of retaliation" by Petitioner.  (Ex. M at 80.)

[24] Lopez heard seven to eight gunshots coming from outside KP Hall, stood up and saw Petitioner holding a handgun.  He saw Petitioner run from the hall and get into the passenger's side of a blue Mazda.  (Ex. M. at 80.)

gather her children and looked back and saw the victim fall to the ground. (*Id.* at 73.) Roman Rodriguez Rubio was with the victim when Petitioner ran at them with a gun in his hand. Rubio stood between Petitioner and the victim and was trying to push them apart, but Roger pointed his gun up in the air and fired. He was able to push the victim away from Petitioner, and then he ran toward KP Hall. He looked back and saw Petitioner standing still aiming his gun in the direction that the victim was running and saw him fire three rounds in that direction.[25] (*Id.* at 48.) Finally, Juan Bolanos, Sylvia Escamilla's boyfriend, saw Petitioner firing a handgun recklessly in different directions. He was five feet from Petitioner and close enough to see the muzzle flash from the gun. He ran for safety into KP Hall. While he did not see Petitioner shoot anyone, he saw the victim injured and bleeding afterwards. (*Id.* at 79–80.)

Joaquina Soltero, who had known Petitioner for ten years at the time of the shooting, described him as "light skinned medium build Hispanic male adult, 5'7", about 29 years old with short black hair and a mustache." (*Id.* at 53.) Adan Rivera, who also had known Petitioner for ten years at that time, described Petitioner as a "Hispanic, male adult, about 28 years old", "5'7"–5'8" tall, about 160 pounds, with a thin build", "black hair on top with the side of his head shaved", a "light complexion, a trimmed mustache" and silver braces on his teeth. He was wearing "a black long sleeve shirt and black slacks." (*Id.* at 57; *see also* Lodgment 2, vol. 5 at 688, 699–700 [Petitioner testifying he was around 155 to 156 pounds in 2001 and around five foot seven or eight inches tall].)

In light of this description of Petitioner, five witnesses to the shooting who did not know Petitioner's name, Jose Sanchez, Antoinette Gonzalez, Daniel Alatorre, Beginia Carillo, and Olivia Addison, described the shooter as a thin Hispanic male (Ex. M at 4

---

[25] Roman Rodriguez Rubio also stated that Sandy Barajas-Espinoza said out loud in Spanish to a group of witnesses waiting to be interviewed by the police, "Everything should be O.K. as long as nobody 'RATS'." (Ex. M at 48.) Per Rubio, "[e]verybody at the party knew that [Petitioner] was the shooter, and she was just trying to keep them from telling the truth about her husband." (*Id.*)

["Hispanic male adult with short dark hair and wearing a dark colored, untucked shirt with a white stripe down the front"]; *id.* at 9 ["Hispanic male adult in his twenties, medium height, skinny build, unknown facial hair wearing a black shirt and a white undershirt" who "possibly threw down a cowboy style hat during the incident") and 21 ["suspect was wearing a beige colored cowboy hat and it either fell off his hear or he threw it down"]; *id.* at 10 ["Hispanic male adult, late twenties, unknown hat, wearing a white shirt and a cowboy hat"]; *id.* at 11–12 ["Hispanic male, late twenties, with a skinny physical build]; *id.* at 20 ["Hispanic male adult of unknown age, about 5'6"–5'7", about 140 lbs, wearing long black pants, a light colored shirt, and a white cowboy hat"], and 71 ["Hispanic male unknown age, 5'6"–5'7" tall, 170lbs, normal build, with short dark hair, wearing a cowboy hat, a long sleeve shirt, possible a button down, and dark pants"].)[26]  A nine-year old boy, Jesse Addison, said the suspect looked "similar to a White male, wearing a sombrero and a white shirt," but that he could not identify him again.  (*Id.* at 11; *see* Lodgment 2, vol. 3 at 437:7–14 [trial testimony from Alatorre's mother Olivia Addison regarding her sons' ages].)

Of the five witnesses who described the shooter as possibly Asian and/or wearing a hat of some kind, three were ages nine, ten, and twelve.  (Ex. M at 40, Lodgment 2, vol. 3 at 437:7–14.)  A ten-year-old girl, Guadalupe "Lupe" Barrera, was the only witness to describe the shooter as possibly of Asian descent.  In one report she stated the shooter looked angry, was squinting his eyes and possibly Chinese.  (Ex. M at 40.)  In a second report, Barrera stated the shooter was a "Hispanic or Asian male adult, 25 years old, 5'9" tall, normal to chubby build with chubby cheeks, with short, slicked back, black hair, wearing a black puffy jacket, and blue or black pants."  (*Id.* at 67–69.)

_____

[26] Several other witnesses from residences near KP Hall described seeing a Hispanic male run across the street or flee in a vehicle following hearing the sound of gun shots.  (Ex. M at 39–40 [Hispanic male "about 25 years of age, 5'8", 160 pounds, with short slicked back brown hair, wearing dark clothing."]; at 19 [witness was awakened by the sound of three gun shots, went outside, and saw Hispanic male adult run from KP Hall to a dark car and get in].)

Four witnesses said the shooter may have been wearing a cowboy hat or sombrero. Antoinette Gonzalez was parked nearby and said the suspect "possibly threw down a cowboy style hat during the incident," and said it either fell off his head or he threw it down. (*Id.* at 9–20, 21, 32.) She described it as a beige colored cowboy hat. (*Id.* at 21.) She did not think she would recognize the suspect if seen again. (*Id.* at 21.) Olivia Addison and her two sons, Daniel Alatorre and Jesse Addison who were twelve and nine at the time of the shooting, said that the shooter was wearing a cowboy hat or sombrero. (*Id.* at 10–11, 20, 31, 70–7; *see* Lodgment 2, vol. 3 at 437:7–14 [trial testimony from Alatorre's mother Olivia Addison regarding her sons' ages].) Jesse Addison stated he could not identify the shooter if seen again. (Ex. M at 11.) Olivia Addison described the shooter as wearing a white cowboy hat. (*Id.* at 20, 31.) She needs glasses to drive and was not wearing the night of the shooting. She was not certain she would recognize the suspect if seen again. (*Id.* at 31.) At no time did any witness state that the shooter was wearing a black cowboy hat or sombrero. (*See* Ex. M.)

## V. STANDARD OF REVIEW

Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a petition for writ of habeas corpus challenging a state court conviction. "Petitioner carries the burden of proving by a preponderance of the evidence that he is entitled to habeas relief." *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

In order to obtain federal habeas relief with respect to a claim adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Section 2254(d) is a threshold requirement, and even if it is satisfied, or does not apply, a petitioner must still show a federal constitutional violation occurred in

order to obtain relief. *Fry v. Pliler*, 551 U.S. 112, 119–22 (2007).

Section 2254(d) is a gateway. If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 953–54 (2007) (When section 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires."); *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). While in many cases, the section 2254(d) analysis and direct merits analysis will substantially overlap, there are cases in which a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the section 2254(d) analysis. When such is the case, the substantive claim must be evaluated under a de novo standard and if facts are in dispute or the existence of constitutional error depends on facts outside the existing record, then an evidentiary hearing may be necessary. *Frantz*, 533 F.3d at 737, 745; *see also Earp v. Ornoski*, 431 F.3d 1158, 1185 (9th Cir. 2005) (remanding for evidentiary hearing after finding section 2254(d) satisfied).

In this case, the Ninth Circuit found that "the state court decision constituted an unreasonable application of Supreme Court law under 28 U.S.C. § 2254(d)(1)". (Mem. Disp. at 5–6.) Because there was "no evidence in the state court record to explain trial counsel's behavior" in failing to investigate Escamilla and Rubio, the Ninth Circuit assumed that "the California Supreme Court decided [Petitioner's] case on prejudice grounds." (*Id.* at 7.) Applying the doubly-deferential standards of AEDPA and *Strickland*, and based largely on the sworn declarations provided by Escamilla and Rubio, the Ninth Circuit concluded that "trial counsel's decision not to call Escamilla and Rubio to testify at trial prejudiced [Petitioner]." (*Id.* at 7–9.) In finding the state court's denial of Petitioner's claim was an unreasonable application of *Strickland*, the Ninth Circuit considered the same record that was before the state court. (*Id.* at 11.) Accordingly, Petitioner has overcome the hurdle posed by section 2254(d)(1) by showing that the state court's denial of Petitioner's habeas petition constituted an unreasonable application of

*Strickland* in regards to his ineffective assistance of counsel failure to interview claim. (*See id.*) Because Petitioner has demonstrated that the decision of the state court on his ineffective assistance of counsel claim regarding counsel's failure to interview Escamilla and Rubio was based on an unreasonable application of *Strickland*, this Court will address that claim de novo. *See Frantz*, 533 F.3d at 737 ("where the analysis on federal habeas, in whatever order conducted, results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo."). As discussed above, the Ninth Circuit ordered the district court to conduct an evidentiary hearing pursuant to *Townsend v. Sain*, 372 U.S. 293, 313 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), to "consider whether trial counsel was deficient as well as Escamilla and Rubio's credibility." (Mem. Disp. at 12.) judges

As stated above, the Ninth Circuit held that if Escamilla and Rubio were found credible, trial counsel's decision not to call them as witnesses at trial prejudiced Petitioner. It therefore appears that, the Ninth Circuit has already found that the prejudice prong is satisfied so long as this Court finds the two declarants credible. The Ninth Circuit has expressly limited the inquiry of the *Strickland*'s deficiency prong to whether trial counsel was deficient in not interviewing declarants Rubio and Escamilla. Thus, this Court is tasked with assessing the credibility of Rubio and Escamilla on remand. Accordingly, the Ninth Circuit on remand limited the evidentiary hearing for the Court to ascertain: (1) whether there was deficient performance of Petitioner's trial counsel with respect to his alleged failure to interview Escamilla and Rubio and (2) whether this Court finds Escamilla and Rubio credible, thereby prejudicing Petitioner by counsel's failure to interview them. The Court now turns to that analysis.

## VI.  DISCUSSION

As discussed above in the context of the scope of this proceeding, Petitioner's ineffective assistance of counsel claim regarding trial counsel Jan Ronis' failure to

investigate Sylvia Escamilla and Miguel Rubio is currently before the Court. Accordingly, this Court is tasked with conducting "an evidentiary hearing on counsel's failure to interview the two witnesses" Escamilla and Rubio. (Mem. Disp. at 5 [emphasis added].) This requires assessing (1) the credibility of the declarants and (2) whether trial counsel was deficient in not calling them to testify. *See* Section III. Petitioner's additional claims regarding trial counsel's purported deficiencies are addressed below as well.

## A. Parties' Contentions

The Court has carefully reviewed and considered the parties' post-Hearing briefs. (ECF Nos. 152, 157.) Briefly, Respondent argues that the rule of mandate limits the issues to be decided at the Hearing to (1) whether Sylvia Escamilla and Miguel Rubio are credible witnesses and (2) whether trial counsel was deficient for failing to investigate and present their testimony at trial. (ECF No. 152 at 5–6.) Respondent contends that Petitioner has not met his burden of proving his allegations by a preponderance of the evidence. (*Id.* at 5–6.) Respondent further argues that Petitioner's own testimony at trial is credible and demonstrates that there was only one shooter. (*Id.* at 6–7.) Additionally, Respondent asserts that Escamilla is not a credible witness because (1) she did not see someone other than Petitioner shoot the victim and (2) she did not communicate to trial counsel that she did as she claims in her declaration. (*Id.* at 7–11.)

Respondent further argues that Rubio is not a credible witness as he did not testify at the Hearing, denied seeing the shooting or anyone with a gun in his statement to police following the shooting, and did not communicate to Ronis that he purportedly saw someone other than Petitioner shoot the victim as claimed in his declaration. (*Id.* at 12–13.) Lastly, Respondent argues that because Escamilla and Rubio are not credible witnesses, trial counsel was not ineffective for failing to investigate their claims and calling them as witnesses at the Hearing. (*Id.* at 13.) Respondent raises no new objections to the testimony and exhibits presented. (*Id.* at 6.)

As discussed above, Petitioner argues for a more expansive view of the Ninth

Circuit's remand. (ECF No. 157 at 18–19.) Petitioner does not address the credibility of Escamilla and/or Rubio, or even the fact that Rubio did not testify at the Hearing in support of his sworn declaration under penalty of perjury. Instead, Petitioner argues that because Ronis failed to interview witnesses identified in police reports who stated the shooter was "Asian" and/or wearing a "cowboy hat" or a "sombrero", Ronis failed to select and present the correct defense. (*Id.* at 22–30.) Petitioner argues that if Ronis had interviewed witnesses such as Daniel Alatorre who told police that the shooter was wearing a cowboy hat, "Escamilla and Rubio's statements would have been supported by other witnesses on the second shooter theory and made their testimony more viable." (*Id.* at 22–24.)

Petitioner proceeds to attack Ronis' proffered defenses of self-defense and accidental shooting, claiming that due to Ronis' failure to investigate, Ronis had an "inadequate understanding of . . . . the availability of another defense [the second shooter theory] that would have significantly minimized [Petitioner's] exposure by challenging the firearms/injury allegations." (*Id.* at 27–28.) He claims that then Ronis could have properly advised Petitioner not to testify. (*Id.* at 29.) Specifically, he argues that "had Ronis investigated and developed alternative defense theories, and consulted with [Petitioner] about them, [Petitioner] might have elected not to testify . . . ." (*Id.*) Critically, Petitioner did not take the stand at the Hearing to attest to the fact that he would not have testified at his trial under these circumstances.

### B. Credibility of Declarants

As discussed above, the Ninth Circuit remanded Petitioner's case for the District Court to hold an evidentiary hearing to assess Escamilla and Rubio's credibility as well as to determine whether trial counsel was deficient. (Mem. Disp. at 12.) The Court first assesses the credibility of Escamilla and Rubio.

"There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility." *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995). "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice

that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). "[O]ne of the purposes of an evidentiary hearing is to enable the finder of fact to evaluate the credibility of witnesses by seeing 'the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice . . . .'" *Vickers v. Smith*, No. 115CV00129SABPC, 2019 WL 1367784, at *5 (E.D. Cal. Mar. 26, 2019) (quoting *Mejia*, 69 F.3d at 315); *Conservation Cong. v. United States Forest Serv.*, No. CV 2:15-00249 WBS AC, 2016 WL 3126116, at *5 (E.D. Cal. June 2, 2016) (evidentiary hearings "enable the court to listen to the witnesses' testimony, observe their demeanor, assess their credibility, and resolve the disputed issues of fact regarding defendant's motivations based on the totality of the evidence"). Further, "factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson*, 470 U.S. at 575.

The Court applies the Ninth Circuit's factors for assessing the credibility of a witness: "(1) the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case, if any; (5) the witness's bias or prejudice, if any; (6) whether other evidence contradicted the witness's testimony; (7) the reasonableness of the witness's testimony in light of all the evidence; and (8) any other factors that bear on believability." Ninth Circuit Manuel of Model Civil Jury Instructions 1.14 (2017 ed.).

a. Escamilla's Declaration is Not Credible

Central to Petitioner's ineffective assistance of counsel claim in this matter is the credibility of Sylvia Escamilla. For the reasons discussed below, the Court does not find Escamilla to be credible. Her accounts of the shooting are inconsistent, her accounts of contacting trial counsel Jan Ronis and/or his investigator Juan Lopez are inconsistent, and

60

the circumstances surrounding the creation of her declaration are suspect.

### 1. *Inconsistent Accounts of the Shooting*

In remanding this case for an evidentiary hearing, the Ninth Circuit relied upon Escamilla's declaration and her version of events surrounding the March 10, 2001 shooting. In relevant part, the Ninth Circuit stated:

> Espinoza indeed "shot one or two shots into the ground" to warn off Arturo and Adan before a struggle ensued, and "more shots were [then] fired in the air." "[S]omeone in the crowd" was trying to get the gun and at that point "shots began to go in all directions." Someone yelled that the police were coming, and Escamilla then saw "someone else grab the gun." She believed this person then shot Arturo, and was willing to testify as such. She felt confident she could identify the person.

(Mem. Disp. at 3.) Based on review of Escamilla's declaration, the Ninth Circuit stated, "Escamilla and Rubio both would have testified that *someone got the gun away from [Petitioner]* and fired it at [the victim]." (*Id.* at 8 [emphasis added].) Based on the information contained in Escamilla and Rubio's declarations, the Ninth Circuit was "convinced that Escamilla and Rubio's testimony creates 'a reasonable probability' that 'the fact-finder would have had a reasonable doubt as to [Espinoza's] guilt…'" (*Id.*) As such, this Court must assess Escamilla's credibility with respect to what she claims to have observed on the night of the shooting as set forth in her declaration and relied upon by the Ninth Circuit.

Importantly, Escamilla's Hearing testimony was not consistent with the version of events presented to the Ninth Circuit via her declaration. *See* Model Civil Jury Instruction 1.14(6) (whether other evidence contradicts the witness's testimony). Further, both her Hearing testimony and her declaration were inconsistent with the two police statements she gave within hours of the shooting, when the facts were freshest in her mind. Even Escamilla's two statements to police, given within hours of each other, were inconsistent with each other. She has provided a different version of events each time she has proffered information about the shooting.

In her declaration, Escamilla claims that:

> I remember Rogelio telling the Adan and Arturo (Rivera brothers) pleading them to stop, that he did not want to fight and that he (Rogelio) had a gun. Rogelio continued warn them about the gun, and one of the brothers said to him that he did not have the balls to shoot anyone. They kept kicking him and attacking him. *Then Rogelio, shot one or two shots into the ground and the brothers began to struggle and more shots were fired in the air, while someone in the crowd at the same time was trying to struggle for the weapon. That is when I believe the shots began to go in all directions. I then remember hearing someone saying police, and I saw someone else grab the gun and tried to shoot Rogelio as he ran across the street. I believe from what I witnessed the guy who had the gun was the one who shot Arturo and not Rogelio because he had already ran off and no one was hurt at that moment.* I can identify all involved even the person who shot the gun at the end of the struggle.

(Ex. K [emphasis added].) Based on this, Escamilla is asserting that she observed Petitioner initially in possession of the gun, and he was the first person shooting the gun. Then, someone in the group grabbed the gun from Petitioner and supposedly shot at Petitioner as he ran across the street and then also shot the victim. (*See id.*) However, this is not the same version of events that Escamilla testified to at the Hearing.

At the Hearing, she testified that she was outside of the party smoking a cigarette when she observed a group of people approaching and attack Petitioner, her son-in-law. (EHRT, vol. 1 at 27:12–15.) She heard and saw two gunshots "shot up" and did not know who shot the gun because "there were a lot of hands." "It was like they were struggling to try to take the gun, something like that." (*Id.* at 27:20–28:1; 42:10–22.) The shots were fired from a group of people that included Petitioner. (*Id.* at 23–25, 44:1–7.) The shooting occurred around 7:00 or 7:30 p.m. (*Id.* at 29:3–6.) After she heard the gunshots, she saw Petitioner cross the street and run away. Then she observed another young man shoot. (*Id.* at 28:2–6.) This man was dressed in black, wearing a black hat "like a Texan cowboy" and "his eyes were, like, a little slanted." (*Id.* at 28:7–12, 54:1–5.) He was "shooting all over the place." (*Id.* at 43:8–15.) In this version of events, it is unclear how the second shooter obtained a gun.

Thus, in stark contrast to her declaration, Escamilla testified at the Hearing not only that she did not observe Petitioner with the gun, but also that she never observed anyone take the gun out of his hand. In fact, she averred that a man dressed in black, wearing a black cowboy hat with slanted eyes fired shots "all over the place" after Petitioner fled the scene. Instead of corroborating the version of events presented to the Ninth Circuit via her declaration, she contradicted it. Moreover, it was not until the Hearing that Escamilla described this purported second shooter as having "slanted" eyes and wearing a black cowboy hat, which comports with Petitioner's new theory that the shooter was an Asian man wearing a cowboy hat.[27] *Escamilla had not previously given any such description of this second shooter shooter in any of the police reports or her declaration.* Such an omission further calls her veracity into question.

Escamilla's declaration and Hearing testimony also conflict with the statement she gave to Sergeant Shephard at KP Hall on the night of the shooting. That interview was recorded (Ex. L), transcribed (Ex. O), and summarized in Sergeant Shephard's police report (Ex. A at 2–3). During that on-scene interview, Escamilla identified the shooter as her son-in-law, Petitioner. (Ex L; Ex. A at 2–3; Ex. O at 2–3.) She stated that she observed Petitioner shoot the gun up in the air. (Ex L; Ex. A at 3; Ex. O at 2–3.) She identified Petitioner and only Petitioner as a shooter of the gun. (Ex. L; Ex. O at 1–4.) She made no mention of a second shooter, let alone provide a description of a second shooter with slanted eyes and wearing a black cowboy hat. (*See id.*) Critically, this interview took place at KP Hall immediately following the shooting when the events were freshest in her mind and perhaps before she fully realized the impact her statements could have upon her then-son-in-law.

_____

[27] It is important to note that other witnesses who reported the shooter was wearing a cowboy hat or sombrero either made no mention of the color of the hat or referred to it as white or beige. (EHRT, vol. 1 at 18–19 [Hearing testimony of Daniel Alatorre]; Ex. M. at 20–21 [witness statements of Olivia Addison and Antoinette Gonzalez].) No other witnesses reported the shooter to be wearing a black or dark colored hat. (*See* Ex. M.)

Later that night, Escamilla was interviewed at the police station by Sergeant Cordero. The interview was recorded (Ex. C), transcribed and translated (Ex. E), and summarized in a police report (Ex. B). In this second interview, Escamilla changed her story yet again. In this account of the shooting, she stated she saw "someone (unknown) who fired several shots in the air" and "could not provide a description of the handgun or the shooter." (Ex. B.) She told Sergeant Cordero that she did not see who fired the shots or had the gun and did not see Petitioner with the gun. (Ex. E at 9–15.) She saw two shots "fired up" from a group of boys that included Petitioner, but she was not able to see who was shooting the gunshots up "because there were too many [people] because they were all together." (*Id.* at 9–12 [Petitioner "was among all of them but I did not exactly see him with the gun, I saw gunshots but I did not see that he had it.") She explicitly stated that she never saw Petitioner with the gun. (*Id.* at 10.) She denied that she had previously stated Petitioner shot the gun. (*Id.* at 10–11.) Once again, she failed to mention seeing a man with slanted eyes and a black cowboy hat shoot the victim. (*See* Ex. E.)

The gross inconsistencies between her prior statements to police and her declaration and Hearing testimony impeach Escamilla's credibility. It is a "basic rule of evidence" that "prior inconsistent statements may be used to impeach the credibility of a witness" regardless of whether the prior statements are oral and unsworn. *United States v. Monroe,* 943 F.2d 1007, 1012 (9th Cir. 1991) (citations omitted); *see* Fed. R. Evid. 613.[28]

Apart from Escamilla's inconsistent and contradictory accounts of what she observed of the shooting, the Court applied additional Ninth Circuit factors for assessing the credibility of a witness to her testimony. *See* Model Civil Jury Instruction 1.14. First,

---

[28] Federal Rule of Evidence 613 provides that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b). Escamilla was both given that opportunity at the Hearing and the parties stipulated to the admission of her prior statements for purposes of impeachment. (*See* ECF No. 116 at 5,7.)

Escamilla testified at the Hearing that her memory was most accurate right after the incident. (EHRT, vol. 1 at 59:2–4); *see* Model Civil Jury Instruction 1.14(2) (the witness's memory).[29] If such is the case, then logically and reasonably her first accounts to the police are the most accurate, and therefore most reliable. As noted above, these interviews are completely inconsistent with both her declaration to the Ninth Circuit as well as her testimony at the Hearing.

Secondly, Escamilla effectively testified under oath she did not tell the truth in her declaration and Hearing testimony about the "second shooter" version of events. At the Hearing, Escamilla testified that during the interview at the police station, she told the truth about what she saw.[30] (EHRT, vol. 1 at 47:22–24, 58:17–19.) Further, although she could not remember if she was interviewed by the police at KP Hall after the incident, Escamilla testified she would have given the police officer an accurate statement of what she saw. (*Id.* at 44:1–45:2.) However, these versions of events are inconsistent with the "second shooter" versions in her declaration and Hearing testimony. She cannot be telling the truth as to four different versions of events. Accordingly, Escamilla's own Hearing testimony confirms that her first two versions of events to the police are the more accurate ones. And the Court notes that these two accounts are at least consistent with Petitioner's testimony at trial in which he conceded to being the sole shooter. *See* Model Civil Jury Instruction 1.14(7) (the reasonableness of the witness's testimony in light of all the other evidence); (Lodgment 2, vol. 5 at 751–52 ["Q: But you still were the only person with a gun; right? A: That night? Yes.").

---

[29] Escamilla incorrectly testified that she gave the police the following description of the shooter that night – a short person, dressed in a black shirt, dressed in black and wearing a hat. (EHRT, vol. 1 at 30:19–25.) Additionally, over the course of Petitioner's counsel's direct examination of Escamilla, it became apparent that she was very "suggestable." (*Id.* at 38–39); *see* Model Civil Jury Instruction 1.14 (3) (the witness's manner while testifying).
[30] She could not remember telling a police officer at the scene that she saw Petitioner shoot a handgun into the air. (EHRT, vol. 1 at 46:8–10.)

Third, her declaration came *years* after Petitioner's conviction. Further, Escamilla did not make any claims about a second shooter until she signed the declaration some eight years *after the shooting itself*. (*See* Ex. K.) This was corroborated by her daughter, Sandy Barajas, when she testified that her mother did not tell her about a second shooter until 2009 when they prepared the declaration. (EHRT, vol. 1 at 188:15–21.) This late in the day declaration raises suspicions to the Court of Escamilla's desire to help Petitioner get relief. *See* Model Civil Jury Instruction 1.14(4) (the witness's interest in the outcome of the case), 1.14(5) (the witness's bias or prejudice); *cf. Taylor v. Illinois*, 484 U.S. 400, 413–14 (1988) ("[I]t is . . . reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed."). Further, Escamilla did not give a satisfactory explanation as to why she waited years before telling anyone about this second shooter. *See Herrera v. Collins*, 506 U.S. 390, 417–18 (1993) ("The affidavits filed in this habeas proceeding were given over eight years after petitioner's trial. No satisfactory explanation has been given as to why the affiants waited until the 11th hour—and, indeed, until after the alleged perpetrator of the murders himself was dead—to make their statements.") She testified that she executed this declaration "to preserve [it] in case Mr. Espinoza needed it in the future, [s]ince neither the attorney nor the 'detective' decided to reach out to [her]." (EHRT, vol. 1 at 37:19–24.) It strains credibility that Escamilla would not have told her daughter, Petitioner's wife, that she witnessed *another person shoot the victim*, especially since she supposedly wanted to testify for Petitioner at his 2006 trial. *See* Section IV.B.b. It is also illogical to wait years after trial to preserve her account of the shooting when her purported desire was to present it at trial**.**

Finally, the version of events that Escamilla attested to in her declaration and the version of events she testified to at the Hearing, in light of other evidence, are improbable if not implausible. *See* Model Civil Jury Instructions 1.14(6) (whether other evidence contradicted the witness's testimony), 1.14(7) (reasonableness of the witness's testimony

in light of all the evidence). Critically, Petitioner testified at trial that he fled the scene *with the gun still in his possession*.[31] (Lodgment 2, vol. 5 at 712, 715, 745 [emphasis added].) Petitioner also testified that "there was only one gun involved" in the shooting during his trial. (*Id.* at 751–52.) Thus, in order for the purported second shooter to have been able to shoot the victim *after* Petitioner fled the scene, Escamilla's version of events presented at the Hearing requires there to have been *a second gun*. However, Escamilla herself repeatedly referred to the weapon involved in the shooting as "the" gun in both her declaration and her interview with Sergeant Cordero.[32] (Ex. K; Ex. E at 12–13.) She stated that she "did not exactly see [Petitioner] with *the* gun" and that she "did not see that he had *it*." (Ex. E at 12 [emphasis added].) When asked "what type of gun was it?" she replied "No, no I don't know what type *it* was, I didn't see *it*." (*Id.* at 13 [emphasis added].) Again, she made no mention of having seen a second shooter or even having witnessed the victim be shot.

In the version of events contained in Escamilla's declaration, she saw Petitioner in possession of the gun, fire shots, and then "saw *someone else grab the gun* and tr[y] to shoot [Petitioner] as he ran across the street" who then proceeded to also shoot the victim. (Ex. K [emphasis added].) As previously noted, Petitioner testified at trial that he fled the scene with the gun still in his possession. (Lodgment 2, vol. 5 at 712, 715, 745.) These

---

[31] The inculpatory nature of Petitioner's trial testimony on this point is particularly credible, as he had no motive to fabricate evidence to show he was the sole shooter in possession of the sole gun used in the shooting.

[32] In light of Petitioner's counsel's questioning of Sandy Barajas at the Hearing, it is apparent that he is aware of this inconsistency as well. As recounted in the Court's summary of Hearing testimony, counsel questioned Barajas about whether Escamilla said "a gun" or "the gun" when providing her account of the shooting that Barajas went on to memorialize in Escamilla's declaration. *See* Section IV.H. Barajas stated that because English is her second language, she could have confused the definite and indefinite articles. (EHRT, vol. 1 at 185:11–188:14; 190:15–192:12.) Ultimately, Barajas admitted that Escamilla concurred that it was "the gun." (*Id.* at 188:9–14, 191:18–192:11 [denying she made a mistake in her translation].)

two statements cannot be reconciled unless Petitioner somehow was able to wrestle the gun back from the purported second shooter *after* the second shooter had already shot the victim in the eye. Escamilla's versions of events are simply implausible given her prior statements and Petitioner's own testimony.

In sum, based on the above Court's findings, Escamilla's statements in her declaration about what she observed of the shooting as well as her testimony at the Hearing are not credible. The Court finds what she initially told the Sergeant Shephard to be closer to what she was able to observe outside of KP Hall the evening of the shooting. (*See* Exs. L, O.) It is also consistent with the version of events Petitioner testified to at his trial. (*See* Lodgment 2, vol. 5 at 709–10.)

### 2. *Inconsistent Accounts of Contact with Jan Ronis and Juan Lopez*

The Ninth Circuit relied upon Escamilla's claims in her declaration that she contacted Jan Ronis, Petitioner's trial counsel, and Juan Lopez, Ronis' investigator, and told them her version of events exculpating Petitioner. The Ninth Circuit stated that "Escamilla told Espinoza's defense investigator her account, left messages at the law firm, but was 'never contacted' about the matter any further." (Mem. Disp. at 3.) Escamilla's declaration provides:

> I also contacted the Law Firm of Jan Ronis and Ronis and spoke with one of his investigators Juan Lopez along with Jan Ronis in regards to my testimony. I told the investigator that Rogelio had not shot the victim, and that I would testify to my testimony. However I was never contacted again and I contacted them a few times and left messages. I was never asked to appear in trial or submit my testimony in front of a judge. I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and that this affidavit was executed on May 5, 2009, at San Diego, California.

(Ex. K.) In his post-Hearing brief, Petitioner states that, "Escamilla and Rubio have also attested that they were willing to testify that someone other than [Petitioner] shot [the victim], but that they were never contacted by Ronis despite leaving several messages at his office." (ECF No. 157 at 23 [citing ECF No. 131 at 33, 40, 41, 57; Pet. Ex. 28].)

While it is true that Escamilla stated she attempted to contact Ronis by calling his office during the Hearing, she further testified that (1) she did not tell Lopez about the purported second shooter and (2) she provided *no reason* in the messages she left at Ronis' office for her call. Accordingly, the Court finds that Escamilla's Hearing testimony was inconsistent with her declaration and thus her declaration is incredible as it relates to her communications with Ronis and his investigator, Juan Lopez. Notably, Escamilla admitted at the Hearing that she did not tell Lopez about the purported second shooter. (EHRT, vol. 1 at 50:24–25, 51:1.) She later conceded that despite her prior statements, she never even called Lopez. (*Id.* at 51:23–52:1.) This contradicts her claim in her declaration that she told Lopez that Petitioner had not shot the victim and further explains Lopez's lack of memory about the case in his testimony. (*See* Ex. K.)

While in her declaration she vaguely claimed to have "contacted the Law Firm of Jan Ronis and spoke[n] with one of his investigators Juan Lopez along with Jan Ronis in regards to [her] testimony" (Ex. K), at the Hearing she testified that she saw Petitioner's defense counsel once and he told her they would speak but he never got back to her. (EHRT, vol. 1 at 33:7–18.) However, she could not remember Ronis' name or when she called his office but said that it was not during the trial. (*Id.* at 34:23–35:3, 48:25–49:6.) Moreover, she testified that while she left messages for Ronis on his voicemail, she provided no reason for the call. (*Id.* at 51:7–22.) Additionally, Ronis testified that he has always had staff in his office answering telephone calls, calling into question whether Escamilla did in fact contact Ronis' law firm. (EHRT, vol. 3 at 24:12–20.)

Despite the vague claim in her declaration that she spoke to Ronis regarding her purported second shooter testimony, Escamilla did not testify at the Hearing that she actually told Ronis about a second shooter or that the Petitioner did not shoot the victim. *See* Section IV.B.b. As such, Escamilla's testimony, even if true, supports Ronis' own testimony and recollection that he was never told about a purported second shooter. (*See* Ex I at 12:18–13:1 [if someone called and asserted the claims made in Escamilla's

declaration, he "can't believe that [he] wouldn't remember that"]; EHRT, vol 1 at 121:3–12 ["I find it incredible that I would not have remembered a conversation of the nature that's alleged."]; EHRT, vol. 3 at 19:25–20:4 ["I can just tell you what my practice as a lawyer would have been had somebody come to me at the time of these events and made a statement such as that, I certainly would have moved on it and it wouldn't have been something that would have been overlooked."].)  This also aligns with the letters that Petitioner's appellate attorney Barbara Smith wrote to Petitioner in which she states that there was no mention of a second gunman during her review of Ronis' case file.  (*See* Ex. P at 36, 38–40, 42.)

Escamilla's Hearing testimony that she never actually told Ronis about a second shooter is further corroborated by Barajas's testimony that she witnessed her mother leave a message for Ronis on one occasion, and that her mother did not tell her about the "second shooter" until several years later, in 2009.  (EHRT, vol. 1 at 188:15–189:9.)  If Escamilla had left a detailed message for Ronis in her daughter's presence regarding a second shooter around the time of the Petitioner's trial, 2005 to 2006, then Barajas would have known about the content of Escamilla's supposedly exonerating testimony several years earlier than 2009.  And it is simply incredible that Escamilla would not have told her daughter, Petitioner's wife at the time of the shooting, about her account of a second shooter if in fact she had really observed it.

Given the foregoing testimony and evidence, the Court finds that Escamilla never informed Lopez or Ronis about a purported second shooter.  Her declaration on this point is not credible.

### 3.  *Origins of Escamilla's Declaration*

As set forth above, the Ninth Circuit heavily relied on Escamilla and Rubio's declarations when it remanded this case for an evidentiary hearing.  However, these declarations were not prepared until 2009, *three years* after Petitioner's trial.  (*Compare* Exs. K and 28 [dated June 5, 2009 and May 30, 2009], *with* ECF No. 16-4 at 33 [verdict

form dated March 2, 2006].) As previously noted, and despite the shooting taking place in March of 2001, Escamilla allegedly told no one about the purported second shooter until 2009. (EHRT, vol. 1 at 188:15–189:9.)

The timing of the declarations must first be viewed in the context of Petitioner's ex-wife Sandy Barajas desperately trying to produce a list of exonerating witnesses to Petitioner's appellate attorney, Barbara Smith. (*See* Ex. P at 38 ["[A]t this juncture, you have to do more than hint to me that there were exculpatory witnesses not presented at trial to raise a third party culpability issue, particularly as an [ineffective assistance of counsel] issue."].) Smith's Hearing testimony and her letters to Petitioner in 2007 and 2008 demonstrate that Barajas continued to promise Smith that she would provide her with a list of witnesses who could exonerate the Petitioner; however, the only name Barajas ever mentioned was her mother Escamilla. Smith felt Escamilla could not exonerate Petitioner based on the police and investigative reports in the file. (Ex. P at 36, 38–40; EHRT, vol. 4 at 9:17–10:11, 16:20–17:5, 18:9–24.) Correspondence from Smith in 2007 and 2008 reveals that Barajas never produced a list of exonerating witnesses despite her promises to do so. (*See* Ex. P.) Smith further recalled that Petitioner told her that he and/or Barajas had given his first attorney, David Bartick, a list of exonerating witnesses who would say someone else did the shooting. She asked them repeatedly for the list and searched Bartick's file and did not find any such list.[33] (EHRT, vol. 4 at 18:9–15; *see* 9:17–10:7.) If there were such exonerating witnesses, surely Barajas would have presented a list of their names to Smith at the time of Petitioner's appeal. The fact that Barajas failed to do so indicates that these purportedly exonerating witnesses did not actually exist.[34]

_____

[33] Smith did see investigative reports she believes from Bartick in Petitioner's case file. (EHRT, vol. 4 at 26:10–20, 27:13–28:1.) Nothing in the file indicated that Petitioner "was not the shooter, and/or someone grabbed the gun after [Petitioner] fired in the air and then someone else shot the victim." (Ex. P at 38.)

[34] Further, the Court notes that Barajas served as a notary for Escamilla's declaration. (*See* Exs. K.) She became a notary public within the six months prior to Escamilla executing

The Court finds that Escamilla's testimony surrounding how the declaration was prepared was inconsistent and that she was a very "suggestable" witness. (EHRT, vol. 1 at 38:23–39:3.) At first, she said the declaration was written in Spanish. (*Id.* at 32:10–15.) She later testified that she said it orally in Spanish and her daughter translated and wrote it in English. (*Id.* at 36:13–18, 37:1–4, 15–18.) She then said she did not remember whether she actually wrote out the declaration or stated it orally. (*Id.* at 40:9–12.) She conceded that the declaration is written in English, but since she does not speak or read English, she supposed that her daughter would have written down what she told her. (*Id.* at 48:1–9.) She then said it was written out in Spanish by her daughter, and that she had a copy in Spanish at home. (*Id.* at 48:10–19.) In contrast, Barajas herself testified that she read the declaration back to her mother in Spanish before her mother signed it under the penalty of perjury. (*Id.* at 187:2–188:5.) Barajas did not testify that she wrote out the declaration in Spanish for her mother.

It is also unclear what prompted Escamilla to prepare her declaration after years had passed since Petitioner's trial and his direct appeal had concluded. Escamilla testified that she executed this declaration "to preserve [it] in case [Petitioner] needed it in the future, [s]ince neither the attorney nor the 'detective' decided to reach out to [her]." (*Id.* at 37:19–24.) Barajas denied asking her mother to prepare the declaration, but said she mentioned to her mother that "something had to be done because Mr. Espinoza was going to be fighting an appeal" and that it was not proper that they were never called to testify. (*Id.* at 178:4–18.) She further testified that her mother indicated to her that she wanted to put in writing what she remembered happened and preserve it for the future. (*Id.* at 178:21–24.) As discussed above, this lack of a substantive reason for Escamilla's delay in providing her declaration renders it suspect.

Finally, Barajas' role in translating, drafting and notarizing Escamilla's declaration

the declaration, so in addition to translating and drafting the declaration, Barajas conveniently was able to notarize it as well for her mother. (*See* EHRT, vol. 1 at 36–37.)

calls its credibility into question. In an attempt to explain why Escamilla's declaration referred to "the" gun instead of "a" gun, Barajas stressed how English is her second language, how she was not as proficient in English in 2009 as she is now, and how it is possible she mistranslated what her mother said. (*Id.* at 184:11–23, 185:11–18, 186:9–13, 190:15–191:14, 192:5–7.) However, upon the Court's review of Barajas' recorded interview the night of the shooting, which was conducted entirely in English, it is apparent that she spoke English very well as far back as 2001. (*See* Exs. G, H.) The fact that she was willing to make statements to the contrary in an effort to prop up her mother's declaration and Petitioner's second shooter theory (1) casts doubt on the declaration's credibility as Barajas is the individual who translated, transcribed, and notarized it and (2) underscores the lengths Barajas is willing to go to help Petitioner obtain relief.[35]

The foregoing leads the Court to conclude that Escamilla's declaration was not truthful and was prepared at the behest of her daughter and Petitioner's ex-wife Sandy Barajas in an attempt to present an exonerating witness in support of Petitioner's habeas corpus petition.

### 4. *Conclusion*

Despite Escamilla testifying that the information contained in her declaration was accurate (EHRT, vol. 1 at 40:15–20), her testimony at the Hearing contradicted the declaration in numerous ways as set forth above. Further, the circumstances surrounding the creation of the declaration are questionable at best. The Court has considered, among other things, the manner in which she testified, her interest in the outcome of the case, and the reasonableness of her testimony in light of all of the evidence. Accordingly,

---

[35] Additionally, during her recorded police interview following the shooting, and while authorities were trying to find Petitioner, Barajas stated that Petitioner did not have a cell phone. (Ex. H at 32–33.) During Petitioner's testimony at his trial, however, he stated that both he and Sandy had cell phones, they always carried them, and they frequently used them to communicate. (Lodgment 2, vol. 5 at 735.) Such behavior demonstrates Barajas' bias. *See* Model Civil Jury Instruction 1.14(5) (a witness's bias impacts their credibility).

Escamilla's account of events in her declaration (Ex. K) relied upon by the Ninth Circuit is not credible given the above circumstances. The Court does not find Escamilla to be a credible witness.

### b. Rubio's Declaration is Inadmissible and Impeachable

In remanding this case for an evidentiary hearing, the Ninth Circuit also relied upon Rubio's declaration which it described as follows:

> Rubio similarly saw several people surround Espinoza and "saw a gun being shot in the air." "[E]veryone was trying to take control of [the gun]" and during the struggle, "a lot of gun shots were fired towards all directions." Someone yelled that the police were coming, and everyone began to scramble. At that point, Rubio claimed that a "short male in the group" fired two shots "towards Arturo." Rubio similarly told the defense investigator his story, "was told [he] would need to tell this to the courts," but "never received a call or a time to appear."

(Mem. Disp. at 4.) The Ninth Circuit later wrote that "Escamilla and Rubio both would have testified that someone got the gun away from Espinoza and fired it at Arturo . . . .", and, "[w]e are convinced that Escamilla and Rubio's testimony creates 'a reasonable probability' that 'the fact-finder would have had a reasonable doubt as to [Petitioner's] guilt…'" (*Id.* at 7–8.) As such, this Court was tasked with assessing Rubio's credibility with respect to what he claims to have observed the night of the shooting and his communications with Ronis and/or Lopez as set forth in his declaration and relied upon by the Ninth Circuit. (*See* Ex. 28.) However, Rubio failed to present at the Hearing and the claims in his declaration have never been challenged by cross-examination.

As discussed above, Petitioner's counsel attempted to locate Rubio, the brother-in-law to Sandy Barajas and son-in-law of Escamilla, to no avail. *See* Section IV.C. Without his testimony, his declaration is inadmissible to prove the truth of the statements asserted pursuant to Federal Rules of Evidence 801 and 802. Rules 801 and 802 provide that hearsay statements, *i.e.* those made outside of court that are offered into evidence to prove the truth of the matter asserted, are inadmissible unless they fall within a hearsay exception. *See* Fed. R. Evid. 801, 802. Accordingly, Rubio's declaration is admissible only if it falls

74

within a hearsay exception. *See* Rule 803 (exceptions to hearsay rule regardless of whether declarant is available as witness); Rule 804 (exceptions to hearsay rule when declarant is unavailable as a witness). The parties have not provided and the Court does not find any of the hearsay exceptions to be present here.

Accordingly, to the extent Petitioner bases his ineffective assistance of counsel claim on the allegations set forth Rubio's declaration, he cannot establish that counsel was ineffective or that he suffered any prejudice from counsel's failure to call Rubio. *See Pickens v. Chrones*, No. CV 06-5297-JFW JC, 2010 WL 5392809, at *15 & n.17 (C.D. Cal. Oct. 14, 2010), *report and recommendation adopted*, No. CV 06-5297 JFW JC, 2010 WL 5423713 (C.D. Cal. Dec. 22, 2010). Rubio's declaration was not presented or discussed at the Hearing. Petitioner cannot use Rubio's declaration to establish the facts asserted therein. "Issues of fact presented in habeas corpus proceedings may not be established by ex parte affidavits." *Wright v. Dickson*, 336 F.2d 878, 882 (9th Cir.1964) (quoting *Jones v. Cunningham*, 313 F.2d 347, 349 n.4 (4th Cir. 1963), *cert. denied*, 375 U.S. 832, (1963)), *cert. denied*, 386 U.S. 1012 (1967). Affidavits may "only serve to make the issues which must be resolved by evidence taken in the usual way. They can have no other office. The witnesses who made them must be subjected to examination ore tenus or by deposition as are all other witnesses." *Wright*, 336 F.2d at 882–83 (quoting *Walker v. Johnston*, 312 U.S. 275, 287 (1941)); *see also* Fed. R. Evid. 1101 advisory committee's note to subsection (d) (applying the federal rules of evidence to habeas corpus proceedings to the extent not inconsistent with the statute and citing *Walker v. Johnston*, 312 U.S. 275 (1941) and *Townsend v. Sain*, 372 U.S. 293, 322 (1963), which emphasizes "demeanor evidence as a significant factor . . . . in applications by state prisoners aggrieved by unconstitutional detentions"). Accordingly, Rubio's declaration is inadmissible hearsay.

However, given the Ninth Circuit's heavy reliance on Rubio's declaration, it is important to note it is plagued by many of the same issues as Escamilla's declaration. Rubio's declaration is thoroughly impeached by his prior inconsistent statement to

Sergeant Shephard at KP Hall immediately following the shooting on March 10, 2001. (Exs. A, N, L; EHRT, vol. 1 at 85:4–86:9.) Rubio told Sergeant Shephard right after the shooting the he was inside the hall and did not witness the shooting. (Exs. A [Officer's Report of interview with Rubio and Escamilla], N [transcript of Sergeant Shephard's March 10, 2001 interview with Rubio], L [recording of Sergeant Shephard's March 10, 2001 interview with Rubio]. Specifically, he did not see the guy that shot the victim, did not hear anything, and did not see anybody with a gun as he just came outside after the victim was already bleeding. (Ex. N.) More than eight years later, Rubio purportedly executed a declaration which told a completely contradictory account: that he saw a short male in the group fire two shots toward the victim. (Ex. 28). His declaration fails to address the stark discrepancy between the version of events therein and his police interview, and it fails to address the eight-year delay in telling this version. *See Herrera*, 506 U.S. at 417–18 ("No satisfactory explanation has been given as to why the affiants waited until the 11th hour . . . ."); *Taylor*, 484 U.S. at 413–14 ("[I]t is . . . reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed."). If Ronis called Rubio as a witness at trial, and assuming Rubio would have testified consistent with his declaration, such testimony would have been impeached by his prior inconsistent statement to the police at the time of the incident when the facts were freshest in his mind.

The Court also notes that Rubio's declaration was signed on June 2, 2009, three years after the trial and three days before Escamilla's declaration was signed.[36] (*See* Exs. K, 28.) And as stated above, if Rubio was a potential exonerating witness, surely Barajas would have provided his name to Attorney Smith, which she never did. (*See* Ex. P; EHRT, vol. 4 at 18:3–24.) Additionally, given Lopez's statement that he had no recollection of a conversation with Rubio about a second shooter and would have followed up on

---

[36] Petitioner filed his initial petition for writ of habeas corpus with the California Supreme Court on August 31, 2009. (Lodgment 9.)

information about a second shooter, Rubio's claim that he told Lopez about the supposed second gunman is not credible. (*See* Ex. J at 6–8.)

Finally, Rubio failed to attend the hearing and testify. (*See* EHRT, vols. 1–4.) Petitioner at no point has addressed this fact or attempted to explain why Rubio failed to appear. This leads the Court to reasonably infer that what Rubio purportedly signed off on in his declaration was not reliable. Based on the foregoing, the Court finds that Rubio's declaration is not only inadmissible hearsay, but also is not credible.

### C. Deficiency of Trial Counsel

In addition to remanding this case for an evidentiary hearing to evaluate the credibility of Rubio and Escamilla, the Ninth Circuit also remanded "for an evidentiary hearing on counsel's failure to interview the two witnesses." (Mem. Disp. at 5.) As discussed above (*see* Section III), this requires the Court to assess *Strickland*'s deficiency prong, and whether trial counsel was deficient in light of this Court's assessment of Escamilla and Rubio's credibility. (*See id.* at 9 ["Because there is no record about trial counsel's failure to investigate Escamilla and Rubio, there is an issue as to whether an evidentiary hearing on the matter is appropriate."]; 12 [reversing and remanding "for an evidentiary hearing to consider whether trial counsel was deficient as well as Escamilla and Rubio's credibility."]) Trial counsel's additional purported deficiencies raised by Petitioner are addressed below as well.[37]

#### a. Ineffective Assistance of Counsel Standard

To succeed on a *Strickland* claim, a defendant must prove that (1) his counsel's performance was deficient and (2) he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Wiggins v. Smith*, 539 U.S. 510,

---

[37] While this Court does not view Petitioner's claims regarding the "cowboy hat" witnesses and the defenses proffered at Petitioner's trial to be within the scope of the Ninth Circuit's remand, the arguments are addresses below for purposes of this Report and Recommendation.

521 (2003). "Surmounting *Strickland* 's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Petitioner bears the burden of establishing both components. *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000); *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

To establish constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment." *United States v. Ferreira–Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1987); *see Strickland*, 466 U.S. at 690. *Strickland*'s deficiency prong requires a showing that counsel's performance was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted). "'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citation omitted). Critically, the relevant inquiry under *Strickland* is not what defense counsel could have done, but whether counsel's choices were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998), *cert. denied*, 525 U.S. 1159 (1999).

Additionally, to demonstrate prejudice, the defendant has the burden of proving that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000). Petitioner must show that "counsel's errors were so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

Due to the difficulties inherent in making the above-described evaluation, there is a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance. *Strickland*, 466 U.S. at 689; *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir.2004) (there is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment), *cert. denied*, 546 U.S. 934 (2005) (citation omitted). A habeas petitioner bears the burden to overcome the presumption that, under the circumstances, the challenged action constituted competent representation. *Strickland*, 466 U.S. at 689.

In the context of an ineffective assistance of counsel claim based on a failure to investigate and interview witnesses, "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 521–22. He must "at a minimum conduct a reasonable investigation enabling him to make informed decisions about how to best represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). This includes a duty to follow up on exculpatory evidence. *Kimmelman v. Morrison*, 477 U.S. 365, 384–85 (1986) (counsel deficient for failing to conduct any pretrial discovery); *see also Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (defense counsel's duties include "a duty to investigate the defendant's 'most important defense,' and a duty adequately to investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict" (citations omitted)), *amended by* 253 F.3d 1150 (9th Cir. 2001).

However, "'the duty to investigate and prepare a defense is not limitless,' and . . . .'it does not necessarily require that every conceivable witness be interviewed or that counsel must pursue every path until it bears fruit or until all conceivable hope withers.'" *Hamilton v. Ayers*, 583 F.3d 1100, 1129 (9th Cir. 2009) (citation omitted); *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004). "To determine the reasonableness of a decision not to investigate, the court must apply 'a heavy measure of deference to counsel's judgments.'" *Babbitt*, 151 F.3d at 1173; *Strickland*, 466 U.S. at 691 ("a particular decision not to

investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments"). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A disagreement with counsel's tactical decisions does not prove that the representation was constitutionally deficient. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (per curiam).

"Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial. A witness's testimony consists not only of the words he speaks or the story he tells, but also of his demeanor and reputation. A witness who appears shifty or biased and testifies to X may persuade the jury that not-X is true, and along the way cast doubt on every other piece of evidence proffered by the lawyer who puts him on the stand." *Lord v. Wood*, 184 F.3d 1083, 1095–96 (9th Cir. 1999) (holding that excluding three alibi witnesses who would have testified to seeing the murder victim alive after defendant was alleged to have killed her, based solely on a vague and incorrect impression that police did not find them credible, was outside the "wide range of professionally competent assistance"). Critically, "[c]ounsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively." *Id.* at 1095 n.8 (citing *LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir.1998), *cert. denied*, 525 U.S. 971 (1998) and *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)).

Further, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions" because counsel's actions are normally based on "informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. As outlined in *Strickland*:

In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel *because of what the defendant has said*, the need for further investigation may be considerably diminished or eliminated altogether. And *when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or*

> *even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.*

*Id.* (emphasis added). Accordingly, a decision not to investigate, when a petitioner has provided counsel with information that such investigation is unnecessary, is not outside the range of reasonable trial decisions and does not amount to prejudice. *Cf. Cox v. Del Papa*, 542 F.3d 669, 681–83 (9th Cir. 2008) (counsel's decision not to investigate or present additional evidence regarding defendant's drug use not deficient where defendant had continuously and strenuously protested any suggestions that his behavior was the result of his drug use).

Counsel need not put on an unpersuasive defense. *See Williams*, 384 F.3d at 610–11 (holding that because mental-health expert's evaluations did not support mental-state defense, counsel's decision to not investigate further or pursue that defense was a reasonable strategic choice). Once counsel reasonably selects a defense theory, his duty to investigate a defense that directly conflicts with that theory ends. *Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997); *see Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995) (holding that once counsel "made the reasonable strategic decision" not to elicit testimony from a witness, "there was no need to investigate evidence corroborating that testimony"), *cert. denied*, 517 U.S. 1111 (1996); *see also Wong v. Belmontes*, 558 U.S. 15, 18–20 (2009) (suggesting that counsel's decision to forego a defense because it would prompt the introduction of damaging evidence was not deficient). Critically, "the viability of the defense selected bears on the reasonableness of counsel's actions." *Bohana v. Vaughn*, 389 Fed. App'x 600, 602 (9th Cir. 2010) (citing *Turk*, 116 F.3d at 1267).

> b. <u>Ronis Was Not Deficient in Failing to Interview and Present the Testimony of Escamilla and Rubio</u>

Applying de novo review, the Court finds that Ronis was not deficient in failing to interview Escamilla and Rubio[38] as witnesses or to call them to testify.

First, based on the evidence presented at the Hearing, Ronis had no reason to interview these two witnesses: their statements given to police at the time of the shooting did not point to a second shooter. Rubio told the police that he did not even witness the shooting. Escamilla first told the police that she saw Petitioner shoot the gun, and later told the police that she saw shots fired from a group of boys that included Petitioner. During these interviews, she never gave any indication she observed a second shooter. The Ninth Circuit has repeatedly held that counsel is not deficient for failing to investigate matters to which they were never put on notice. *See Babbitt*, 151 F.3d at 1174 (holding counsel's failure to uncover defendant's alleged family history of mental illness was not unreasonable and that defendant improperly focused on showing "what defense counsel could have presented, rather than upon whether counsel's actions were reasonable"); *Langford v Day*, 110 F.3d 1380, 1386–87 (9th Cir. 1996) (the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions"); *Hensley v Crist*, 67 F.3d 181, 186 (9th Cir. 1995) (finding failure to investigate insanity defense was not objectively unreasonable because a single police report in defendant's record was not enough to put counsel on notice that such a defense may be appropriate).

Second, no evidence was presented at the Hearing that either Rubio or Escamilla ever told Ronis about a purported second shooter.[39] Ronis testified credibly that he was

---

[38] Petitioner presented no evidence at the Hearing that Ronis did not interview Rubio. As discussed above, Rubio did not present at the Hearing and his declaration is inadmissible hearsay. *See* Section VI.B.b. Further Ronis testified that any witness he felt was important to interview would have been interviewed. (EHRT, vol. 1 at 132:5–8.)

[39] This conclusion is supported by Petitioner's appellate attorney Barbara Smith's Hearing testimony that she thoroughly reviewed the contents of Ronis' file and did not come across anything that would tend to corroborate Petitioner's belated claims of another shooter. (EHRT, vol. 4 at 10:8–11:19, 15–17, 18:19–24, 29:23–25, 30:1–2.) Smith's letters to

never contacted by Escamilla or Rubio about a second shooter and that if he was, he would have acted on that information because it was so different from his understanding of the evidence. (EHRT, vol. 1 at 121:3–12; EHRT, vol. 3 at 19:25–20:4; Ex. I at 12:18–13:1, 17:25–18:5, 28:1–15.) He stated that even if there were witnesses willingness to testify that someone else had committed the offense but they had made prior inconsistent statements to the police, Ronis testified he would still have interviewed those witnesses. (Ex. I at 19:1–18.) As discussed above, Rubio's declaration is not admissible for the truth of the matter asserted and is impeached by his prior inconsistent statements to the police on the night of the shooting. Even so, in his declaration Rubio claims that he told the version of events contained in his declaration to Ronis' "helper," Juan. (Ex. 28.) While he could not recall Rubio or Escamilla, investigator Juan Lopez testified that that type of information would never have stopped with him.[40] (EHRT, vol. 1 at 167:19–168:7.) Rubio never claimed to have told the story directly to Ronis. (Ex. 28.) As regards Escamilla, her own testimony at the Hearing demonstrates she did not actually inform Ronis about a second shooter. She claims to have called Ronis several times and left messages, but she admitted that she did not leave any details on those messages.[41] (EHRT, vol. 1 at 51:7–22.) While Escamilla claims in her declaration that she told Lopez that Petitioner did not shoot the victim, she admitted at the hearing that she did *not* tell Lopez about the other man she claims to have seen shoot the gun. (EHRT, vol. 1 at 50:24–51:1, 51:23–52:1.) As such,

---

Petitioner during his direct appeal repeatedly informed him that his claims of another shooter were not borne out by the evidence in the file, and that in her opinion and review of the file, Ronis had not failed to follow up on any exculpatory leads. (*See* Ex. P.)

[40] Lopez further testified that if he was working on a case with Ronis and a witness contacted him claiming to have seen someone other than Ronis' client do the shooting, he would not have ignored that information and would have relayed it to Ronis and prepared a report if Ronis asked him to.

[41] Escamilla's declaration is vague in this regard and does not assert that she told Ronis about a second shooter. (*See* Ex. K.)

even if the Court accepts Escamilla's testimony as true, there is *no evidence* that Ronis was ever actually informed about a purported second shooter.[42]

Moreover, even if Ronis had been made aware of Escamilla and Rubio's claims of a second shooter, deciding to call them as trial witnesses would have opened them up to impeachment by their prior inconsistent statements to the police. *See* Fed. R. Evid. 613. Further, their testimony would have contradicted Petitioner's testimony of having acted accidentally and in self-defense. And as confirmed by Ronis at the Hearing, it would not have been advisable to put on testimony that is perjured or fabricated or inconsistent with all the other reports and facts of the case.[43] (ECF No. 122 at 43:21–44:14); *see* Restatement (Third) of the Law Governing Lawyers § 120(1) (2000) ("A lawyer may not: (a) knowingly counsel or assist a witness to testify falsely or otherwise to offer false evidence; (b) knowingly make a false statement of fact to the tribunal; (c) offer testimony or other evidence as to an issue of fact known by the lawyer to be false."); *id.* § 120(3) ("A lawyer may refuse to offer testimony or other evidence that the lawyer reasonably believes is false, even if the lawyer does not know it to be false."). Here, such testimony could have prejudiced Petitioner in that the jurors may have viewed it as having been fabricated in order to help the Petitioner. Such testimony would have also created confusion since Petitioner testified to a completely different version of what had occurred.

---

[42] See Section VI.B.a.1. wherein the Court finds Escamilla never informed Lopez or Ronis about a purported second shooter and that her declaration on this point is not credible. This conclusion is further bolstered by Barajas' testimony that Escamilla did not inform her of the second shooter until 2009. (EHRT, vol. 1 at 188:15–25.) It also aligns with the fact that Petitioner's appellate attorney observed investigative reports in Ronis' case file, none of which produced any exonerating witnesses. (EHRT, vol. 4 at 10:8–17, 11:10–19 26:10–20, 27:13–28:1; Ex. P at 38.)

[43] See Exhibit M. Additionally, the Court notes that a forensic specialist testified for the prosecution at trial that eight nine-millimeter shell casings and a bullet fragment were recovered from the crime scene, and a criminologist specializing in firearms testified that they were all fired from the same nine-millimeter gun. (*See* Lodgment 2, vol. 4 at 542–43, 565–78.)

Indeed, *Strickland* provides that:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689. Applying the *Strickland* presumption, this Court finds given the risks detailed above, the decision not to call Escamilla and Rubio to testify, even if counsel had been made aware of their claims that they witnessed a second shooter injure the victim, was sound trial strategy on the part of Ronis. Ronis reasonably relied on Escamilla and Rubio's statements to police *which in no way exculpated Petitioner. See* (Exs. A, B, M.) Failure to interview a witness is not incompetent where defense counsel knows the witness' account. *Eggleston*, 798 F.2d at 376 (failure to interview not ineffective where counsel had access to witness' statements taken by government, supporting documents, and FBI reports); *Anderson v. Ducart*, No. 11-CV-02636-JST (PR), 2015 WL 694767, at *13 (N.D. Cal. Feb. 18, 2015) (holding defense counsel reasonably relied on detective's report and taped interview with potential witness whose DNA from a bloodstain linked him to car involved in commission of murder), *aff'd*, 708 F. App'x 905 (9th Cir. 2017). Ronis stated numerous times he reviewed all reports. (Ex I at 13:8–14; EHRT, vol. 1 at 126:20–127:1, 131:20–23 ["there's no question in my mind that I read every report and I was familiar with it at the time"]; EHRT, vol. 3 at 6:6–8, 7:2–4.) Thus the Court finds that Ronis reasonably relied on Rubio's statement in Sergeant Shephard's report that he was inside during the shooting and did not see who shot the victim. (Ex. A.) Further, he reasonably relied on Escamilla's statement documented in Sergeant Shephard's report that she saw Petitioner shoot the gun and her subsequent statements memorialized in Sergeant Cordero's report. (Exs. A, B.) Additionally, as testified to by Petitioner's appellate attorney Smith,

there were investigate reports attributable to Petitioner's former trial counsel Bartick; to the extent they involved statements from Escamilla and Rubio the Court can reasonably infer, Ronis reasonably relied upon those reports as well. (*See* EHRT, vol. 4 at 26:10–20, 27:13–28:1.) Accordingly, Ronis' decision to not interview Escamilla and Rubio to present their second shooter testimony at trial was reasonable.

### c. Ronis' Decision to Not Further Investigate and Present the Testimony of the "Cowboy Hat" Witnesses[44] at Trial was Reasonable

Petitioner also alleges that Ronis was deficient in failing to interview and proffer testimony from the small subset of witnesses who described the shooter as wearing a cowboy hat or sombrero the night of the shooting and the one witness who described the shooter as possibly of Asian descent (collectively, the "cowboy hat" witnesses). Petitioner argues that the investigation of these witnesses would have resulted in Ronis being able to proffer a "second shooter" defense, a claim which is discussed below. He argues that Ronis conducted no investigation and interviewed no witnesses regarding Petitioner's case.

First, the Court disagrees with Petitioner's characterization of trial counsel Jan Ronis' testimony at the Hearing. Throughout his post-trial brief, Petitioner states that "Ronis himself admitted he did not interview *any* witnesses. (ECF No. 122, at 8, 11–12, 43.)" (ECF No. 157 at 23, 26 ["Ronis investigation was incomplete – he failed to interview any witnesses . . . ."].) Petitioner attempts to paint a picture that Ronis failed to conduct any investigation in this matter at all. (ECF No. 157 at 22.) That is not correct. *See* Section IV.F. As recounted in the Court's summary of Ronis' testimony, he testified that over the course of his investigation he reviewed all police reports and his investigator interviewed witnesses that were at the scene. (EHRT, vol. 1 at 126:20–127:1.) He stated numerous

---

[44]Daniel Alatorre was the only "cowboy hat" witness who testified at the Hearing that he was not interviewed by Ronis. There is nothing in the record to suggest that the other "cowboy hat" witnesses were not interviewed. Further, Ronis testified that any witness he felt was important to interview would have been interviewed. (EHRT, vol. 1 at 132:5–8.)

times that he does not have an *independent recollection* of interviewing witnesses before Petitioner's trial. (EHRT, vol. 3 at 9 ["Well, my memory is that I don't have any independent recollection, myself, having personally interviewed somebody. That doesn't mean I didn't. It's been a long time."]; 11–12 [But I just don't have any independent recollection of myself having, as part of pretrial investigation, interviewed anybody. That certainly doesn't exclude the likelihood that reports were presented to me by investigator -- investigator or investigators and that I certainly read at the time."].) However, that does not negate the possibility that his investigator interviewed them or that he himself did not personally interview someone. (EHRT, vol. 3 at 4–5; 9, 11–12.) And he testified that any witness he felt was important to interview would have been interviewed. (EHRT, vol. 1 at 132:5–8.) Additionally, "there's no question in [his] mind that [he] read every report and [he] was familiar with it at the time." (EHRT, vol. 1 at 131:20–23.) Further, he testified that had many conversations with Petitioner about the events and he never mentioned that there was a second shooter; he in fact told Ronis that he shot the victim. (EHRT, vol. 1 at 122:10–14; EHRT, vol. 3 at 15:23–16:25.)

Second, Petitioner argues that Ronis "failed to even speak to the witnesses who had seen, and were willing to testify, that someone other than [Petitioner] shot [the victim] . . . ." (ECF No. 157 at 29.) Once again, this is an inaccurate characterization of the evidence before the Court.[45] The "cowboy hat" witnesses, three of whom were young children at the time of the shooting, did *not* tell police that they saw multiple shooters. None of these individuals made statements to police indicating they would testify to the fact that someone other than Petitioner was the shooter, as is evidenced by the fact that Olivia Addison was called to testify *by the prosecution* at trial. (*See* Lodgment 2, vol. 3 at

---

[45] To the extent Petitioner is referring to Escamilla and Rubio, they never informed Ronis that they witnessed someone other than Petitioner shooting a gun and were willing to testify as such.

435–60.)[46]  Instead, their descriptions of the individual they saw shooting, other than the mention of him wearing a hat, are consistent with Petitioner's overall appearance that night based on statements made to police by those who knew Petitioner and based on Petitioner's own trial testimony.  Further, Olivia Addison testified during Petitioner's trial that "*there was only one person with a gun*." (Lodgment 2, vol. 3 at 448:22–24 [emphasis added].)  Thus, she would *not* have testified to the fact that there was a second shooter to corroborate the version of events contained in Escamilla and Rubio's declarations as Petitioner would have the Court believe.

Additionally, as is evidenced by the parties October 2, 2017 Joint Pre-Hearing Brief, Petitioner anticipated calling all the "cowboy hat" witnesses at the Hearing.  (ECF No. 82 at 10 [Petitioner's witness list, which includes Guadalupe "Lupe" Barrera twice].)  The Court continued the Hearing and extended the discovery period so as to allow Petitioner's counsel to contact this group of witnesses.  (*See* ECF No. 84–86.)  However, Daniel Alatorre was the sole witness from this group willing to testify, via videoconference, at the Hearing.[47]  To say now that these witnesses "were willing to testify, that someone other than [Petitioner] shot [the victim] . . . ." is an overstatement at best.  (*See* ECF No. 157 at 29.)

Petitioner argues that "[t]he failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence", quoting *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002), but again that is not what occurred here.  As Ronis described during the Hearing, "[i]t's not uncommon for people to misidentify and to attribute clothing and facial hair and things that other witnesses contradict." (EHRT, vol.

---

[46] Olivia Addison testified during Petitioner's trial that there was only one person with a gun. (Lodgment. 2, vol. 3 at 448:22–24.)  She did not provide a description of the shooter at trial. (*Id.* at 435–60.)

[47] Given that Alatorre is the son and brother of two of the other "cowboy hat" witnesses, it seems unlikely the Petitioner's counsel was unable to contact Olivia and Jesse Addison to ask them to testify at the Hearing.

3 at 45:15–21.)  When the statements of the "cowboy hat" witnesses are read within the context of Exhibit M, the Court finds it apparent that this is what happened here – a small group of witnesses, many of whom were children, provided information slightly different than other witnesses.  Their statements do not lend credence to the existence of a second shooter; they merely show witness misattribution or misidentification.

This is not an instance where "trial counsel had at [his] fingertips information that could have undermined the prosecution's case, yet he chose not to develop this evidence and use it at trial."[48] *Lord v. Wood*, 184 F.3d 1083, 1096 (9th Cir. 1999).  Ronis testified at the Hearing that he does not believe there was any credible evidence or reports of another shooter based upon the reports he had at the time he represented Petitioner.  (EHRT vol. 3 at 38:21–39:2 ["I don't think there were any reports that would credibly indicate another shooter involved.")  This would necessarily include his review of the "cowboy hat" witness statements.  After reviewing the witness statements contained in Exhibit M, and in light of appellate counsel's review of Ronis' case file in which she found no witness statements indicating that there was a second shooter, the Court finds that the objective evidence supports Ronis' conclusion that the "cowboy hat" witnesses would not have provided credible evidence of another shooter.

Petitioner points to the few "cowboy hat" witnesses, highlighting Daniel Alatorre, in an attempt to cast doubt on the theory that Petitioner was the only shooter.  (ECF No. 157 at 17–19.)  With respect to Alatorre, in addition to being only twelve years old at the time of the shooting, the Court notes that he observed the shooting in the dark from his

---

[48] Ronis was in no way put on notice about Escamilla and Rubio's change to the version of events they witnessed during the shooting.  Further, this is not an instance where counsel "offered no persuasive justification" for his strategic choices.  *Lord*, 184 F.3d at 1096.  The basis for Ronis' decision to not interview Escamilla and Rubio regarding the second shooter and present their testimony at trial was clear: they never informed him that they witnessed a second shooter and their prior police statements did not support that version of events.

front porch and then from his living room, approximately 25 to 30 feet away from the incident. (EHRT, vol. 1 at 18, 19:22–20:4.)[49]  Alatorre said the shooter was wearing a white cowboy hat and a white shirt, but he could not remember what his face looked like. (EHRT, vol. 1 at 19:1–2, 22:17–20.)  He also mistakenly testified that he saw the shooter in custody; when questioned further about that assertion, he said "it's a little blurry" and that he "can't really recall." (*Id.* at 24:12–16.)  The Court finds that the foregoing calls into question Alatorre's credibility regarding his perception of events the night of the shooting.

Petitioner cites to a string of cases including *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) and *Riley v. Payne*, 352 F.3d 1313 (9th Cir. 2003) to argue that counsel was deficient for failing to interview Escamilla, Rubio, and the "cowboy hat" witnesses. However, in these cases there was no evidence in the record to explain why potential defense witnesses were not contacted. *See Alcala*, 334 F.3d at 870–71; *Riley*, 352 F.3d at 1317.  As discussed above, Ronis was never made aware of the fact that Escamilla and Rubio claimed to witness a second shooter.  Further, he was in possession of and reviewed police reports in which Escamilla gave varying accounts of what she witnessed, at first placing the gun in Petitioners hands and then subsequently claiming to not know who shot the gun, and Rubio claimed to see nothing.  Thus, this is unlike cases such as *Lord v. Wood*, 184 F.3d 1083 (9th Cir. 1999) in which counsel's stated reason for disputing purported witnesses' credibility was not supported by objective evidence.  Here, Ronis' decision to not put Escamilla or Rubio on the stand to claim someone else shot the victim is reasonable

---

[49] The shooting occurred at approximately 7:30 p.m. on March 10, 2001.  According to the websites timeanddate.com, on Saturday, March 10, 2001, the sun set in National City at 5:52 p.m.  *See*  https://www.timeanddate.com/sun/@5376200?month=3&year=2001 (updated Jan. 20, 2020).  The Court takes judicial notice that it was dark outside at that time.  *See* Fed. R. Evid. 201; *Futi v. United States*, No. 08-00403JMS/LEK, 2010 WL 2900328, at 23, n. 12 (D. Haw. July 22, 2010) ("The court may take judicial notice of the time of sunrise for a particular day.").

given their contradictory prior police statements, which would have left them susceptible to impeachment.

While the Court finds that Petitioner's arguments about the witnesses who observed the shooter wearing a cowboy hat or being of Asian descent are outside the scope of the remand, those outlying statements are far overshadowed by the multiple witnesses who were present at the party, knew the Petitioner and specifically named him as the shooter.[50] Further the only witness who told police that the shooter may have been of Asian descent was a ten-year-old girl playing outside who said the shooter looked angry and like he was squinting his eyes. (*See* Ex. M, at 40, 69.) Every other witness statement described the suspect as a Hispanic male, except one other witness, Daniel Alatorre's nine-year old brother who said the suspect looked "similar to a White male." (*See generally* Ex. M; *id.* at 11.)

As Ronis stated at the Hearing, "[i]t's not uncommon for people to misidentify and to attribute clothing and facial hair and things that other witnesses contradict. So I can't reconcile inconsistent statements in-between witnesses but based upon everything I knew about the case I proffered the evidence, I proffered the defense which I thought was credible."[51] (ECF No. 122 at 45:15–21); s*ee Parker v Tilton*, 255 Fed. App'x 252 (9th Cir. 2007) ("a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments"; noting "the defense played the hand as well as it could be played"). Accordingly, the Court

---

[50] The witness statements are discussed above in Section IV.J. and below in Section VI.C.d.

[51] Escamilla testified at the hearing that the shooter wore black clothing and a black Texas cowboy type hat. Assuming Escamilla if called at trial would have testified to this description, such testimony would have directly contradicted Alatorre. Such a contradiction at a minimum demonstrates the inaccuracy of eyewitness identifications. It would have been another sound tactical reason for Ronis not to have pursued a second shooter defense based upon such apparent inaccuracies.

finds Ronis' decision to not further investigate this string of "cowboy hat" witnesses regarding a potential second shooter defense to be reasonable.

### d. Ronis Was Not Deficient for Presenting Defenses of Self-Defense and Accident at Trial

Notwithstanding the Ninth Circuit's remand to apply the deficiency prong to trial counsel Ronis' alleged failure to interview declarants Rubio and Escamilla, this Court also finds that Ronis' actions in not presenting a second shooter defense were reasonable, the decision was based on sound trial strategy, and it does not constitute ineffective assistance of counsel. This is not a case where counsel selected a defense without an adequate investigation of an alternative available defense. All the evidence available to Ronis at the time of trial overwhelmingly pointed to Petitioner as the shooter—Ronis stressed repeatedly, as did Petitioner's appellate counsel, that there was no factual basis for a second shooter defense to be presented at trial. (*See* EHRT, vol. 3 at 38:21–39:2; EHRT, vol 4 at 39:12–23; Ex. P at 38.)

Petitioner cites to several Ninth Circuit cases which found counsel ineffective for failing to investigate and present alternative defenses. However, in those instances, the defenses selected were not viable and there were multiple witnesses that counsel failed to investigate who would have easily yielded contradictory evidence to the selected defenses. *See Johnson v. Baldwin*, 114 F.3d 835, 839 (9th Cir. 1997); *Phillips v. Woodford*, 267 F.3d 966, 978 (9th Cir. 2001); *Rios*, 299 F.3d at 806; *Sanders*, 21 F.3d at 1455. Such is not the case here. As discussed above, the second shooter accounts provided by Escamilla and Rubio are not credible, and the "cowboy hat" witness descriptions of the shooter are seemingly instances of witness misattribution or misidentification.

Given the information provided by Petitioner to Ronis and the eye-witness accounts discussed below, the Court finds that Ronis reasonably chose the self-defense and accident theories of the case and was justified in not pursuing an entirely different defense of a second shooter. *See Strickland*, 466 U.S. at 691 (counsel need not pursue investigation

after making "a reasonable decision that makes particular investigations unnecessary"); *see also Williams*, 384 F.3d at 611 ("Having reasonably selected an alibi defense as the primary defense theory, [counsel] no longer had a duty to investigate a conflicting mental-state defense"); *Turk*, 116 F.3d at 1267 (once counsel "reasonably selected the self-defense theory, his duty to investigate the competency defense, which directly conflicted with the self-defense theory, ended").

A second shooter defense not only was contradicted by the bulk of the evidence (*see* Exhibit M), but also contradicted Petitioner's own statements to Ronis. Petitioner told Ronis that he "was the guy with the gun" and that he was the sole shooter; critically, he never told Ronis that there was a second shooter. (EHRT, vol. 1 at 131:10–14, 122:12–14; EHRT vol. 3, 15:23–16:5,); s*ee Langford*, 110 F.3d at 1387 (no ineffective assistance for failure to investigate where client failed to tell attorney about relevant facts). As held by the Ninth Circuit in *Turk v White*, "[a]s *Strickland* suggests, once [Ronis] reasonably selected the self-defense theory, his duty to investigate the [second shooter] defense, which directly conflicted with the self-defense theory, ended." 116 F.3d at 1267. Indeed, "[c]ounsel's performance . . . is not deficient if [he] reasonably decides to limit the investigation. Counsel may reasonably base investigation decisions on information supplied by the defendant." *Atwood v. Ryan*, 870 F.3d 1033, 1055 (9th Cir. 2017) (citing *Strickland*, 466 U.S. at 690–91).

Petitioner cites *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) to argue that counsel cannot rely on a defendant to provide information and a duty to investigate exists "regardless of the accused admissions or statements to the lawyer of facts constituting guilt . . . ."[52] (ECF No. 157 at 21–22.) However, *Rompilla* does not support such a broad proposition in this context. In *Rompilla*, the Court stated that "the duty to investigate does

---

[52] Note, this language is quoting ABA Standards for Criminal Justice guidelines. *See Rompilla*, 545 U.S. at 387 (quoting 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp.)).

not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." 545 U.S. at 383. The case in *Rompilla* turned on counsel's failure to examine the court file from the defendant's prior conviction, which the prosecution itself twice had brought to the attorney's attention and which was readily obtainable. *Id.* at 383–84. Here, assuming arguendo that there was a second shooter, Petitioner chose to deliberately misinform Ronis that he was the sole individual with a gun and he shot the victim. Given that information, and in light of the evidence discussed below, Ronis' presentation of self-defense and accident theories and curbing his investigation of a possible second shooter defense was reasonable. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987) (limited investigation reasonable because witnesses brought to counsel's attention provided predominantly harmful information); *Rodelas v. Arnold*, No. 14-CV-05017-JST, 2016 WL 4073307, at *12 (N.D. Cal. Aug. 1, 2016) (finding *Rompilla* inapplicable as "Petitioner deliberately failed to inform his counsel that he learned of the restraining order" at issue in failure to investigate claim.)

In addition to Petitioner's own statements to Ronis in which he admitted to shooting the victim, nine other witnesses specifically named "Roger Espinoza," "Roger," or "Rogelio Espinoza" as the person they saw shoot the gun and/or they positively identified him as the person they saw shoot the gun in statements given to police.[53] Those witnesses were: Roman Rodriguez Rubio, Eva Gallegos, Joaquina Soltero, the victim Pedro Arturo Rivera, Norma Soltero, Silvia Escamilla (in her first police interview), Adan Rivera, Juan Bolanos, and Herman Lopez. (*See* Ex. M.)

Roman Rodriguez Rubio told police that he was standing in between Petitioner and Arturo Rivera trying to push them apart. He said the shots were fired by Petitioner right next to Rubio's head; his ears were ringing as a result. Rubio said Petitioner pointed the

---

[53] This is notwithstanding the fact that during Petitioner's trial testimony, he admitted to shooting the gun accidentally and in self-defense. (Lodgment 2, vol. 5 at 701:13–712:20.)

gun up in the air while Rubio was standing right next to him and fired about five rounds. Rubio ran away and looked back and saw Espinoza standing still and aiming his gun in the direction Arturo had run – he fired about three rounds in that same direction. (*See* Ex. M, at 47–48, 69–70.)

Eva Gallegos saw Petitioner holding a small silver or chrome gun in his right hand and saw him fire the gun twice into the air. She also positively identified him from a 1995 booking photo. (Ex. M at 36, 62.)

Joaquina Soltero said she saw Petitioner shooting directly at the victim and following him with the gun. She said he shot the gun approximately ten times. (*Id.* at 24–25, 37, 52–53.)

The victim, Pedro Arturo Rivera, told police that Petitioner came running toward them with a gun in his hand and heard him "click it." He then fired one round into the ground. He then fired two to three more rounds into the air while looking at Pedro and saying "yeah! Yeah! What now?! What now?!" Pedro put one of Petitioner's friends in between Petitioner and himself to use the friend as a shield. Petitioner chased him around the friend in circles a few times. Pedro then ran away and Petitioner chased him, shooting at him. He shot and missed. Pedro ran behind a car but people were already hiding there. He kept running and looked back to see Petitioner chasing him with the gun in his right hand. He ran and turned around to see Petitioner shoot at him again. He saw the muzzle flash, and felt a pain in his head like he had run into a metal pole. He continued to walk for five yards and then collapsed. (*Id.* at 26, 75–77.)

Norma Soltero told police that she came outside of the hall and saw Petitioner holding a silver gun in his right hand. At first he had it pointed down, he was holding onto someone going in circles and Espinoza shot the gun in the air three to four times. She saw Petitioner shoot at the victim's feet area once, then the victim was running away and Petitioner shot at him. She looked away to gather her kids and looked back and saw the victim fall to the ground. (*Id.* at 25 27, 72–74.)

As discussed above, Silvia Escamilla told Sgt. Shephard in an interview at the scene that she saw Petitioner shoot the gun into the air. (Ex. A.)

Adan Rivera told police that Petitioner had a full-size semi-automatic gun in his hand. He initially had it up in the air – he fired one or two shots into the air and then pointed it at Adan and then the crowd. Adan Rivera ran and turned to see Petitioner firing the gun numerous times in the direction of the crowd, about ten to fifteen times. (Ex. M at 56–58, 64–66.)

Juan Bolanos told police that he was at the party standing outside the hall when he heard several sounds of gunshots. He saw "Sandy's husband, [Petitioner] firing a handgun," holding the gun in his right hand. He said Petitioner was recklessly firing the gun in different directions. Bolanos was five feet away from Petitioner during the shooting. He saw the muzzle flash. He estimated hearing five or more shots fired. He ran back into the hall for safety and did not see Petitioner shoot anyone. He did see the victim injured. He told police he was afraid of retaliation from Petitioner. (*Id.* at 79–80.)

Herman Lopez told police that he heard seven to eight gunshots come from outside. He stood up and saw Petitioner holding a handgun in his right hand. He saw Petitioner running from the hall and get into the passenger side of a blue Mazda that made a U-turn and drove away. (*Id.* at 80.)

Further, five witnesses to the shooting who did not know Petitioner's name, Jose Sanchez, Antoinette Gonzalez, Daniel Alatorre, Beginia Carillo, and Olivia Addison, described the shooter as a thin Hispanic male in keeping with Petitioner's then-physical description. *See* Section IV.J.

The Ninth Circuit did not have the benefit of knowing these witness statements were contained in the police reports Ronis reviewed prior to Petitioner's trial. Ronis testified repeatedly during his deposition and at the Hearing that he believed self-defense was the best defense available to Petitioner and all evidence available to Ronis pointed to those

facts, including the police reports.  (EHRT, vol. 3 at 17:1–5, Ex. I at 8:15–9:3.) [54]  Further, Ronis stated that he would not have proffered a self-defense theory without investigating all other possible defenses.  (Ex. I at 17:15–24.)

His belief that there was only one shooter was based on the investigative reports, his conversations with Petitioner, the defense they chose, and the absence of any other credible evidence pointing to another shooter.  (*Id.* at 28:23–29:6, 42:3–17.)  Critically, Petitioner told him that he was the lone shooter who shot the victim.  (EHRT, vol. 3 at 15:23–16:5.) He saw Petitioner several times in jail, discussed the shooting, and both felt Petitioner had a good self-defense argument.  (*Id.* at 16:18–17:5.)  When asked to justify his self-defense theory, Ronis stated that "the credible evidence was that he – there was a gun in his hand. People described the gun in his hand.  People described him, you know, taking shots, as I recall.  And you know, it seemed to me that was a far more credible defense than somebody else did it."  (Ex. I at 48:20–49:7.)  For these reasons, a second shooter defense was simply not credible and if presented could have resulted in backlash from the jury regarding Petitioner's attempted murder charge, which the jury hung on.  *See Bohana*, 389 F. App'x at 602 ("the viability of the defense selected bears on the reasonableness of counsel's actions."); (*see* Ex. I at 31:14–32:6 [Ronis explaining that if there were reports stating that witnesses said the shooter was Asian, and they appeared to be credible and stronger than the defenses he eventually offered, he would have pursued it]).

When asked whether he would have chosen a different defense if he had information indicating that the description of the shooter was different than that of Petitioner, Ronis said he would have if it was "really credible evidence that outweighed the other defense," but that his recollection was that the credible defense is the one that was asserted.  (Ex. I at 37:1–9.)  He stated that even if he had interviewed witnesses and they had described

---

[54] The Court finds Ronis credibly testified that he reviewed all of the police reports and was familiar with them at the time of the trial.  (EHRT, vol. 1 at 131:20–23; Ex. I at 13:8–14.)

someone wearing a cowboy hat, he would still have gone with his chosen defenses. (EHRT, vol. 1 at 130:1–6, 144:9–16.)  Even though some witnesses testified to someone wearing a cowboy hat, he still felt that he had chosen the most credible defense.  (*Id.* at 144:9–16.)

Petitioner argues that Ronis "chose and utilized weak and inconsistent defenses, self-defense and accidental shooting – and overtly conceded that the firearm that inflicted the injury to the victim was in [Petitioner]'s hand . . . ."  (ECF No. 157 at 27.)  Ronis stated during his deposition that it is his practice to pull the relevant jury instructions when he gets a case as part of his preparations for discussions with his client.  (Ex. I at 58:18–22.) He would have researched relevant legal issues during his representation of Petitioner.  (*Id.* at 58:10–13.)  Thus, he would have been fully aware of the nature of the charges against Petitioner and the relationship between his proffered defenses of self-defense and accident.

Despite this information Ronis had before him, Petitioner claims that Ronis' proffered theories of self-defense and the accidental shooting would have had no impact on the mayhem charge and the attendant personal use of a firearm enhancement under Penal Code § 12022.53(d), as they put the gun causing the injury in Petitioner's hand and foreclosed that any other person inflicted the injury.[55]  (ECF No. 157 at 28.) He proceeds to argue that "the most serious charge here was the firearm enhancement under Penal Code § 12022.53(d)" because it required the imposition of a mandatory 25-year-to-life sentence.[56]  (ECF No. 157 at 23 n.9.)  Left unstated by Petitioner, the firearm enhancement

_____

[55] Petitioner also argues that "according to the prosecution's theory, [Petitioner] was running after the victim and shooting as the victim was running away" making "it virtually impossible to support a perfect self-defense." (ECF No. 157 at 28.) However, such logic assumes that the jury would automatically believe the prosecution's theory of events. Petitioner testified to another version of events, in which he stated that he did not intend to shoot anyone in alignment with accident and self defense theories.  The jury was properly instructed as to these defenses, they just did not find Petitioner's version of events credible.
[56] California law has since changed to permit courts to strike or dismiss an enhancement otherwise required to be imposed by this section at sentencing or resentencing.  Cal. Penal

under Penal Code § 12022.53(d) was charged as an enhancement to *both* the Count 1 attempted murder and the Count 2 mayhem charges.

Critically, before considering the firearm enhancement, jurors would have first had to find Petitioner guilty of either one of the underlying offenses, attempted murder or mayhem. If the jurors accepted Petitioner's version of events and found the defenses of accident and/or self defense credible, they never would have even addressed the applicability of the firearm enhancement under Penal Code § 12022.53(d). As the jurors were instructed, accident and self defense were complete defenses to both mayhem and attempted murder.[57] The trial court judge clarified with counsel prior to instructing the jury that actual self-defense and accident applied to all three charges, with imperfect self-defense applying only to the attempted murder charge. (Lodgment 2, vol. 6 RT at 788:5–13.) This is in keeping with the instructions charged to the jury. (Lodgment 1, vol. 2 at 173–75 [stating defendant not guilty of mayhem or attempted murder, amongst other charges, if he acted accidentally or used force against another person in self-defense].) Further, the jury was instructed that attempted murder, mayhem, and the firearm enhancement under Penal Code § 12022.53(d)[58] all had a heightened intent requirement of

---

Code § 12022.53(h) (as effective Jan. 1, 2019). This authority "applies to any resentencing that may occur pursuant to any other law." *Id.*

[57] Further, imperfect self-defense would have reduced attempted murder to attempted voluntary manslaughter as the jury was instructed. (Lodgment 1, vol. 2 at 169.)

[58] The enhancement for intentionally and personally discharging a firearm under Penal Code § 12022.53(d) requires showing that the "defendant intended to discharge the firearm". (Lodgment 1, vol. 2 at 171 [Instruction 3149. Personally Used Firearm: Intentional Discharge Causing Injury or Death].) As acknowledged by the trial court judge with regard to the enhancement under Penal Code § 12022.53(d)), "because a gun was fired at someone if it was done accidentally, it would not meet the elements of that offense." (Lodgment 2, vol. 6 at 744:17–22, 775:8–28. 778:7–19 [discussing the mental state required for section 12022.53 and adding into the instruction that the individual must intend for the gun to go off].) This is a lesser intent requirement than mayhem, which requires more than just intent to pull the trigger of the gun. (*See* Lodgment 1, vol. 2 at 170 [Instruction 801. Mayhem].)

"specific intent or mental state" and that to be guilty of these offenses "a person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state." (Lodgment 1 vol. 2 at 163 [Instruction 252. Union of Act and Intent: General and Specific Intent Together].) Jurors were further instructed that mayhem required the defendant to have acted "unlawfully and maliciously", with maliciously defined as when someone "intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone." (*Id.* at 170 [Instruction 801. Mayhem].)

Thus, there is nothing to support Petitioner's statement that accident (and self-defense) was not a complete defense to mayhem because the jury was instructed as to the heightened intent requirement. If jurors had believed Petitioner's version of events, self-defense and/or accident were complete defenses to the charged crimes. As Ronis acknowledged, the two defenses could have gone hand-in-hand based on the reports of shots being fired into the air and into the ground. (Ex. I at 27:13–24.) This is an instance in which Ronis "made an informed decision to present an imperfect, but well-prepared [self-defense/accident defense], rather than a weak alternative defense [i.e., second shooter defense] (or no defense) . . . ." *Contra Bemore v. Chappell*, 788 F.3d 1151, 1165–66 (9th Cir. 2015).

Petitioner avers that had counsel "investigated and developed alternative defense theories" he might have not elected to testify. (ECF No. 157 at 29.) Petitioner did not take the stand during the Hearing to attest to the fact that he would have elected to pursue a second shooter theory and would not have testified.[59] Regardless, he argues that had he

---

[59] Ronis did not recall the circumstances surrounding Petitioner's decision to take the stand and testify but he knows there were discussions about it. (Ex. I at 39:15–21.) Ronis saw Petitioner several times in jail. (EHRT, vol. 3 at 16:18–25.) They discussed the events and felt Petitioner had a good self-defense argument. Ronis explained an attorney cannot "proffer a self-defense argument unless the person [they] are representing was truly the mechanism of injury and [Petitioner] told [him] the circumstances surrounding the obtaining of the weapon and the shooting." (*Id.* at 17:1–5.)

100

conducted further investigation, Ronis "could have made an appropriate strategic choice and then competently advised [Petitioner] as to whether to take the stand, given the available alternatives." (ECF No. 157 [quoting *Bemore*, 788 F.3d at 1665].) However, Petitioner provided no evidence that Ronis did not competently advise him about his ability to take the witness stand and the availability of alternative defenses. In fact, Ronis testified he reviewed all the police reports and met various times with Petitioner. The most reasonable inference is they discussed the content of the police reports and Petitioner's ability to testify about these defenses.

Looking at the charges and fleshing out the facts before Ronis at the time of trial, the Court has determined that accident and self-defense were the most credible defense theories he could have proffered. First, the witnesses discussed above who knew Petitioner identified him by name as the shooter who injured the victim. Second, the group of witnesses who did not know Petitioner by name provided a description matching his immediately following the shooting to police. Third, Petitioner fled to Mexico for several years following the shooting, which permits an inference of his knowledge of his guilt. *See* California Criminal Jury Instruction No. 372. Fourth, there were no reports of an additional shooter contained in the police reports. At best, there were a few witnesses, three of whom were children, who misattributed a cowboy hat to the shooter. Fifth, and most importantly, Petitioner told Ronis that he was the only shooter and the individual who shot the victim. With this information, and given the charges against Petitioner, the only viable defenses were self-defense and accident. *See Bohana*, 389 Fed. App'x at 602 (viability of a defense informs reasonableness of counsel's actions). Additionally, the forensic evidence involved a trail of shell casings that were all from the same weapon, which was consistent with Petitioner's statement to Ronis. (EHRT, vol. 3 at 18:14–20.) As acknowledged by Ronis, an attorney cannot "proffer a self-defense argument unless the person [they] are representing was truly the mechanism of injury and [Petitioner] told [him] the circumstances surrounding the obtaining of the weapon and the shooting." (EHRT, vol. 3

at 17:1–5.) Such was the case here, and Ronis' decision to pursue self-defense and accident defense theories was reasonable given the aforementioned circumstances.

Finally, Petitioner chose to take the stand at trial and testify in his own defense that he shot the gun albeit in self-defense and accidentally. (Lodgment 2, vol. 5 at 709:24–28, 710–11). There is nothing in the record to indicate his decision to testify was not made knowingly and voluntarily.[60] Had Ronis called Rubio, Escamilla and/or any other witnesses to testify that there was a second shooter who shot the victim, such testimony would have conflicted directly with Petitioner's testimony that he shot the gun in self-defense. Such a trial strategy would have raised a colorable claim of a violation of Petitioner's Sixth Amendment "autonomy" right. *See McCoy v. Louisiana*, ____ U.S. ____, 138 S. Ct. 1500, 1508 (2018).

The Supreme Court in *McCoy* affirmed the defendant's autonomy to determine the "objectives" of his defense. The Sixth Amendment "'contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense.' Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence. Some decisions, however, are reserved for the client – notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy*, 138 S. Ct. at 1508 (internal citations omitted) (citing

---

[60] During a January 12, 2007 post-trial status conference before the trial court judge, Petitioner stated he had requested that Ronis subpoena percipient witnesses to testify on his behalf at trial, which Ronis did not do. He claimed that "it was another suspect who [shot the victim's eye] after grabbing the gun from me." (Lodgment 2, vol. 1 at 2:21–4:15.) These statements were not under oath and directly contracted the facts he testified to at trial. (*See* Lodgment 2, vol. 5 at 709:24–28, 710–11.) Further, Petitioner was presented ample opportunity during the Hearing to take the stand and testify under oath regarding the circumstances surrounding his chosen defenses and his decision to take the witness stand. He chose not to do so. (*See* EHRT, vol. 3 at 48:12–49:4; EHRT, vol. 4 at 54:4–9, 65:5–21.)

*Gannett Co. v. DePasquale*, 443 U.S. 368, 382, n.10 (1979), *Gonzalez v. United States*, 553 U.S. 242, 248 (2008), and *Jones v Barnes*, 463 U.S. 745, 751 (1983)); *see, e.g.*, *United States v. Read*, 918 F.3d 712, 720 (9th Cir. 2019). As the Court explained in *McCoy,* the latter category of decisions "are not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are." *McCoy*, 138 S. Ct. at 1508–09. With these principles in mind, *McCoy* held that the decision of whether to admit guilt remains with the client. *Id.* at 1510–11.

In *McCoy*, defense counsel wanted the defendant to concede that he was the cause of the individuals' death in order to try to avoid the death penalty. Defendant clearly instructed his counsel not to do so, but his counsel nonetheless told the jury that defendant committed the killings. The Supreme Court held that the Sixth Amendment's guarantee of the right of the assistance of counsel precluded his lawyer from admitting the defendant's guilt of the acts alleged as the actus reus of a charge crime over his objections. *Id.* at 1509. It was the client's role, not the lawyer's, to determine the objective of the client's defense, and defendant had a right to insist that he did not kill the victims. He was thus entitled to a lawyer who would represent and attempt to further the object of the defense that defendant had established. Defense counsel's actions amounted to structural error requiring a new trial, as the "[v]iolation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural'; when present, such an error is not subject to harmless error review." *Id.* at 1511.

Similarly, in *United States v. Read* counsel was allowed to present an insanity defense over defendant's objection and citing *McCoy*, the Ninth Circuit held that the defendant's Sixth Amendment rights were violated. 918 F.3d at 720. The Court reasoned that an insanity defense is tantamount to a concession of guilt. Since the defendant had a Sixth Amendment right to choose his defense, not so allowing him to do so was a structural error, and the proper remedy is a new trial. *Id.* at 721; *see, e.g.*, *United States v. Audette*, 923 F.3d 1227, 1236 (9th Cir. 2019) (had counsel presented an insanity defense over

defendant's objection, defendant would have a claim of ineffective assistance of counsel); *People v. Flores,* 34 Cal. App. 5th 270 (2019) (counsel's concession of the actus reus over defendant's objection was a violation of his Sixth Amendment rights and constituted structural error requiring reversal).

In the instant case, Petitioner exercised his Sixth Amendment secured-autonomy rights as defined by *McCoy.* First, he chose to testify on his own behalf at trial. There is no evidence in the record that Petitioner's choice to testify on his own behalf was not made knowingly and voluntarily. Secondly, in exercising this autonomy right to testify on his own behalf, he chose to concede the actus reus of the crimes charged, i.e., the shooting of the gun, injuring the victim, in order to claim self-defense. Once Petitioner chose this objective, to concede guilt on the actus reus, he was entitled under the Sixth Amendment to a lawyer who would represent and attempt to further the object of that defense, namely self-defense and accident. *See McCoy*, 138 S. Ct. at 1511.[61] Were Ronis not to further Petitioner's goal of self-defense and accident, but rather present evidence that another person committed the actus reus, such conduct by Ronis would have been a violation of Petitioner's Sixth Amendment right and constituted structural error. The same respect for the individual to decide whether to refuse to plead guilty in the face of overwhelming evidence, or even reject the assistance of legal counsel altogether, also allows criminal defendants the right to set the fundamental objective of their own defense. *Id.* at 1508. Therefore, regardless of the reasonableness of Ronis' conduct in presenting the defense of self-defense and accident at trial, he was obligated under the Sixth Amendment to present this defense since this was the objective and choice of the Petitioner, as evidenced by his decision to testify that he acted in self-defense.

Based on the foregoing, Petitioner has not overcome the presumption that Ronis'

---

[61] The defendant in *McCoy* testified at trial that he did not commit the murders. The Court held that even if he disagreed with the defendant, counsel could not interfere with his defendant telling the jury he was not the murderer. 138 S. Ct. at 1509.

proffered defenses of self-defense and accident were "sound trial strategy" and constituted competent representation. *See Strickland*, 466 U.S. at 689. Neither has Petitioner offered any evidence to show he did not concur with or choose these defenses. Accordingly, Petitioner has failed to meet his burden of proving by a preponderance of the evidence that he is entitled to habeas relief as he has failed to satisfy *Strickland*'s deficiency prong. *See Davis*, 384 F.3d at 638 ("Petitioner carries the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.").

## VII. EVIDENTIARY ISSUES

On March 30, 2018, the parties filed a Joint Exhibit List in which they stipulated to the admission of many proffered exhibits and set forth their arguments regarding contested exhibits. (ECF No. 116.) The parties were ordered to include any further evidentiary objections they had in their post-Hearing briefs. (ECF No. 140 at 9.) Both parties raised no objections to the testimony or exhibits presented other than those raised in their Joint Exhibit List and as outlined in their Joint Statement regarding Exhibit M (ECF No. 154). (*See* ECF No. 152 at 6; ECF No. 157 at 25.)

### A. Stipulated Exhibits

The parties stipulated to a number of exhibits, as set forth below. The following Petitioner's Exhibits are deemed **ADMITTED**:

(1) Exhibit 1: Police Report of Daniel Alatorre's Statement is admitted for the limited purposes of the effect of the report on trial defense counsel Jan Ronis and for impeachment.

(2) Exhibit 2: Police Report of Olivia Addison's Statement is admitted for the limited purposes of the effect of the report on trial defense counsel Jan Ronis and for impeachment.

(3) Exhibit 3: Police Report of Antoinette Gonzalez's Statement is admitted for the limited purposes of the effect of the report on trial defense counsel Jan Ronis and for impeachment.

(4) Exhibit 4: Petitioner's October 23, 2009 Discovery Motion to the California

105

Supreme Court is admitted.

(5) Exhibit 5: Petitioner's July 19, 2009 Motion for Interrogatories in the California Superior Court is admitted.

(6) Exhibit 6: April 17, 2015 email from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(7) Exhibit 7: April 28, 2015 email from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(8) Exhibit 8: May 21, 2015 email from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(9) Exhibit 9: May 21, 2015 email from Petitioner's trial counsel Jan Ronis to Petitioner's counsel Tony Farmani is admitted for the limited purpose of impeachment.

(10) Exhibit 10: May 26, 2015 email from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(11) Exhibit 11: June 5, 2015 email from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(12) Exhibit 12: September 4, 2007 letter from Petitioner's appellate counsel Barbara Smith to Petitioner's trial counsel Jan Ronis is admitted.

(13) Exhibit 13: Declaration of Petitioner's appellate counsel Barbara Smith signed January 23, 2018 is admitted.

(14) Exhibit 14: Reporter's Transcript of Petitioner's January 12, 2007 state court Status Conference Hearing is admitted.

(15)  <u>Exhibit 15</u>: April 10, 2017 email from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(16)  <u>Exhibit 16</u>: April 25, 2017 email from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(17)  <u>Exhibit 17</u>: April 25, 2017 letter from Petitioner's counsel Tony Farmani to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(18)  <u>Exhibit 18</u>: June 26, 2017 email from Respondent's counsel Assistant Attorney General Daniel Rogers to Petitioner's trial counsel Jan Ronis is admitted for the limited purpose of impeachment.

(19)  <u>Exhibit 19</u>: October 12, 2017 email from Petitioner's trial counsel Jan Ronis to Petitioner's counsel Tony Farmani is admitted for the limited purpose of impeachment.

(20)  <u>Exhibit 20</u>: Reporter's Transcript of Prosecution's Rebuttal Argument at Petitioner's trial is admitted.

(21)  <u>Exhibit 21</u>: Reporter's Transcript of Defense's Closing Argument at Petitioner's trial is admitted.

(22)  <u>Exhibit 22</u>: Reporter's Transcript of Prosecution's Closing Argument at Petitioner's trial is admitted.

(23)  <u>Exhibit 23</u>: Excerpts of Reporter's Transcript are admitted.

(24)  <u>Exhibit 24</u>: The Ninth Circuit's Memorandum Decision is admitted.

(25)  <u>Exhibit 25</u>: *Fonseca v. Hall*, 568 F. Supp. 2d 1110 (C.D. Cal 2008) is admitted.

(26)  <u>Exhibit 26</u>: Because of the inconsistent labeling and numbering between the parties' Joint Exhibit List and Petitioner's exhibits provided to the Court, the parties did not stipulate to the admission of what is marked as Exhibit 26, which

is a portion of the Reporter's Transcript of the February 16, 2006 motions in limine hearing prior to Petitioner's state court trial. Regardless, the Transcript of the February 16, 2006 motions in limine hearing is **ADMITTED** as <u>Exhibit 26</u>. *See United States v. Arias*, 575 F.2d 253, 254 (9th Cir. 1978) (holding that a trial transcript is admissible under the Federal Rule of Evidence 803(8)).

(27)   <u>Exhibit 27</u>: December 14, 2017 Declaration of Petitioner's trial counsel Jan Ronis is admitted.[62]

Further, the following Respondent's Exhibits are deemed **ADMITTED**:

(A) <u>Exhibit A</u>: March 12, 2001 Officer's Report of Interview of Miguel Rubio and Silvia Escamilla by Sergeant Shephard is admitted for the limited purposes of effect of the report on Petitioner's trial counsel Jan Ronis and for impeachment.

(B) <u>Exhibit B</u>: March 14, 2001 Detective Follow-up Report by Sergeant Cordero of March 11, 2001 interview of Sylvia Escamilla is admitted for the limited purposes of effect of the of the report on Petitioner's trial counsel Jan Ronis and for impeachment.

(C) <u>Exhibit C</u>: Recording of March 11, 2001 interview of Silvia Escamilla by Sergeant Cordero is admitted for the limited purpose of impeachment.

(D) <u>Exhibit D</u>: Transcript (Spanish) of March 11, 2001 interview of Silvia Escamilla by Sergeant Cordero is admitted for the limited purpose of impeachment.

(E) <u>Exhibit E</u>: Transcript (English) of March 11, 2001 interview of Silvia Escamilla by Sergeant Cordero is admitted for the limited purpose of impeachment.

(I) <u>Exhibit I</u>: Transcript of November 30, 2017 Deposition of Jan Ronis is admitted.

---

[62] On the parties' Joint Exhibit List (ECF No. 116), Petitioner's Exhibit 27 is listed as a search warrant. (*Id.* at 5.) However, the Court was not presented with a copy of a search warrant and it does not appear to have been entered as an exhibit during the Hearing. The declaration of Jan Ronis was marked and admitted during the Evidentiary Hearing as Exhibit 27. (EHRT, vol. 4 at 29:8–31:5.) On the Joint Exhibit List, Ronis' declaration is listed as Exhibit 26. (ECF No. 116 at 5.)

(J) <u>Exhibit J</u>: Transcript of November 30, 2017 Deposition of Juan Lopez is admitted.

(K) <u>Exhibit K</u>: June 5, 2009 Declaration of Silvia Escamilla is admitted.

(L) <u>Exhibit L</u>: Recording of March 10, 2001 interviews of Miguel Rubio and Sylvia Escamilla by Sergeant Shephard is admitted for the limited purpose of impeachment.

(N) <u>Exhibit N</u>: Transcript of March 10, 2001 interview of Miguel Rubio by Sergeant Shephard is admitted for the limited purpose of impeachment.

(O) <u>Exhibit O</u>: Transcript of March 10, 2001 interview of Sylvia Escamilla by Sergeant Shephard is admitted for the limited purpose of impeachment.

(P): <u>Exhibit P</u>: Letters from Petitioner's appellate counsel Barbara Smith to Petitioner, as redacted by the parties and updated by the Court during the Hearing (*see* EHRT, vol. 4 at 4:12–5:14), are admitted for the limited purposes of establishing what Smith saw in Ronis' file regarding another shooter and what Petitioner and Sandy Barajas communicated to her identifying another shooter.

## B. Contested Exhibits

In addition to the Exhibits the parties stipulated to, Petitioner objects to the admission of Respondent's Exhibits F, G, H, and M. (ECF No. 116 at 6–7.)

### a. <u>Exhibits F, G, and H</u>

Exhibits F, G, and H are the detective follow up report, recording, and transcript of Sandy Barajas' March 10, 2001 interview with Sergeant Cordero. Respondent asserts that these exhibits are admissible for purposes of impeachment to the extent that Barajas' statement are inconsistent with Barajas' testimony at the Hearing. Petitioner objects to the admission of these exhibits. He argues that Barajas never testified at the Hearing to anything contrary to her police statement. (ECF No. 116 at 6.)

During Barajas' testimony, she made statements calling into question her ability to speak English at the time she translated and drafted her mother Sylvia Escamilla's 2009 declaration. She stressed repeatedly that English is her second language and while she has

improved, her "English is not the best." (EHRT vol. 1, at 184:11–23, 186:9–13.) She stated her "knowledge of English back then is not what it is today . . . ." (*Id.* at 192:5–7.) Further, in an attempt to overcome the fact that the declaration referred to only a single gun, Barajas stated that it is possible she mistranslated her mother's statements and she intended to say "a" gun instead of "the" gun. (*Id.* at 185:11–18, 190:15–191:14.)

Barajas' interview with Sergeant Cordero shows that Barajas was proficient in English at the time of the shooting, on March 10, 2001, in contradiction to these statements. (*See* Exs. F, G, H.) Accordingly, the Court **ADMITS** Exhibits F, G, and H for the limited purposes of impeachment regarding Barajas' ability to speak English at the time she prepared Escamilla's declaration.

### b. Exhibit M

Respondent introduced all the police reports that Respondent's counsel received from the District Attorney's office in connection with this case as Exhibit M. As set forth in the Joint Exhibit List (ECF 116), the parties did not stipulate to the admission of these reports. Respondent's position is that the reports should be admitted not for their truth, but for the limited purposes of the effect of the reports on Jan Ronis and for impeachment. Petitioner's position is that except for the police reports contained in Petitioner's Exhibits 1, 2 and 3, and Respondent's Exhibits A and B, Ronis was not questioned about other police reports and therefore there is no proof that he reviewed the reports in Exhibit M. (ECF No. 116 at 7.)

On the final day of the hearing, September 14, 2018, a discussion was held regarding these reports. This Court ruled that the reports in Exhibit M would be admitted, subject to a showing that they were turned over to trial counsel. (EHRT, vol. 4 at 62:12–20.) Respondent's counsel agreed to procure a declaration from the District Attorney's office regarding a discovery log or some proof that the file was turned over to trial counsel and Petitioner's counsel said that if the declaration was satisfactory, he would stipulate that what is contained in Exhibit M was the District Attorney's file that was turned over to trial

counsel. (*Id.* at 64:4-25–65:4.)

In the parties Joint Statement Regarding Exhibit M, the parties attach a declaration from James E. Atkins, a Retiree Deputy District Attorney from the San Diego County District Attorney's Office who reviewed the Officer's Case Management System for Petitioner's case. (ECF No. 154 at 6–8.) The Case Management System discovery record shows that "all Bates stamped pages numbered 1 through 333 were made available to, and received by the defense." (*Id.* at 7.) Petitioner argues that because Ronis was not Petitioner's counsel of record until March 10, 2005, there is nothing to show that Ronis took possession of the police reports bates stamped 1 through 288 from prior counsel, as they were received by the defense on February 9, 2005. (*Id.* at 2.)

However, as noted by Respondent, Petitioner's prior counsel was required to return all client papers and property on termination of his representation and upon the request of the client. *See* Rules of Professional Conduct of the State Bar of California Rule 3-700(D)(1) (in effect from 1992 to 2018). Ronis testified numerous times to the fact that he reviewed all police reports in this action. (*See* Ex. I at 13:8–14; EHRT, vol 1 at 126:20–127:1, 131:20–23, 144:9–16; EHRT, vol 3 at 6:6–8, 7:2–4, 26:6–10.) Additionally, Petitioner's appellate counsel testified that based on her review of the police and investigative reports, Escamilla's statements did not exonerate Petitioner. This necessarily shows that Ronis was in possession of Escamilla's statements to police if they were provided to Petitioner's appellate attorney as part of Ronis' case file. (*See* EHRT, vol. 4 at 9:17–10:17.) Escamilla's statements to police are bates stamped 186–187 and 232. (Ex. M at 36–37, 51.) Thus, they were part of the police reports bates stamped 1 through 288 that Petitioner argues Ronis did not receive.

The Court finds that the declaration from James E. Atkins coupled with the information discussed above establishes that the reports contained in Exhibit M were turned over to Ronis. *See* Fed. R. Evid. 104(b) (requiring only "evidence sufficient to support a finding of the fulfillment of the condition" to establish conditional relevancy).

Accordingly, the Court **ADMITS** Exhibit M into evidence not for the truth of the matters asserted, but for purposes of impeachment and for the effect of these reports on Jan Ronis in his preparation of Petitioner's defense at trial.

### C. Miguel Rubio's Declaration

As discussed above in Section VI.B.b., Rubio's declaration (Ex. 28) is inadmissible for the truth of the matters asserted and the parties have failed to proffer an applicable hearsay exception. Rubio did not testify at the Hearing and his statements contained in his declaration were not subject to cross-examination.[63] Accordingly, Rubio's declaration (Ex. 28) is **EXCLUDED** and Petitioner cannot use Rubio's declaration to establish the facts asserted therein.

### VIII. CONCLUSION & RECOMMENDATION

For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) finding Miguel Rubio and Sylvia Escamilla are not credible witnesses; (3) finding trial counsel was not deficient in not interviewing them and not presenting their testimony at trial; (4) finding trial counsel's actions did not constitute ineffective assistance of counsel; and accordingly, (5) denying the Petition.

**IT IS ORDERED** that no later than **February 11, 2020** any party to his action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties by **February 18, 2020.**

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

---

[63] It is also important to note that the declaration is thoroughly impeached by Rubio's prior statement to police, as discussed above. (*See* Exs. L, N.)

**IT IS SO ORDERED.**

Dated:  January 28, 2020

_Hon. Bernard G. Skomal_
United States Magistrate Judge